CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
November 06, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:24-cr-00008 |
| v. | MEMORANDUM OPINION |
| BRIAN LAMONT TURNER, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Defendant Brian Lamont Turner has moved to vacate the no-contact order entered against him on February 20, 2024, Dkt. 31, and subsequently amended on July 17, 2024. Dkt. 173. The Government has also filed a second emergency motion seeking to revoke Defendant's communication privileges, Dkt. 228, due to his repeated violations of court-ordered communication restrictions during his pretrial detention at the Central Virginia Regional Jail ("CVRJ"). This misconduct led the Court to hold Defendant in criminal contempt of its prior orders and impose an appropriate sentence at a hearing on September 19, 2024.  However, the Court noted that the Government's second emergency motion remained under advisement pending its resolution of Defendant's motion to vacate. Dkt. 251.

As discussed more fully below, a district court has inherent authority to protect its proceedings and the administration of justice. Accordingly, the Court will deny the Defendant's motion to vacate. Nevertheless, a complete ban on a criminal defendant's communications with other individuals – even if they are alleged victims or witnesses – requires a consideration of the protected interests at stake and whether the restriction is narrowly tailored with no reasonable

1

alternatives. The parties will be directed to provide further briefing in anticipation of the Court issuing an amended no-contact order to ensure that this analysis occurs for each name that appears on the no-contact order.

Moreover, the enhanced restrictions that the Government proposes in its second emergency motion are currently unnecessary for protecting interests related to the administration of justice, such as shielding victims and witnesses from harassment or attempts to dissuade them from testifying. Thus, for the reasons stated below, the Court will also deny this motion.

## I. BACKGROUND

Defendant faces a multitude of criminal charges related to alleged sex trafficking and prostitution of adult women in various states, including Virginia, North Carolina, and South Carolina. Dkt. 180.[1] As stated in the Second Superseding Indictment, the Government alleges that Defendant "targeted, trafficked, and prostituted adult victims vulnerable to coercion due to their life circumstances or drug addiction issues." *Id*. at 2. The Government alleges that the Defendant controlled and directed his victims by providing and then controlling their access to drugs, posting commercial sex advertisements online, and facilitating their commercial sex acts. *Id*. He allegedly required that the victims provide him with the proceeds – "in whole or in part" – that customers paid for such acts. *Id*.

Since the Government filed its initial criminal complaint in this case and this Court issued an arrest warrant, Dkts. 3 and 4, the Defendant has engaged in troubling conduct that can only be described as defiance of this Court's orders.

---

[1] The 16-count superseding indictment in this case includes charges of conspiracy to commit sex trafficking, 18 U.S.C. § 1594; sex trafficking, 18 U.S.C. § 1591; transporting individuals for purposes of prostitution, 18 U.S.C. § 2421(a); enticement and coercion, 18 U.S.C. § 2422(a); and conspiracy to obstruct the enforcement of 18 U.S.C. § 1591 in violation of 18 U.S.C. §§ 1594(c) and 1591(d).

As recounted in U.S. Magistrate Judge Memmer's Order of Detention Pending Trial, the Defendant resisted arrest during an 18-hour standoff with law enforcement at a residence in Charlottesville:

> The defendant barricaded himself in a residence along with [an adult victim, or "AV"] and a two-year old child. … During the stand-off, defendant made or attempted to contact additional victims/witnesses. Defendant also secreted his phone with AV3 after arrest. Defendant was reported to have attempted to destroy other cell phones in a prior encounter with law enforcement for similar alleged charges.

Dkt. 20 at 3. After a grand jury handed down an indictment of the Defendant on February 14, 2024, Dkt. 22, the Court held an arraignment hearing on February 20, 2024. At that hearing, Judge Memmer considered an oral motion by Government counsel to enter a no-contact order against the Defendant to prohibit him from contacting any and all victims, witnesses, and co-defendants.  Dkt. 31. *See also* Dkt. 50 at 16-17.

In requesting such an order, the Government's counsel alluded to Defendant's prior actions of contacting potential victims and witnesses during his standoff with authorities and offered the following justification:

> the government does have concerns that the defendant may attempt to -- has already attempted to reach out to potential victims, witnesses, co-defendants in this case. So we would ask the Court here today for an oral order essentially reminding him that he is not to have any contact with potential victims, potential witnesses, and potential co-defendants to include, but not be limited to, the following individuals.

Dkt. 50 at 9. The Government's counsel then listed the names of eight individuals. *Id*. During a discussion about whether two particular individuals should be on a no-contact list and what restrictions should apply to them, Government counsel argued that a no-contact order was "the cleanest and simplest way to ensure that there isn't any attempt to interfere with the investigation or obstruct justice or otherwise interfere with those individuals potential[ly] discussing their connection to this case with the government." *Id*. at 13-14.

3

Judge Memmer ultimately granted the Government's motion. Dkt. 50 at 16.  She cited several factors relevant to this decision, including the allegations regarding Defendant contained in an FBI special agent's affidavit attached to the original criminal complaint, Dkt. 3; information produced at the Defendant's preliminary hearing (where an FBI agent testified about law enforcement's investigation into Defendant's alleged sex trafficking activities and the circumstances of Defendant's arrest), Dkt. 46 at 5-35; and representations made at the arraignment hearing. Dkt. 50 at 16.  On the same day, Judge Memmer entered a written order expressly ordering Defendant to "avoid all contact, directly or indirectly, with any person who is or may be a victim, witness, or codefendant in the investigation or prosecution" and included a non-exhaustive list of eight individuals with whom Defendant could have no contact. Dkt. 31. Judge Memmer appropriately filed the no-contact order under seal. *Id*. The Court will generally refrain from using specific names in this Memorandum Opinion because of the sensitive nature of personally identifying information of potential victims and witnesses in a sex trafficking case such as this one.

