CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
January 27, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA,

v.

BRIAN LAMONT TURNER,

*Defendant.*

CASE NO. 3:24-cr-00008

**MEMORANDUM OPINION**

JUDGE NORMAN K. MOON

The Government has submitted a list of 11 names to be included on an amended no-contact order in this sex trafficking case. After considering the parties' briefing on this matter and the existing record, the Court concludes that a no-contact order is necessary for 10 of the proposed names: all the alleged victims and a third party. Because a narrowly tailored no-contact order adequately addresses credible concerns about how Defendant Brian Lamont Turner's outreach to these individuals could undermine the administration of justice, the Court will vacate other existing communication restrictions.

## I. PROCEDURAL BACKGROUND AND LEGAL STANDARDS

The Defendant's communications with alleged victims and other individuals during his pretrial detention at the Central Virginia Regional Jail has been the subject of much pretrial litigation. Despite the existence of a no-contact order and other restrictions on his telephonic and electronic communications with individuals outside the jail, the Defendant violated this Court's orders multiple times and has now been twice convicted for criminal contempt of court. Dkts. 163, 251.

The Defendant previously moved to vacate the no-contact order entered against him on February 20, 2024, Dkt. 31, and subsequently amended on July 17, 2024. Dkt. 173. Because a district court has inherent authority to protect its own proceedings and the administration of justice, the Court denied the Defendant's motion. Dkts. 258, 259. Still, the Court acknowledged in a Memorandum Opinion issued November 6, 2024, Dkt. 258, that a total ban on a defendant's communications with another individual requires a consideration of the protected interests at stake and whether the restriction is narrowly tailored with no reasonable alternatives.

As discussed at length in the Memorandum Opinion, the Court concluded that *Wheeler v. United States*, 640 F.2d 1116 (9th Cir. 1981) and *United States v. Morris*, 259 F.3d 894, 900-01 (7th Cir. 2001) articulated the proper legal standards for evaluating a no-contact order. More specifically, a no-contact order should be (1) based on a showing that communication between the Defendant and the prohibited individual would pose "a clear and present danger or a serious and imminent threat to a protected competing interest" and (2) narrowly drawn with no reasonable alternatives to have a lesser impact on First Amendment freedoms. *Wheeler*, 640 F.2d at 1124. The administration of justice – particularly, the need to shield alleged victims from harassment and curtail efforts to create reluctant witnesses – is a protected competing interest. *See Morris*, 259 F.3d at 901. To ensure that the *Wheeler-Morris* standards informed each name's inclusion on the Court's no-contact order, the Court directed the Government to provide a list of proposed names for an amended order and for the parties to submit further briefing on whether a no-contact order is necessary for each individual. Dkt. 258 at 27.

The Government's brief in support of including specific individuals on the no-contact order largely relies on recorded phone calls at issue in prior contempt proceedings, as well as a sworn declaration by FBI Special Agent Mary G. Echols ("SA Echols") about each individual's

2

alleged experiences with the Defendant and representations made by the individuals to law enforcement. Dkt. 264. The Defendant, meanwhile, points to omissions in SA Echols's declaration by highlighting inconsistent statements made by the proposed subjects of the no-contact order. Dkt. 266. He also asks the Court to hold an evidentiary hearing so that his counsel may confront and cross examine SA Echols as an expert witness. *Id*. at 7-8.

At the outset, it is critical to note that a no-contact order is *not* an adjudication of the Defendant's guilt of a charged criminal offense, nor is it a punishment. *See Morris*, 259 F.3d at 901 ("The purpose of the no-contact restriction is not to punish Morris, but to protect his victim and her family from further harassment, and reduce the possibility of creating a reluctant witness."). A no-contact order is a restriction that protects the integrity of judicial proceedings and the safety of witnesses and alleged victims. More specifically, it reflects an assessment of two criteria. First, the no-contact order is only necessary if the Government has produced evidence showing a "clear and present danger or a serious and imminent threat to a protected competing interest." *Wheeler*, 640 F.2d at 1124.  Second, the Court must consider whether a restriction is narrowly tailored and protects a defendant's First Amendment rights to the greatest extent possible. *Id*.

While the limited case law on no-contact orders is unclear on when evidentiary hearings are required for a court to bar certain communications while a defendant is in pretrial detention, such a hearing is unnecessary here because the facts most relevant to the propriety of a no-contact order are uncontested. To be sure, several of the Defendant's objections to the inclusion of certain individuals on a no-contact order focus on the credibility of SA Echols's declaration, calling into question whether it adequately presents the perspectives of various alleged victims based on statements that the declaration omits and what appear to be inconsistent statements that

some alleged victims have made over time.  But key evidence – including the Defendant's
recorded phone calls - was already the subject of prior hearings at which the Defendant had an
opportunity to cross examine witnesses and present evidence. Additionally, even if some of the
alleged victims have made contradictory statements over time, the fact remains that some of
them have expressed fears of the Defendant contacting them. In sum, further proceedings on the
no-contact order are not necessary to protect the Defendant's due process rights or to aid the
Court in its decisional process.