Despite the entry of the no-contact order, the Defendant proceeded to communicate with individuals on the list. Since the Court's entry of the no-contact order, it has twice found the Defendant in criminal contempt of court for phone calls he made to individuals he was barred from contacting. Dkts. 163 and 251. The Court has also added a ninth name to the no-contact order, Dkt. 173, and partially granted a motion by the Government to restrict the Defendant's communications when the Government produced evidence showing that the Defendant communicated with a prohibited individual just days *after* the Court's first contempt finding. Dkt. 177. In its order on July 17, 2024, the Court revoked the Defendant's telephonic and electronic communication privileges with exceptions to allow for Defendant to communicate

with his mother, brother, daughter, and legal team.[2] *Id.* at 1. Accordingly, the Defendant is currently bound by the no-contact order as well as this Court's subsequent orders.

Nevertheless, two pending motions raise questions about judicial authority to restrict a criminal defendant's communications with potential witnesses and victims prior to trial.

First, the Government filed a "Second Emergency Motion to Revoke Defendant's Communication Privileges." Dkt. 228. Because the Defendant had not ceased his phone calls with prohibited individuals, the Government requested that the Court "immediately revoke the defendant's telephonic and electronic privileges at CVRJ, or at any other institution at which he may be housed during, the pendency of this case, with the exception of attorney communications." *Id.* at 5. The Government's motion described such drastic measures as "[t]he only way to ensure his compliance and protect the victims in this case[.]" *Id.*

For his part, the Defendant conceded that he made the calls at issue in the second emergency motion, but attempted to minimize the significance of the communications. His response brief [3] emphasized that he "has long-standing relationships with both of the individuals called." Dkt. 243 at 1. Moreover, he pointed out that only one of the individuals contacted is alleged to be a victim but that "Mr. Turner did not attempt to engage in any discussion of his case with her" and that "when she brought it up on two of the phone calls, Mr. Turner specifically told her that he didn't want to talk to her about it." *Id.* at 1-2. The Defendant went on to characterize the Government's proposed communication restrictions as "unduly severe, unnecessary, and … cruel and unusual punishment." *Id.* at 3.

---

[2] Defendant may also communicate with the press provided that his attorney sets up and remains on the call. Dkt. 177 at 1.

[3] This brief, Dkt. 243, was filed in response to the Court's order to show cause as to why he should not be held in contempt of court at a September 17, 2024, hearing. However, the response includes arguments that address the Government's second emergency motion.

The second motion is the Defendant's "Motion to Vacate No-Contact Order." Dkt. 244. He contends that this Court lacked the proper authority to issue the original no-contact order on February 20, 2024. *Id*. at 1.  The motion surveys several possible sources of statutory authority for no-contact orders – including the Bail Reform Act and Crime Victims' Rights Act – but concludes that the circumstances of this case do not provide a justification for invoking such statutes. *Id*. at 2-3. While the Defendant acknowledges a line of case law in which courts have utilized their "inherent authority" to issue no-contact orders, he argues that such authority needs to be exercised narrowly and that such an order "must be necessary to prevent harassment, an imminent threat or clear and present danger, or to protect the administration of justice." *Id*. at 4. Defendant suggests that "[h]ere, the conditions that might justify a no-contact order do not exist, and such an order is not warranted under the court's inherent authority." *Id*.

The Government's response raises several arguments in support of the no-contact order.

First, the Government cites Federal Rule of Criminal Procedure 59 for the proposition that because the Defendant had 14 days to seek direct review of the magistrate judge's initial entry of the no-contact order and failed to do so, he should now be barred from seeking further review of the order. Dkt. 252 at 3.

Second, the Government's core argument is that a district court has inherent authority to protect the integrity of its proceedings. This means that a court may "impose restrictions on the parties to protect the sanctity and accuracy of the proceeding, such as guarding it against witness tampering or intimidation." *Id*. at 4.  Here, the Government contends that it was entirely permissible for Judge Memmer to issue the initial no-contact order because at the time she approved it "she had before her a troubling record," including  evidence that the Defendant targeted and manipulated vulnerable women with drug addictions, that he coerced his victims to perform commercial sex acts, and that during the 18-hour standoff with authorities he

6

"communicated with multiple victims to such an extent that several victims arrived on the scene." *Id*. at 252. "Consequently, the magistrate judge needed to craft an order to protect victims and witnesses from undue influence by Turner." *Id*. The Government contends that the dynamics of sex trafficking cases are relevant because victims "may develop feelings of love or loyalty towards their trafficker, blame themselves for their circumstances, develop a lack of trust in law enforcement, and may even forego opportunities to leave their trafficker if an opportunity presents itself." Therefore, traffickers can "maintain control over victims, including through psychological manipulation, such as with a simple phone call" without any overt threats. *Id*. at 5-6.  Thus, the Government contends that "[a] no-contact order covering witnesses and victims, including eight specified individuals, was an appropriate exercise of inherent authority to protect the integrity of the case." *Id*. at 6. The Government further emphasizes that Turner's violations of the no-contact order – particularly, his calls with alleged victims – have bolstered concerns about protecting the integrity of this Court's proceedings. *Id*. at 7-9.  The Government cites to case law that supports inherent authority to issue no-contact orders. *Id*. at 6-7.[4]

Third, the Government argues that the presence of statutory authority to issue no-contact orders under certain circumstances should not be understood to supplant a court's inherent powers. *Id*. at 9. "Although statutes covering pretrial matters like the Bail Reform Act set the framework for bond conditions or detention decisions, they do not oust a court's inherent authority to 'do all that is appropriate to the orderly progress of the trial and the fair