## II. Names To Be Included on an Amended No-Contact Order

### A. Adult Victim 1 ("AV1")

AV1[1] is an alleged victim of the offenses in Counts Two, Six, Eight, Ten, and Fifteen of
the Third Superseding Indictment. Dkt. 297 at ¶¶ 8-9, 16-17, 22-25, 34-35. The Defendant is
specifically accused of sex trafficking in violation of 18 U.S.C. §§ 1591, 1594(a); transporting
individuals for purposes of prostitution in violation of 18 U.S.C. § 2421(a); and enticement and
coercion in violation of 18 U.S.C. § 2422(a). *Id*. The conduct giving rise to the charges allegedly
occurred between December 2021 and November 2023. *Id*. at ¶¶ 8, 16, 20, 24, 34.

 SA Echols's declaration states that after being contacted by the Government about this
case, AV1 informed the Defendant in August 2023 that he was under investigation and that she
did so because she felt like she owed it to him. Dkt. 264-1 at ¶ 13. AV1 also reportedly
"expressed concern about [the Defendant] finding out that [she] talked to the FBI." *Id*.
Nevertheless, the Defendant points to sworn testimony from AV1 from August 9, 2023, in which

---

[1] The parties are prohibited from using the alleged victims' full names in unsealed filings and must refer to the
alleged victims by their assigned Adult Victim numbers in pre-trial proceedings. Dkt. 175. This opinion also utilizes
the relevant adult victim numbers.

AV1 stated that the Defendant had not been violent with her in the past and that he had never threatened her, nor controlled her. Dkt. 266 at 8-9.

During pretrial detention, the Defendant told a third party – Breezie Mills – to locate AV1 on social media. The Government characterizes this as an "attempt to contact AV1 regarding this case." Dkt. 264 at 7-8. The Defendant notes that the calls indicate that the Defendant instructed Ms. Mills to not contact the witnesses; instead, he wanted Ms. Mills to locate their social media presence and share the information with his attorney. Dkt. 266 at 9 (citing Dkt. 166 (Ex. 2) at 5:25-5:38). Even so, the Court does not place too much weight on this instruction because, as explained below, Ms. Mills' statements on the recorded calls indicate that she contacted one of the other alleged victims and followed one of the alleged victim's family members on social media. Ms. Mills' conduct was not confined to passively collecting information from the internet.

The Court finds that there is a significant risk that the Defendant could attempt to interfere with AV1's role as a witness. Based on all the circumstances – including the Defendant's instruction to Ms. Mills to locate AV1, Ms. Mills' conduct regarding other alleged victims, and the Defendant's history of contacting other alleged victims, including one with whom he discussed grand jury testimony (AV2) – the Defendant poses a clear and present danger to the administration of justice. Accordingly, AV1's inclusion on a no-contact order is necessary because no lesser restriction would sufficiently shield AV1 from harassment or other efforts to dissuade her from providing truthful testimony.

## B. Adult Victim 2 ("AV2")

AV2 is an alleged victim of the offenses in Counts Three, Six, Seven, and Eleven of the Third Superseding Indictment. Dkt. 297 at ¶¶ 10-11, 16-19, 26-27. The grand jury charged the

Defendant in these counts with sex trafficking in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), 1594(a); transporting individuals for purposes of prostitution in violation of 18 U.S.C. § 2421(a); and enticement and coercion in violation of 18 U.S.C. § 2422(a). *Id.* The underlying conduct allegedly occurred between March and July of 2023. *Id.* at ¶¶ 10, 16, 18, 26.

SA Echols informs the Court that on October 17, 2024, AV2 expressed concern to the FBI about the Defendant calling her. She was "uncomfortable and did not want to talk to [the Defendant]." Dkt. 264-1 at ¶ 23. The Defendant casts doubt on the significance of these concerns by noting that AV2 "was in custody on that date and has been continuously in custody since at least October 15, 2024," so the Defendant cannot call her. Dkt. 266 at 10. Moreover, AV2 "recently told a member of the defense team that she feels the government is 'trying to blackmail' her and 'make her a victim' when she does not feel she is one." *Id.* The Defendant also emphasizes that AV2 testified under oath on February 14, 2024 that the Defendant was not violent toward her and she never felt like he was going to harm her. *Id.* at 9-10.

Regardless of how AV2 previously or currently feels about the Defendant, a phone call that the Defendant made to AV2 in July 2024 provides sufficient reason to impose a no-contact order. On that call, the Defendant complained to AV2 about her grand jury testimony: "I've seen the Grand Jury talking about … me making you do this and taking your money." Dkt. 166 (Ex. 6 at 2:45-3:00). AV2 defended herself, saying, "I never told them nothing bad about you." *Id.* at 2:58-3:02. The Defendant responded: "You didn't say nothing bad but you ain't say nothing good either! And I'm reading that shit and I'm like 'Yo! Ain't no way she said this shit!'" *Id.* at 3:05-3:16. AV2 repeated that she had never said anything bad about the Defendant. *Id.* at 3:23-3:26. She later reiterated that she "never was trying to make [the Defendant] look bad" and "wasn't trying to be a snitch." *Id.* at 7:44-7:56.