---

[4] A key precedent the Government relies on is *United States v. Morris*, 259 F.3d 894 (7th Cir. 2001), which, as discussed later, this Court also finds to be a persuasive authority on a district court's inherent authority to issue no-contact orders in a pretrial context.

administration of justice.'" *Id*. at 10 (quoting *U.S. ex rel. Brown v. Fogel*, 395 F.2d 291, 293 (4th Cir. 1968).[5]

Finally, the Government rejects Defendant's argument that his First Amendment rights have been violated. The Government analogizes the present circumstances to Supreme Court precedent on prison regulations, which has upheld the validity of regulations that impinge on constitutional rights so long as such regulations are reasonably related to legitimate penological interests. *Id*. at 12 (citing *Turner v. Safley*, 482 U.S. 78 (1987)).[6] The Government contends that the no-contact order reflects a "legitimate and neutral interest in protecting the integrity of these proceedings and Turner's victims," that further restrictions have only been the result of Defendant's own refusal to follow this Court's orders, and that there are no reasonable alternatives that would serve the purposes of protecting victims and the integrity of judicial proceedings. *Id*. at 13. Relatedly, the Government asserts that if the restrictions are lifted, it "would be forced to devote additional, considerable resources to monitor Turner's calls to determine whether he was continuing to attempt to influence these proceedings." *Id*.

Although the parties' briefs discuss statutory bases for issuing no-contact orders, *see* Dkt. 244 at 2-3 and Dkt. 252 at 9-11, the Court does not construe the Government's response to the motion to vacate as arguing that the no-contact order here was issued pursuant to a particular

---

[5] The Court does not read the Defendant's motion to vacate as arguing that statutory authority displaces inherent authority with respect to no-contact orders. To the extent that Defendant believes he has raised this line of argument, the Court rejects it. It is certainly true that "the exercise of an inherent power cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). However, if a statute or rule does not address a particular kind of conduct, the Supreme Court has recognized that inherent power can "fill in the interstices." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). While the statutes that the Defendant addresses in his motion do not directly apply to the exact circumstances of the Defendant, the Court still possess inherent authority to protect the administration of justice. The Court more fully elaborates on its inherent authority in its discussion of the appropriate standard for evaluating challenges to no-contact orders.

[6] The Court does not address arguments suggesting that it turn to precedent on prison regulations to address First Amendment claims because the restrictions on the Defendant's communications arise from the Court's inherent authority. The standard that it adopts – considering whether the conduct would pose a clear and present danger or a serious and imminent threat to a protected competing interest *and* whether the restriction is narrowly drawn with no reasonable alternatives – sufficiently protects the First Amendment rights of a criminal defendant in pretrial detention.

8

statute. Instead, the Court understands the Government's central argument to be that the no-contact order is justified by the inherent authority of courts "to protect the sanctity of the judicial process and the orderly administration of justice." Dkt. 252 at 1. Similarly, the Government's second emergency motion cited "the Court's inherent authority" as a basis to further curtail the Defendant's telephonic and electronic communications. Dkt. 228 at 1.

Accordingly, the Court understands the pending motions to present a common set of questions: *Does the Court have inherent authority to issue communication restrictions, and if so, what is the scope of that authority and do the existing restrictions exceed it?*

Before addressing these questions, the Court must first address a preliminary procedural matter about the Defendant's motion to vacate. It then turns to determining the appropriate standard for evaluating a criminal defendant's challenges to pretrial communication restrictions issued pursuant to a district court's inherent authority and applies that standard to the present circumstances.

## II. RULE 59 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

The Government contends that Federal Rule of Criminal Procedure 59 should preclude the Defendant from seeking further review of the no-contact order issued by Judge Memmer on February 20, 2024 and subsequently amended by this Court. It does not.

Under Rule 59, a party has 14 days to seek a district judge's direct review of a magistrate judge's action on a nondispositive matter. When a party fails to raise an objection in a timely manner, they waive a right to seek such review. Fed. R. Crim. P. 59(a). Because the Defendant failed to raise his objection to the no-contact order within 14 days of its initial entry, the

Government argues that he should now be barred from seeking further review of the order. Dkt. 252 at 3.

The Government correctly notes that this Court relied on Rule 59 in its July 8, 2024 order holding the Defendant in criminal contempt. Dkt. 163. There, the Defendant asserted that the no-contact order was invalid as part of his defense to being held in criminal contempt. The Court rejected this line of argument by noting that Defendant failed to timely file objections to the no-contact order within 14 days of its entry. *Id*. at 5. Thus, the Court held that this argument was foreclosed. *Id*. To allow otherwise in a contempt proceeding would have permitted Defendant to "make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside." *Id*. (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 n.56 (1947)).

Although Rule 59 provides important procedural tools to ensure the prompt review of magistrate judge decisions, a district judge has some flexibility in how he or she reviews the decisions of magistrate judges. Indeed, the Committee Notes to the 2005 adoption of Rule 59 explain that "[d]espite the waiver provisions, the district judge retains the authority to review any magistrate judge's decision or recommendation whether or not objections are timely filed." The notes cite to a pair of Supreme Court decisions for this authority: *Thomas v. Arn*, 474 U.S. 140, 154 (1985) and *Matthews v. Weber*, 423 U.S. 261, 270 –271 (1976).

Here, it is prudent for the Court to exercise its authority to review the propriety of the no-contact order.