6

Later in the call, the Defendant referenced another portion of AV2's testimony: "You even said it in the grand jury. You've never felt scared of me. I've never done nothing towards you." *Id*. at 9:06-9:14. But he then seemed to blame her testimony for his charges, telling her that "the way they came off of what you said, they charged me like I was doing everything wrong to you." *Id*. at 9:14-20. "In the grand jury, you said it didn't happen. … You said you didn't say nothing bad towards me. But what they did was, they charged me like you did, and then put you in my indictment like you were saying that shit." *Id*. 9:25-9:44. AV2 told the Defendant that she would "never … say that shit." *Id*. at 9:46-9:49.

Throughout the conversation, the Defendant advised AV2 that the Government was trying to play "dirty" in this case, *id*. at 1:30-1:33, and was attempting to manipulate her. *Id*. at 7:07-7:10 ("They are lying to you about this shit and how they got you."); 12:10-12:32 (saying that he had seen interviews from AV2 where authorities allegedly tried to trick and mislead her).

To be sure, the Defendant did not expressly instruct AV2 to not cooperate with investigators or to change her testimony. He also repeatedly told AV2 that he had no "ill will" toward her, *id*. at 1:27-1:29; 5:19-5:21; 5:52-5:55, and he advised her to talk to his lawyer. *Id*. at 4:52-4:56; 6:21-6:25; 10:22-26; 12:55-12:58. Nevertheless, when taken together, the Defendant's specific references to AV2's grand jury testimony, his express disdain for what she said (or failed to say), his allegations that the Government was misleading AV2, and AV2's defensiveness on the call all point toward a reasonable inference: the Defendant was monitoring AV2's statements and she needed to watch what she said. Concerns about creating a reluctant witness are further bolstered by statements that Ms. Mills made on one of the calls with the Defendant, in which she reads aloud a text message that she reported sending to AV2 about her testimony**.** Dkt. 166 (Ex. 5) at 4:19-4:37. ("I need to know what exactly is going on with [the Defendant's] case, as far as

you are concerned, if you are testifying or not and if so what all is being said.") Overall, these circumstances demonstrate that further communication between the Defendant and AV2 poses a clear and present danger of deterring AV2 from participating as a witness. A no-contact restriction is necessary to ensure that AV2 is not improperly dissuaded from providing truthful testimony.

## C. Adult Victim 3 ("AV3")

AV3 is named as an alleged victim in four counts of the grand jury's Third Superseding Indictment: Counts Six (transporting individuals for purposes of prostitution in violation of 18 U.S.C. § 2421(a)); Eight (transporting individuals for purposes of prostitution in violation of 18 U.S.C. § 2421(a)); Twelve (enticement and coercion in violation of 18 USC § 2422(a)); and Fifteen (transporting individuals for purposes of prostitution in violation of 18 U.S.C. § 2421(a)). Dkt. 297 at ¶¶ 16-17, 20-21, 28-29, 34-35. The offenses allegedly occurred between April 2023 and January 2024. *Id*. at ¶ 16, 20, 28, 34.

In July 2024, the Defendant called AV3 and berated her for not communicating with him or providing him money. Dkt. 166 (Ex. 1). The Government contends that the Defendant's statements in the call show that he "is attempting to establish a dynamic in which AV3 owes [the Defendant] for the purported good he had done for her in the past." Dkt. 264 at 10. Meanwhile, the Defendant argues that the Government has not set forth evidence that he is a threat to AV3 or has otherwise had contact with her that poses a serious or imminent threat to the administration of justice. Dkt. 266 at 10.

The Defendant's comments to AV3 reflect his frustration with having limited funds and a lack of contact with others while incarcerated. While the angry tone and the language suggesting that AV3 somehow owes the Defendant may present a risk of turning AV3 into a reluctant witness, the more concerning aspect of AV3's relationship with the Defendant – and the primary reason that a no-contact order is necessary – arises from AV3's actions after the Defendant's arrest in January 2024.

Following an 18-hour standoff with police – during which the Defendant barricaded himself in his home with a young child and AV3 – law enforcement determined that AV3 had left the scene with a phone associated with the Defendant. FBI Special Agent Andrew Klauser ("SA Klauser") provided testimony about this at a preliminary hearing on January 29, 2024. Dkt. 46 at 22-24. There, SA Klauser testified that authorities had worked with the Defendant's service provider to ensure that the Defendant's cell phone could only make and receive calls from law enforcement. *Id.* at 22. After AV3 left the house, law enforcement determined that she had the Defendant's phone in her possession because every time she made a call, the restrictions applied and sent the call to SA Klauser's phone. *Id.* at 23. SA Klauser testified that when he picked up the phone, he "immediately recognized AV3's voice, having spoken with her during the attempted arrest, and [he] recognized that she had [the Defendant's] cell phone in her possession." *Id.* at 23-24. A reasonable inference of these circumstances is that AV3 was likely attempting to conceal the Defendant's phone from authorities and prevent its seizure, despite law enforcement having a search warrant for the device. *Id.* at 24. Although it is unclear from the record whether the Defendant specifically directed AV3 to take possession of the phone, the fact that AV3 possessed a phone belonging to the Defendant that he had used to communicate with

9

law enforcement during the barricade is enough for the Court to find that AV3's conduct posed a credible risk of obstructing law enforcement's investigation in this case.