First, the order was not solely produced by a magistrate judge. On July 17, 2024, this Court added a new name to the no-contact list, Dkt. 173, after the Government produced evidence showing that even after being held in criminal contempt for contacting prohibited

individuals, the Defendant had instructed a third party "to track down and investigate witnesses and other prohibited individuals in this case." Dkt. 177 at 2. *See also* Dkt. 166 at 3-4 and exs. 2-5 (Government's description and excerpts of phone calls between the Defendant and a third party and the accompanying recordings of these calls). Because a district judge amended the no-contact order, it is unclear if Rule 59 even applies.

Second, the no-contact order and the more general question of what kinds of communication restrictions are appropriate exercises of inherent authority are arguably intertwined with the Government's Second Emergency Motion, which is properly before the Court and requests even *greater* limitations on the Defendant.

Additionally, given that the Defendant now has a well-documented history of violating this Court's no-contact order and communication limitations (which resulted in two criminal contempt convictions), it is entirely possible that such restrictions will continue to be the subject of pretrial litigation in this case. Thus, to provide clarity to the parties and a thorough explanation of what restrictions are consistent with its inherent authority, it is appropriate to address the substantive issues in the motion to vacate.

In sum, Rule 59 does not completely bar the Court from considering the pending motion to vacate.

Next, the Court reviews the case law on inherent authority and articulates the relevant standard for considering the propriety of no-contact orders and similar communication restrictions on a criminal defendant in pretrial detention. A district court has inherent authority to issue no-contact orders but may only do so in response to rare and compelling circumstances.

### III. STANDARD FOR EVALUATING NO-CONTACT ORDERS

The Supreme Court of the United States has long recognized that federal courts possess inherent authority to protect and manage their proceedings. In *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), the Supreme Court articulated a number of general principles related to inherent powers of federal courts:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson*). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn,* 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); see also *Ex parte Robinson,* 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734 (1962).

However, such inherent authority must be exercised with caution. As the Supreme Court has explained, "there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." *Degen v. United States*, 517 U.S. 820, 823 (1996). Thus, "[p]rinciples of deference counsel restraint in resorting to inherent power," and its use must be "a reasonable response to the problems and needs that provoke it." *Id*. at 823-24. "A court's inherent power is limited by the necessity giving rise to its exercise." *Id*. at 829. *See also United States v. Oliver*, 878 F.3d 120, 124-26 (4th Cir. 2017) (summarizing principles related to inherent authority).

Inherent authority has been recognized across a range of circumstances, such as a federal court's ability to vacate a judgment procured by fraud and to dismiss a case when a plaintiff fails to prosecute a lawsuit. *Id*. at 124 (collecting cases affirming federal courts' inherent authority). Although the Supreme Court has indicated that "[a] trial judge indisputably has broad powers to

ensure the orderly and expeditious progress of a trial," *Bitter v. United States*, 389 U.S. 15, 16

(1967) (per curiam), it has not specifically addressed whether a district court possesses inherent

authority to issue no-contact orders. The Fourth Circuit has also not addressed this question. In a

civil case, it held in an unpublished decision that a district court "possessed the inherent power to

take steps to protect the integrity of the judicial process and of the court itself" when the plaintiff

was found to have sent threatening letters to a witness. *Richardson v. Cabarrus County Bd. of

Educ.*, 1998 WL 371999, at *4 (4th Cir. 1998) (per curiam) (unpublished) (citing language from

*United States v. Shaffer Equipment Co.,* 11 F.3d 450, 462 (4th Cir.1993), which stated that "when

a party deceives a court or abuses the process at a level that is utterly inconsistent with the

orderly administration of justice or undermines the integrity of the process, the court has the

inherent power to dismiss the action."). However, this Court is unaware of any Fourth Circuit

precedent which addresses the inherent authority of federal courts to issue no-contact orders

against criminal defendants.

Nevertheless, this Court is not in uncharted territory. Several other federal courts of

appeals have considered whether district courts can issue no-contact orders in a manner

consistent with their inherent authority. Notably, the Ninth and Seventh Circuits have articulated

influential tests to evaluate no-contact orders in the sentencing and pre-trial contexts,

respectively.

In *Wheeler v. United States*, 640 F.3d 1116 (9th Cir. 1981), the Ninth Circuit heard an

appeal in which a district court issued a no-contact order after a defendant was sentenced to 20

years of incarceration for bank robbery. In *Wheeler*, the defendant was accused of harassing a

witness with "several attempts to expose to her family and military superiors certain information

that discredited her." *Id*. at 1118. The harassment continued after trial and the district court issued

an order two weeks after sentencing to bar the defendant from contacting relatives and the employer of the witness by phone or mail. *Id*. In hearing the appeal of the district court's dismissal of a petition to vacate the order, the Ninth Circuit affirmed that a trial court could issue such an order because "a court has the inherent power to protect witnesses." *Id*. at 1123 (citing to *Bitter v. United States*, 389 U.S. 15, 16 (1976) for the proposition that a court has broad powers "to ensure the orderly and expeditious progress of a trial" and to protect the administration of justice). Even though the trial had already concluded, the court explained that by protecting a witness after the trial, it was "encouraging that witness, and other potential witnesses, to come forward and provide information helpful to the implementation of justice." *Id*. at 1123. The Ninth Circuit proceeded to provide a test (based on circuit precedent) for limiting a defendant's communications: (1) "(t)he government in order to sustain the order must show that the activity restrained poses a clear and present danger or a serious and imminent threat to a protected competing interest" and (2) "the restraint must be narrowly drawn and no reasonable alternatives, having a lesser impact on First Amendment freedoms, must be available." *Id*. at 1124 (citing *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978)). The court remanded the case back to the district court for further proceedings. *Id*. at 1126.