Given the seriousness of AV3's prior actions, the Court finds that further communication between the Defendant and AV3 poses a clear and present threat to the administration of justice and the integrity of the Court's proceedings in this case. No lesser restrictions than a no-contact order would adequately protect these competing interests.

**D. Adult Victim 4 ("AV4")**

AV4 is an alleged victim identified in Count One of the Third Superseding Indictment, which charges the Defendant with conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594(c). Dkt. 297 at ¶¶ 6-7. More specifically, the indictment alleges that between April 2019 and on or about October 19, 2019, the Defendant engaged in a conspiracy to commit sex trafficking involving one or more female victims, including AV4. *Id*. at ¶ 6.

SA Echols reports that "AV4 is afraid of [the Defendant] because of what happened to her in October 2019." Dkt. 264-1 at ¶ 31. As summarized in SA Echols's declaration, AV4 has alleged that on October 19, 2019, the Defendant detained her in a hotel room in Greenville, South Carolina and forced her to have sex with him and customers before law enforcement arrested the Defendant at the hotel. *Id*. at ¶¶ 29-30. In response to the Government's request to include AV4 on the no-contact order, the Defendant asserts that AV4 has "made at least four different and conflicting statements about what she alleges happened" and that the Defendant "has also made no efforts to contact this witness." Dkt. 266 at 10-11; *see also* Dkt. 293 at 6-7 (alleging that AV4 has made inconsistent allegations in interviews with law enforcement).

Even if AV4 made conflicting statements about her prior experiences with the Defendant, it is still significant that AV4 has expressed to law enforcement that she fears the Defendant and has become "visibly upset" when she talks about what the Defendant allegedly did to her. Dkt. 264-1 at ¶ 31. Given AV4's stated fear of the Defendant, the likely emotional turmoil that AV4 would experience if contacted by him, and the Defendant's documented instances of berating other alleged victims over the phone or trying to talk about grand jury testimony, the Court finds that the Defendant poses a clear and present danger of harassing AV4 and potentially dissuading her participation as a witness in the absence of a no-contact order.[2] No lesser restrictions are appropriate under these circumstances.

**E. Adult Victim 5 ("AV5")**

AV5 is an alleged victim in Count Nine of the Third Superseding Indictment. Dkt. 297 at ¶¶ 22-23. In that count, the grand jury alleged that between April and May of 2019, the Defendant violated 18 U.S.C. § 2422(a) when he knowingly persuaded, enticed, or coerced AV5 to travel in interstate or foreign commerce for the purpose of engaging in "prostitution or any sexual activity for which any person can be charged with a criminal offense." *Id.*

On October 4, 2024, AV5 told law enforcement "that she was afraid of [the Defendant] and has safety concerns for her family." Dkt. 264-1 at ¶ 37. SA Echols reports that AV5 "told the FBI that [the Defendant] knows where she, her children, and her family resides" and is concerned about speaking up against him "because she knows what [the Defendant] is capable of and she does not want to risk anything happening to her family." *Id.*

---

[2] Although there are pending motions related to the count involving AV4, Dkts. 273, 293, the Court's analysis for the purposes of the no-contact order should not be construed as resolving or otherwise addressing the merits of those motions, which are under advisement.

Additionally, in a recorded jail call in July 2024, the Defendant told a third party, Breezie Mills, to track down AV5 through AV5's sister. On the call, Ms. Mills tells the Defendant that she had located AV5 on Facebook. Dkt. 166 (Ex. 5) at 14:20-14:26. The Defendant then instructs Ms. Mills to "see if you can find her sister" and names the sister, who he claims would "know her sister [AV5] is fucking lying." *Id.* at 14:26-14:30; 14:41-14:45. "What you want to do," he tells Ms. Mills, "is just friend her but don't come at them aggressive." *Id.* at 14:45-14:49. Ms. Mills replies, "I'll send her, um, I'm following her now." *Id.* at 14:57-15:00.

In his response brief, the Defendant contends that SA Echols's declaration omits that AV5 "reported in January 2024 that she was not afraid of [the Defendant], and she never saw him put his hands on anyone. She was not required to do sex work, and if she wanted to take a day off, she did." Dkt. 266 at 11. However, the Defendant does not dispute that AV5 may have more recently become afraid of him at the time she spoke with law enforcement in October 2024, nor does he address the significance of his recorded comments to Ms. Mills about locating AV5's sister.