In *United States v. Morris*, 259 F.3d 894 (7th Cir. 2001), the Seventh Circuit considered the propriety of a no-contact order in a pre-trial context. There, the defendant had pleaded guilty to traveling in interstate commerce with the intent to engage in a sexual act with a juvenile. As part of its sentence, the court imposed a condition to prohibit the defendant from contacting his victim and her family while he was imprisoned. *Id*. at 897. The court added this condition to the defendant's sentence because the prosecution provided evidence that the defendant had "persisted in contacting his victim by calling her home, asking his friends to relay messages to

her, and writing her a letter." *Id*.  In his appeal, the defendant argued that the district court exceeded its sentencing authority by adding the no-contact condition. *Id*. at 900. The Seventh Circuit noted that the order should be analyzed as being in a *pre-trial* context because the defendant wanted to withdraw his plea, which, in turn, created the possibility of a future trial. *Id*. at 901. Citing to *Wheeler*, the *Morris* court held that a court has inherent authority to protect the administration of justice from "abuses, oppression, and injustice" and that such power must be exercised with caution. *Id*. at 900. The Seventh Circuit noted that no-contact orders should only be used in "rare and compelling circumstances" and explained why the facts in *Morris* constituted such circumstances:

> [B]ecause Morris is endeavoring to withdraw his guilty plea, a future trial is possible and the victim would be a most important witness for the prosecution. Morris has perpetuated his harmful influence in the victim's life by persistently contacting her indirectly by relaying messages through his friends, and directly by telephone and a letter. The purpose of all Morris's communications has been to prolong his presence in the victim's life and to insistently communicate his desire to have an intimate relationship with her in the future, the very type of contact for which he was incarcerated. The victim is particularly vulnerable because she is a child. The purpose of the no-contact restriction is not to punish Morris, but to protect his victim and her family from further harassment, and reduce the possibility of creating a reluctant witness.

*Id*. at 901. Although the Court remanded the case so that the district court could determine whether the defendant could withdraw his plea due to erroneous advice he claimed to have received from his attorney, it affirmed the no-contact order. *Id*.

The Tenth and Third Circuits have also addressed no-contact orders.[7]

---

[7] The Fifth Circuit heard an appeal involving a district court's imposition of a no-contact order as part of a sentence for a defendant convicted of enticing a minor to engage in sexual activity. However, the appellate court did not resolve the legal question of whether a district court has inherent power to issue such an order. *United States v. Darwish*, 755 Fed. Appx. 359 (5th Cir. 2018). The district court barred the defendant, Darwish, from contacting the victim or her family members during his incarceration and he appealed. *Id*. at 360. Although the Fifth Circuit acknowledged the *Morris* and *Wheeler* lines of case law that affirmed no-contact orders intended to protect the administration of justice, it noted that the district court in Darwish's case did not cite administration of justice concerns, such as witness tampering, when it imposed the no-contact order. Instead, "the no-contact condition was to allow the victim to mature prior to making the decision to engage in contact with Darwish." *Id*. at 363. This did not implicate concerns about administration of justice. *Id*. The Fifth Circuit noted, however, that the because the district

In *United States v. Grigsby*, 737 Fed.Appx. 375 (10th Cir. 2018), the Tenth Circuit heard the appeal of a federal prisoner convicted on child pornography charges who was barred from contacting his two children (one of whom was a victim) as a condition of his sentence. After participating in "psychological, vocational, and religious programs" in prison, he requested that the court modify the no-contact condition to allow him to communicate with his children. *Id*. at 376-77. The district court denied the motion and Grigsby appealed. The court cited favorably to *Morris* and affirmed the denial of Grigsby's request to modify the no-contact order. *Id*. at 377-78. The Tenth Circuit explained that the district court did not abuse its discretion because the severity of the underlying crimes meant that "it was reasonable for the district court to require more concrete evidence that contact between Grigsby and his children would be in the children's best interest before modifying the no-contact order." *Id*. at 378. Nevertheless, the decision did not provide a clear standard that district courts should use in evaluating no-contact orders. *See United States v. Paquin*, 676 F.Supp.3d 970, 975-76 (D. N.M. 2021) (summarizing the *Grigsby* decision and acknowledging that the Tenth Circuit lacked a controlling standard to assess challenges to no-contact orders).

More recently, the Third Circuit rejected the use of inherent authority to impose no-contact orders as part of a sentence but seemed to endorse the use of such orders in the pre-trial context. *United States v. Santos Diaz*, 66 F.4th 435 (3d Cir. 2023). In *Santos Diaz*, a district court imposed a no-contact order as a condition of a sentence and period of supervised release at a supervised release violation hearing. *Id*. at 440-41. One of the violations of supervised release arose from a domestic violence incident between the defendant and a woman who became the subject of the no-contact restrictions. *Id*. at 441. After the defendant moved for the district court

court had not considered in the first instance whether it had inherent authority to impose a no-contact condition as part of the sentence, it was appropriate to vacate the restriction and remand the case back to the trial court. *Id*. Thus, the Fifth Circuit did not weigh in on the scope of a district court's inherent authority.

to correct his sentence by eliminating the no-contact order, the court rejected the motion on inherent authority grounds because it found the order to be necessary to protect the woman as a victim and to halt witness tampering. *Id*. On appeal, the Third Circuit affirmed the statutory authority of the court to issue a no-contact order as a condition of supervised release and found that the condition was narrowly tailored such that it did not impermissibly restrict the defendant's First Amendment rights. *Id*. at 448-50. Still, the Third Circuit held that the district court lacked both statutory and inherent authority to impose a no-contact order as a condition of incarceration. *Id*. at 442-47. Relevant here, the appellate court rejected the application of *Wheeler*'s reasoning – protecting the administration of justice – out of concern that the concept is inexact and overly broad. It explained that "[i]f such an exercise of inherent authority were allowed, a district court could use the justification of 'administration of justice' to impose many different types of punishment that are not provided for by federal statute." *Id*. at 446. The court also noted that because this case was in the post-trial context, there were no facts that indicated inherent authority was necessary "to continue the operations of the court" or otherwise protect its proceedings. *Id*.