AV5's comments about the safety of herself and her family, paired with the fact that the Defendant had directed Ms. Mills to go so far as to "friend" AV5's sister on social media, raise credible concerns that contact by the Defendant could dissuade AV5 from providing truthful testimony out of concern for herself and her loved ones. Accordingly, the Court finds that the Defendant poses a clear and present danger to the administration of justice with regard to AV5's participation in this case. A no-contact order is necessary under these circumstances.

**F. Adult Victim 6 ("AV6")**

12

AV6 is the alleged victim named in Count Eighteen of the grand jury's Third Superseding Indictment. Dkt. 297 at ¶¶ 40-41. The count alleges that the Defendant violated 18 U.S.C. § 1594(a) by engaging in attempted sex trafficking of AV6 between December 2023 and January 23, 2024. *Id*.

SA Echols's declaration alleges that AV6 worked for the Defendant for 10 days prior to his arrest in January 2024. Dkt. 261-1 at ¶ 39. SA Echols alleges that during the 18-hour barricade, Adult Victim 7 ("AV7") instructed AV6 not to talk with investigators and to "keep her mouth shut" to protect the Defendant. *Id*. at ¶ 40. AV7 reportedly told AV6 that the Defendant instructed them not to speak with law enforcement. *Id*. The Defendant's response explains that "[w]hile [AV7] may have stated that [the Defendant] made the request, [AV6] testified under oath that she was specifically told by [AV7] to take the Fifth and request a lawyer." Dkt. 266 at 11. AV6 also testified that she did not know if the Defendant specifically told AV7 to refrain from speaking with law enforcement. *Id*. The Defendant also notes that AV6 testified that she was told to keep silent to keep "anybody" – not just the Defendant - from running into trouble with the law. *Id*. at 11-12.

A subsequent recorded jail call on July 11, 2024 shows that the Defendant gave AV6's name and date of birth to Ms. Mills as part of their efforts to locate alleged victims. Dkt. 166 (Ex. 5) at 11:30-11:50. The Government characterizes this as an attempt to "influence" AV6, Dkt. 264 at 13, while the Defendant contends "[t]here is no indication from that call" that the Defendant "intended to threaten, intimidate or change or prevent [AV6's] testimony." Dkt. 266 at 12.

Although it is unclear whether the Defendant directed AV6 (through AV7) to stay silent and not provide information to law enforcement, other factors weigh in favor of a no-contact restriction regarding AV6. These factors include the Defendant's attempt to discuss grand jury

testimony with another alleged victim and his calls with Ms. Mills (when placed in the context of how Ms. Mills took steps beyond just collecting online information). These circumstances raise significant concerns about whether the Defendant or intermediaries would try to discuss AV6's testimony with her or otherwise interfere with her participation in this case. Accordingly, the Court finds that the Defendant poses a clear and present danger to the administration of justice and that a no-contact order is necessary with respect to AV6. No lesser restriction would adequately address the Court's concerns.

**G. Adult Victim 7 ("AV7")**

AV7 is an alleged victim of the offenses included in Counts Seven, Nineteen, and Twenty of the Third Superseding Indictment. Dkt. 297 at ¶¶ 18-19, 42-45. In these counts, the grand jury charged the Defendant with transporting individuals for purposes of prostitution in violation of 18 U.S.C. § 2421(a); sex trafficking in violation of 18 U.S.C. § 1591(a)(1), (b)(1), 1594(a); and enticement and coercion in violation of 18 U.S.C. § 2422(a). *Id*. This conduct is alleged to have occurred between December 2021 and January 23, 2024. *Id*. at ¶¶ 18, 42, 44.

Of particular significance to the parties' briefs is the Defendant's phone calls to AV7 in August and September of 2024. During the first of the recorded calls on August 23, 2024, AV7 told the Defendant that "it's going to seem like I'm testifying against you." Dkt. 228 (Ex. 1) at 1:45-1:51. The parties dispute how the Defendant replied. The Government contends he stated, "But you ain't got to explain none of that *to them*." Dkt. 264 at 13 (citing Dkt. 228 (Ex. 1) at 1:57-2:00). This would suggest that he was attempting to dissuade AV7 from providing truthful testimony. But the Defendant maintains that he actually said, "You ain't got to explain none of that," without the addition of "to them." Dkt. 266 at 12. Upon review of the audio recording, the

Court finds the recording unclear on this point because the "to them" language is not clearly audible. The Defendant then states, "you don't have to explain none of that to me. I don't care about none of that. … You've got to protect yourself." Dkt. 228 (Ex. 1) at 2:04-2:13. The Defendant contends that he did not tell the AV4 not to talk with the Government, nor what to say. Dkt. 266 at 12.

On a call between the Defendant and AV7 on September 4, 2024, the two briefly talked about AV7's interactions with law enforcement but the Defendant ended that portion of the discussion by telling AV7, "I don't want to really talk about that. If it's something that's not right, then call my lawyer and talk to them about it." Dkt. 249 (Ex. 2) at 16:11-16:20.