Even though the Third Circuit declined to adopt *Wheeler*'s rationale for exercising inherent authority to restrict a defendant's communications after trial, it did seem to characterize the *Morris* decision – which applied to a defendant whose case was in a pre-trial posture – as a proper exercise of inherent authority. In distinguishing the facts before it from those in *Morris*, the Third Circuit noted that in *Morris* there was still the possibility that the victim's testimony would be needed at a future trial and "[a]ny contact between defendant and victim would then impede her ability to potentially testify." *Id*. at 447. By contrast, a similar risk was simply absent in the Third Circuit's case because the relevant proceedings had concluded. "There was no longer

a risk of Santos Diaz unduly influencing [the woman who was the subject of the no-contact order] to be a 'reluctant witness' because there was no future proceedings where [she] would be called to testify." *Id*. If the case had been one where the woman could have testified, then the Third Circuit explained that "[t]he court there could separately impose a no-contact order under the pre-trial posture." *Id*.

Federal district courts outside the Ninth and Seventh Circuits have since applied or relied on *Wheeler* and *Morris* in decisions that evaluate the propriety of no-contact orders. *See United States v. Potter*, 2020 WL 6081894, at *3 (D. V.I. Oct. 15, 2020) (citing an Alaska state court case that relied on *Wheeler* for the proposition that courts have inherent authority to protect witnesses and victims that arises from the powers of a trial judge to ensure the orderly progress of a trial); *United States v. Paquin*, 676 F.Supp.3d 970, 976-78 (D. N.M. 2021) (applying *Wheeler* in evaluating a pretrial no-contact order); *United States v. Herrera*, 2023 WL 2528288, at *3 (N.D. Iowa Mar. 15, 2023) (favorably citing *Morris* in evaluating government's motion for a pretrial no-contact order after the defendant engaged in contacts with a minor victim that "amount to a significant interference with the administration of justice.").

To be sure, there are legitimate critiques of exercising inherent authority to issue no-contact orders in the post-trial setting, particularly the risk of improperly imposed punishments that are not otherwise provided for in statutes. *United States v. Santos Diaz*, 66 F.4th 435, 446 (3d Cir. 2023) Still, even the Third Circuit – which expressed strong skepticism of no-contact orders justified by inherent authority in *Santos Diaz*, 66 F.4th at 443-47 – has recognized that inherent powers can be appropriately exercised in pretrial contexts to protect witnesses and the administration of justice. *Id*. at 447.

*Morris* is particularly instructive because it features facts somewhat analogous to those in this case. In *Morris*, the defendant was accused of sexual offenses involving a juvenile and evidence showed that while imprisoned the defendant had contacted the vulnerable minor victim both directly (calling her home and writing her a letter) and indirectly (through friends). *Morris*, 259 F.3d at 896-97. Here, the Government argues that at least some of the alleged victims are vulnerable individuals who are addicted to drugs and has presented evidence in the prior contempt proceedings to show that the Defendant has attempted to contact alleged victims and witnesses directly (via phone calls during pretrial detention in the CVRJ), indirectly (through third parties), or some combination of both (such as by dialing a permissible contact, who would then initiate a three-way call with a prohibited party). Moreover, in *Morris*, the Third Circuit expressed concern that "[t]he purpose of all Morris's communications has been to prolong his presence in the victim's life and to insistently communicate his desire to have an intimate with her in the future, the very type of contact for which he was incarcerated." *Morris*, 259 F.3d at 901. Accordingly, the Third Circuit explained that "[t]he purpose of the no-contact restriction is not to punish Morris, but to protect his victim and her family from further harassment, and reduce the possibility of creating a reluctant witness." *Id*. The Government draws similar comparisons between *Morris* and this case in its response to the motion to vacate. Dkt. 252 at 7. *See also* Dkt. 228 at 5 (Government's argument in second emergency motion that restricting Defendant's communications is the "only way to ensure his compliance [with the Court's orders] and protect the victims in this case[.]").

Considering the absence of binding Fourth Circuit case law on this issue and the concerns in this case regarding the Defendant's communications – those related to protecting potential victims and witnesses from harassment and undue influence, as well as more general concerns

19

about the administration of justice – the Court finds *Wheeler* and *Morris* provide the relevant standard for assessing pretrial communication restrictions issued pursuant to a district court's inherent authority to protect the administration of justice. Accordingly, the Court will evaluate the challenge to the no-contact order (and the Government's request for even further restrictions) under the two-prong test in *Wheeler*. That is, (1) the Government "must show that the activity restrained poses a clear and present danger or a serious and imminent threat to a protected competing interest" and (2) "the restraint must be narrowly drawn and no reasonable alternatives, having a lesser impact on First Amendment freedoms, must be available." *Wheeler*, 640 F.2d at 1124. A protected competing interest can include those which the *Morris* court found sufficient to merit a pretrial no-contact order: protecting victims from harassment and reducing the possibility of reluctant witnesses. *Morris*, 259 F.3d at 901. Nevertheless, a district court's inherent authority is limited. It must adhere to the Supreme Court's instruction that "the exercise of an inherent power must be a 'reasonable response to the problems and needs' confronting the court's fair administration of justice." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (quoting *Degen v. United States,* 517 U.S. 820, 823–824 (1996)). No-contact orders and similar communication restrictions "must be reserved for rare and compelling circumstances." *Morris*, 259 F.3d at 901.