The other calls between the Defendant and AV7 on September 4, 2024 largely focused on interpersonal conflict between the two but not specifically on AV7's interviews with law enforcement or participation in this case.

After reviewing the calls, the Court finds that there is insufficient evidence to conclude that the Defendant has expressly instructed AV7 to refrain from cooperating with law enforcement. Even so, the recorded statements to and other conduct toward other alleged victims indicates that the Defendant poses a serious risk of interfering with any of the alleged victims' participation in this case. Accordingly, the Court finds that the Defendant poses a clear and present danger to the administration of justice with regard to AV7. He will continue to be barred from contacting her pending trial.

**H. Adult Victim 8 ("AV8")**

The Third Superseding Indictment alleges that AV8 was the victim of the sex trafficking offense giving rise to Count Thirteen. Dkt. 297 at ¶¶ 30-31. This count alleges that in April 2019, the Defendant trafficked AV8 in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), 1594(a).

AV8 allegedly worked for the Defendant for a short period of time prior to his arrest in Stafford County, Virginia in April 2019. Dkt. 264-1 at ¶ 50. According to SA Echols's declaration, AV8 went on four "dates" (commercial sex encounters) arranged by the Defendant and the Defendant kept all the money that customers paid, at least from the first date. *Id*. at ¶¶ 50-51. SA Echols's declaration states that AV8 fears the Defendant and has a history of not cooperating with law enforcement due to alleged intimidation by the Defendant. *Id*. at ¶ 53. After the Defendant was arrested in Stafford County, he allegedly showed up with a firearm to AV8's family home and asked if she was going to cooperate with the Stafford County law enforcement investigation. *Id*. He also allegedly referred to AV8's child by name despite AV8 never sharing that information with the Defendant. *Id*. AV8 stopped cooperating with the Stafford investigation following this alleged interaction with the Defendant. *Id*.

In response, the Defendant points to inconsistent statements that AV8 made to law enforcement regarding the number of men she had "dates" with and whether she was able to keep the money that customers paid. Dkt. 266 at 13. AV8 has stated under oath that she was not initially truthful with police. *Id*.

Nevertheless, the prior instance of alleged intimidation is quite concerning and is not addressed in the Defendant's response brief. Such an allegation - when considered alongside documented efforts by the Defendant described above to discuss testimony with an alleged victim or to otherwise contact alleged victims - raises a credible concern that communication between the Defendant and AV8 threatens to create a reluctant witness. Accordingly, the Court

finds that contact between AV8 and the Defendant presents a clear and present danger to the administration of justice such that AV8 should be included on an amended no-contact order. No lesser restrictions would protect the witness and the integrity of this Court's proceedings.

However, the Court emphasizes that its determination that a no-contact order is proper is *not* a finding that the Defendant did, in fact, intimidate AV8 in 2019. There is not enough evidence in the record for the Court to draw such a conclusion. The allegation is only relevant to the Court's assessment of the relationship between AV8 and the Defendant, and the potential risk that contact between the two would pose to the administration of justice.

## I. Adult Victim 9 ("AV9")

Count Fourteen of the Third Superseding Indictment charges the Defendant with sex trafficking in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), 1594(a). The grand jury alleges that AV9 was a victim of sex trafficking-related conduct that occurred between February and April of 2019. Dkt. 297 at ¶¶ 32-33.

SA Echols's declaration alleges that AV9 worked for the Defendant's sex trafficking operation but did not fully disclose what she knew to Stafford County investigators in April 2019 "because she was afraid of [the Defendant] and did not want him to know she was talking to law enforcement." Dkt. 264-1 at ¶ 56. The declaration also alleges that at one point, AV9 broke one of the Defendant's rules so that she could obtain money to leave him, which led to him threatening her "by telling her he knew where her family lived in Charlottesville, Virginia." *Id*.

The Defendant's response does not engage with the content of SA Echols's declaration related to AV9; it merely alleges that there is no evidence that the Defendant has attempted to contact AV9. Dkt. 266 at 13.

Like the Court's conclusions regarding AV8, the Court also finds that AV9's allegation of prior intimidation – along with documented instances in which the Defendant discussed testimony with an alleged victim or otherwise contacted alleged victims – presents a legitimate concern that communication between the Defendant and AV9 risks turning AV9 into a reluctant witness. Thus, the Court finds that contact between AV9 and the Defendant presents a clear and present danger to the administration of justice to merit AV9's inclusion on a no-contact order. No alternative restrictions are appropriate under these circumstances.

Once again, the alleged prior intimidation's relevance to the propriety of a no-contact order should not be construed as a determination of whether the Defendant did, in fact, engage in such troubling conduct.

**J. Breezie Mills**

Breezie Mills is a third party to this case who is not an alleged victim. Although the Government characterizes her as a "co-conspirator," Dkt. 264 at 16, she has not been charged as a co-defendant in this case.