## IV. ANALYSIS OF THE NO-CONTACT ORDER AND PROPOSED COMMUNICATION RESTRICTIONS

The Court now considers its inherent authority to impose communication restrictions on the Defendant, specifically the restrictions on telephonic and electronic communications that the Court issued on July 17, 2024, as well as the no-contact order that bars contact with victims, witnesses, and co-defendants. It also addresses the Government's proposed enhancement of the existing limitations.

**A. Communication restrictions issued July 17, 2024**

In the two prior contempt proceedings, as well as in its emergency motions and response to the motion to vacate, the Government presented considerable evidence that the Defendant's conduct threatens the administration of justice. Recordings from the CVRJ show that the Defendant has reached out to several alleged victims, even going so far as to talk with one alleged victim about her grand jury testimony and to instruct a third party to track down individuals who he was barred from contacting. Dkt. 177 (citing Dkt. 166 (Exhibits 2 through 6)). He also utilized other inmates' PIN numbers to circumvent court-ordered communication restrictions and call prohibited individuals. Dkt. 251 at 4.  Like the communications at issue in *Morris*, this kind of conduct raises the specter of harassment and "creating a reluctant witness." *Morris*, 259 F.3d at 901.

Given these facts, the Court finds that the restrictions it imposed in its July 17, 2024 order – which limited the Defendant's telephonic and electronic communication privileges except as to his legal team, mother, brother, daughter, and the press (under certain circumstances) – were a reasonable exercise of inherent authority to respond to a serious and imminent threat that the Defendant has posed to the administration of justice. This response was "narrowly drawn" to protect the Defendant's First Amendment rights. *Wheeler*, 640 F.2d at 1124.

More specifically, the Court had compelling reasons to issue its restrictions because Defendant brazenly defied the Court's orders – even after his first criminal contempt conviction. Defendant persuaded third parties to place three-way phone calls to and track down prohibited individuals was also quite troubling. *Id*. at 1-2. The Court's restrictions were targeted at a specific medium of communication (telephonic and electronic) because this was the only way to limit his efforts at contacting prohibited individuals in contravention of this Court's orders. Such

restrictions on the Defendant, however, are not intended to punish him as he has alleged at various points.[8] Instead, they are reasonably related to legitimate, competing interests of protecting victims, witnesses, and the judicial process. These more expansive restrictions became necessary only because of the Defendant's own misconduct and deception.

The Court further notes that the restrictions were narrower than what the Government proposed. The Defendant can still telephonically and electronically contact a few close family members, his legal team, and the press. Dkt. 177. He may also exchange letters with and receive visits from friends, family, and anyone else not on the no-contact list. *Id*. at 3 n.5. Admittedly, these are not the easiest means of staying in touch with loved ones – but they are alternative channels of communication that have remained wide open. Given the circumstances preceding the July 17, 2024 order, there was simply no other reasonable approach available that would have had a "lesser impact on [the Defendant's] First Amendment freedoms." *Wheeler*, 640 F.2d at 1124.

Thus, to the extent that the Defendant challenges restrictions imposed on July 17, 2024, the Court rejects such arguments and finds that the restrictions were consistent with this Court's "inherent authority to protect [its] proceedings and judgments in the course of discharging [its] traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996). They were issued to curtail the Defendant's efforts to use telephonic and electronic communications to engage in

---

[8] The Defendant previously raised similar arguments about improper punishment with respect to the Government's first emergency motion to revoke communication privileges. The Court addressed those arguments in its July 17, 2024 order. The Court's analysis in that order also applies here:

> Defendant also contends that restricting his communication privileges "imposes impermissible punishment" on him. Dkt. 170 at 8; *see also Bell v. Wolfish*, 441 U.S. 520, 537 (1979) (distinguishing "between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may"). No doubt, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell*, 441 U.S. at 535. But here, the Court is not seeking to punish Defendant. Rather, because he has repeatedly contacted prohibited individuals in this case, the Court believes that the above communication restrictions are "reasonably related to a legitimate goal"—i.e., protecting victims, witnesses, and the judicial process. *Id.* at 538.

Dkt. 177 at 3 n.3.

further defiance of this Court's orders and to protect the administration of justice. The restrictions remain necessary considering the misconduct that led to the Defendant's second criminal contempt conviction – calling prohibited individuals and improperly using other inmates' PIN numbers to place the calls. Dkt. 251 at 6-7. These limitations remain firmly in place.

### B. No-contact order and the Government's proposed restrictions

Even so, the Court must ensure that any other restrictions are also within the limited scope of its inherent authority. The no-contact order, other existing limitations, and the Government's proposed limitations overlap, so it is critical to distinguish them. The no-contact order, Dkt. 31, goes beyond the July 17, 2024 restrictions because it amounts to a *total ban* on communication with regard to potential victims, witnesses, and co-defendants. In other words, the Defendant cannot engage in any telephonic, electronic, mail, or in-person communication with those who are the subjects of the no-contact order. The Government's proposed restrictions in its second emergency motion, Dkt. 228, would block the Defendant's telephonic and electronic communications with anyone who is not his legal counsel (though presumably would leave open mail communication and in-person visitation with anyone who is not on the no-contact list). Compared to the July 17, 2024 order, this would have the effect of removing the Defendant's family and the press from his authorized list of contacts. As discussed in more detail below, neither group of restrictions at issue – the no-contact order and the Government's proposed restrictions – meets the *Wheeler*/*Morris* standard.