The Defendant's calls with Ms. Mills are among the recorded calls that led the Court to previously impose heightened communications restrictions, Dkt. 177, and to find the Defendant in contempt of court. Dkt. 251.

Throughout the calls, the Defendant instructed Ms. Mills to track down and investigate potential witnesses and alleged victims. Dkt. 166 (Ex. 2); *id*. (Ex. 3); *id*. (Ex. 4); *id*. (Ex. 5).  The Defendant contends that Ms. Mills was merely assisting in his defense by locating individuals on social media and sharing that information with defense counsel. Dkt. 266 at 13-14. He cites a statement he made to Ms. Mills in one of the calls on July 7, 2024, where he told Ms. Mills that

18

he did not want her to message people and that he just wanted her to find information that could be passed on to defense counsel. Dkt. 166 (Ex. 2) at 5:25-5:38.

Standing alone, perhaps this instruction to Ms. Mills would not rise to the level of a clear and present danger to the administration of justice. But Ms. Mills did more than just passively gather information online. In one of the calls, she reads aloud a text message that she reports having sent to one of the alleged victims, AV2**.** Dkt. 166 (Ex. 5) at 4:19-4:37. ("I need to know what exactly is going on with [the Defendant's] case, as far as you are concerned, if you are testifying or not and if so what all is being said.") Moreover, as noted above, she apparently followed an instruction from the Defendant to track down AV5's sister and "friend her," presumably on a social media platform based on the context of the conversation.  *Id*. at 14:45-14:49. Ms. Mills then indicated that she was "following her now." *Id*. at 14:57-15:00. The Defendant did tell Ms. Mills to not "come at them aggressive" in reference to the sister, *id*. at 14:45-49, but even so, the act of friending or following someone on social media is an interaction that goes beyond observation.

Considering that Ms. Mills texted AV2 about her testimony and apparently friended or followed the sister of AV5 – an alleged victim who has expressed concerns about the safety of her family – it is reasonable to conclude that Ms. Mills engaged in contacts that alleged victims could have perceived as efforts to dissuade them from participating in this case. Accordingly, the Court finds that the Defendant must be barred from communicating with Ms. Mills pending trial to protect the administration of justice. No less significant restriction would guard against the Defendant's use of Ms. Mills as an intermediary for improper contact with alleged victims.

*** 

19

The Court understands that the nature of the Defendant's contacts with the alleged victims varies. To be sure, with respect to some alleged victims, the Defendant has not contacted them or otherwise tried to dissuade them from testifying. His brief repeatedly notes this. *See, e.g.*, Dkt. 266 at 11-13. However, an individualized assessment of the need for communication restrictions should account for *all* relevant facts and circumstances. These include the risks posed by the Defendant's potential future communication with a witness based on how he or his associates have interacted with other witnesses. The recorded calls that have been brought to the Court's attention in prior proceedings indicate that the Defendant and his friend, Ms. Mills, have at times threatened the administration of justice. Other factors – including alleged victims' statements to law enforcement about their fear of the Defendant and AV3's possession of a cell phone affiliated with the Defendant after his arrest – further solidify the Court's concerns. The Court cannot stand by and wait for the Defendant to harass, intimidate, or pressure a particular witness before taking appropriate steps to protect the integrity of its proceedings. As the Supreme Court has noted, federal courts "have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996); *see also United States v. Moussaoui*, 483 F.3d 220, 236 (4th Cir. 2007) (describing inherent authority as "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–31 (1962)). And as the *Wheeler* court acknowledged, the "inherent power to protect witnesses stems from the 'indisputably ... broad powers (of the trial judge) to ensure the orderly and expeditious progress of a trial.'" 640 F.2d at 1123 (quoting *Bitter v. United States*, 389 U.S. 15, 16 (1976)). Consistent with these principles, no-contact

20

restrictions are necessary for all the alleged victims identified in the Third Superseding

Indictment, as well as Ms. Mills.

### III. THERE IS INSUFFICIENT INFORMATION TO INCLUDE "RAIN" ON AN AMENDED NO-CONTACT ORDER

The Government alleges that a woman referred to in the parties' briefs as "Rain"[3] was a

"second in command" to the Defendant and is a "co-conspirator." Dkt. 264 at 16. However, she

has not been charged as a co-defendant in this case.

To the extent that Rain may have been involved in the offenses at issue in this case, the

Government primarily focuses on her alleged role in the events at issue in Count One. *Id*. The

Government alleges that Rain helped the Defendant "lure" AV4 to a hotel in Greenville, South

Carolina and hold her against her will in October 2019. *Id*. at 16-17. When law enforcement

responded, Rain allegedly lied to authorities "to align her versions of the events with [the

Defendant's.]" *Id*. at 17. The Government also reports that on July 10, 2024, the Defendant called

Rain and asked her to help locate a commercial sex customer and potential witness. *Id*.

In response, the Defendant notes that Rain is not an alleged victim, nor has the

Government interviewed her or provided any indication that she will be a witness in the case.