### *1. No-contact order*

Regarding the no-contact order, there is not enough information in the record to determine if the existing no-contact order meets the *Wheeler/Morris* standard. The case law on no-contact orders suggests that a total ban on a defendant's contact with a specific individual is often based on an assessment of harassment, witness tampering, and other obstruction issues (or the credible risk thereof) arising from the circumstances of the defendant's relationship with the individual. Here, however, the record does not show that this kind of analysis occurred at the time the no-contact order was issued.

When the Government requested Judge Memmer enter the no-contact order, it seems to have been working with limited information.  The Government asked the Court to enter an order that included a non-exhaustive list of eight individuals who may be connected to the case as "*potential* victims, *potential* witnesses, and *potential* co-defendants[.]" Dkt. 50 (emphasis added). In discussing two names proposed for the list, the Government's counsel further stated that authorities believed the people were "connected to the case and may be *potential* victims or co-conspirators." *Id*. at 13 (emphasis added). The no-contact order later included broad language, barring the Defendant from "all contact, directly or indirectly, with any person who is *or may be* a victim, witness or co-defendant in the investigation or prosecution." Dkt. 31 (emphasis added). This was in addition to the list of eight names. *Id*. The Court notes that there was not an individualized determination of what circumstances merited each name's appearance on the no-contact list. At this point in time, the Court expects that the Government has a better understanding of whether the individuals on the no-contact list are, in fact, people who are alleged victims, witnesses, or co-defendants. The Court cannot proceed with the two-step *Wheeler*/*Morris* analysis for such a severe limitation on the Defendant's communications unless

24

it has more information about why each individual's name should be subject to a no-contact order.

To be sure, the prior contempt hearings brought to light several troubling communications between alleged victims and the Defendant that would certainly justify these alleged victims' inclusion on a no-contact order. Although the Court has found that the interactions between the Defendant and several alleged victims has provided sufficient grounds to find the Defendant in contempt of this Court's orders, the Court is presently concerned about the propriety of the no-contact order itself. The Court anticipates that the Government would argue that the nature of the charged offenses in this sex trafficking case inherently merit the inclusion of all potential victims on a no-contact list because of the subtle ways that an accused trafficker may influence his victims. *See* Dkt. 252 at 5. However, an *individualized assessment* of the appropriateness of a no-contact order is a necessary step in determining whether to completely bar the Defendant from communicating with a particular individual. The parties will accordingly be directed to provide further briefing on this matter.

### 2. The Government's proposed restrictions

As noted above, the Government has requested that the Defendant be barred from telephonic and electronic communication with the exception of communicating with his attorney. Dkt. 228 at 5. A significant result of this proposed restriction is that it would cut off an important means of communication with his family.

The most recent instances of the Defendant defying this Court's orders involved him using other inmates' PIN numbers to avoid detection and this is certainly a serious matter.

However, the Defendant was held accountable for his misconduct through a new criminal contempt conviction.

It is unclear how removing the Defendant's communication with his close family members will further the interest of protecting victims and witnesses (provided that his family is not assisting him in indirectly contacting such individuals). Thus, this proposed restriction fails to meet the first prong of the *Wheeler*/*Morris* standard.

Although the Court will not, at this time, adopt a blanket ban on *all* telephonic and electronic communications except for his legal counsel, there are mechanisms available to ensure that Defendant follows this Court's orders. Notably, the Government can request that this Court hold Defendant in contempt if he engages in further violations of court orders. Prosecutors can also pursue obstruction of justice charges if the circumstances and evidence support such action.

<u>CONCLUSION</u>

The Court has inherent authority to restrict the Defendant's communications – including through the issuance of a no-contact order – for the purpose of protecting the administration of justice. *See Wheeler v. United States*, 640 F.3d 1116, 1122-25 (1981); *United States v. Morris*, 259 F.3d 894, 900-01 (7th Cir. 2001). It will **DENY** the Defendant's motion to vacate the no-contact order, Dkt. 244, to the extent that the motion contends that the Court lacks such inherent authority. But, as explained above, the Court does not view the enhanced restrictions proposed in the Government's second emergency motion to revoke Defendant's communication privileges, Dkt. 228, as necessary at this time. The Court will **DENY** the Government's motion.

Nevertheless, the Court intends to amend its no-contact order - what is, in essence, a complete ban on communication - to only apply to specific, identified individuals. This will

26

ensure that such a maximum restraint on the Defendant's communications (1) is based on a showing that communication between the Defendant and the prohibited individual would pose "a clear and present danger or a serious and imminent threat to a protected competing interest" and (2) is narrowly drawn with no reasonable alternatives to have a lesser impact on First Amendment freedoms. *Wheeler*, 640 F.2d at 1124. The Court notes that protected competing interests in this context should relate to the administration of justice – including protecting alleged victims from harassment and curtailing efforts to create reluctant witnesses. *See Morris*, 259 F.3d at 901.

The parties are **DIRECTED** to provide further briefing as follows: the Government shall provide a sealed list of proposed names for the Court's no-contact order and any relevant arguments and evidence supporting an individual's inclusion on the no-contact order by **5:00 P.M. EST on November 15, 2024**. The Defendant shall have until **5:00 P.M. EST on November 22, 2024** to file any objections to the inclusion of an individual's name on the no-contact list.[9]

The existing no-contact order, Dkt. 31, will remain in place until the Court issues its amended no-contact order.

An appropriate Order will accompany this Memorandum Opinion.

Entered this 6th day of November, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[9] The Court anticipates that most of the filings related to the amended no-contact order will be sealed because they may include personal identifiable information or other identifying details about alleged victims. The Court reminds the parties that any public filings must refrain from disclosing full names and other PII. *See* Dkt. 175.