Considering the limited evidence about Rain in the existing record, there is simply not

enough information to impose a no-contact order or other individualized restriction on the

Defendant's communication with her.

---

[3] The Government has disclosed Rain's real name to the Court, but it is unnecessary to name her in this opinion because thus far the parties have only referred to her by pseudonym in public filings and, as far as the Court is aware, she has not been charged with any offenses related to this case.

## IV. OTHER RESTRICTIONS ON THE DEFENDANT'S TELEPHONIC AND ELECTRONIC COMMUNICATIONS ARE LIFTED

The current restrictions on the Defendant's telephonic and electronic communication with anyone who is *not* subject to the no-contact order has been governed by this Court's order issued on July 17, 2024. Dkt. 177. There, the Court partially granted the Government's emergency motion seeking to curtail the Defendant's contacts with individuals outside the jail when it revoked the Defendant's telephonic and electronic communication privileges except as to his legal team, family, and the press. *Id*. 2-3. Those not on the no-contact order could still visit the Defendant in person and exchange letters with him. *Id*. 3 n.5.  At the time, the Court found this to be the least restrictive means of protecting the alleged victims, witnesses, and judicial process. *Id*. at 2.

The parties disagree on whether these communication restrictions should remain in place once the Court issues an amended no-contact order. Based on the individualized analysis that *Wheeler*/*Morris* require, the parties' briefing for the amended no-contact order, and the circumstances analyzed above, the Court will vacate its order of July 17, 2024. Dkt. 177. Admittedly, this is a shift from the Court's prior decision affirming the July 17, 2024 order. Dkt. 258 at 21-23. However, the amended no-contact order itself sufficiently balances the Defendant's First Amendment rights with the integrity of this Court's proceedings and the interests of witnesses. This is consistent with the restraint that courts must show when exercising inherent authority. *Degen*, 517 U.S. at 823-24.

Moving forward, the Defendant may engage in electronic and telephonic communications with individuals not listed on the no-contact order. Nevertheless, the Defendant must not directly or indirectly communicate with the subjects of the no-contact order. He cannot direct third parties or intermediaries to communicate with the individuals on the no-contact order on his

22

behalf. Of course, should the Defendant violate the amended no-contact order, heightened restrictions on the Defendant's communications may become imperative to protect the administration of justice.

### V. THE GOVERNMENT'S *EX PARTE* FILING AND THE DEFENDANT'S MOTION TO RECONSIDER

On December 30, 2024, the Government filed *ex parte* a supplemental brief that it argued was pertinent to the Court's consideration of communication restrictions on the Defendant. As the Government noted in its motion to file its supplement under seal and *ex parte*, Dkt. 277, the supplement was based on information the Government obtained on December 23, 2024, which had become the subject of a grand jury investigation. While *ex pate* proceedings are "greatly disfavored" and "courts are necessarily and properly reluctant to participate in them," *RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 356-57 (4th Cir. 2007), such an approach was necessary to protect the secrecy of the ongoing grand jury investigation. *See generally Butterworth v. Smith*, 494 U.S. 624, 630 (1990) (discussing rationales for the secrecy of grand jury proceedings); *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 n.6 (1958) (same); *United States v. Calandra*, 414 U.S. 338, 343 (1974) (noting that a grand jury proceeding "is an ex parte investigation"). After the Court granted the Government's motion to file *ex parte*, Dkt. 278, the Defendant filed a motion requesting that the Court reconsider its decision. Dkt. 280.

Based on the grand jury's issuance of the Third Superseding Indictment on January 15, 2025, Dkt. 297, the Court finds that the *ex parte* supplemental filing should be disclosed to the Defendant. At a status conference on January 22, 2025, the Government's counsel confirmed that the supplement no longer needs to be filed *ex parte* but requested that it remain under seal because it contains sensitive information about third parties. The Court agrees. Accordingly, the

Court will direct that the supplement shall remain under seal but no longer be filed *ex parte*. The Defendant's motion to reconsider, Dkt. 280, will be denied as moot due to the Government's concession that the supplement no longer needs to be filed *ex parte*.

Finally, the Court notes that the information contained in the supplemental brief was not necessary for the Court's finding that a no-contact order is necessary for the alleged victims referenced in the filing. Accordingly, the Court does not rely on the supplement as providing a basis for the amended no-contact order.

## CONCLUSION

For the reasons stated above, the Court will enter an amended no-contact order on this date applying to 10 of the 11 names proposed by the Government. Because the order names alleged victims of sex trafficking offenses, it will be docketed under seal. Relatedly, the Court will vacate both the prior no-contact order, Dkts. 31, 173, and the restrictions on the Defendant's telephonic and electronic communications with individuals who are not listed on the amended no-contact order. Dkt. 177. Finally, the Court will enter a separate order directing the clerk to remove the *ex parte* designation for the Government's supplemental brief regarding the no-contact order. Dkt. 179. However, the supplemental brief shall remain under seal. The motion for reconsideration, Dkt. 280, will be denied as moot.

Entered this  27th  day of January, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE