CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
July 02, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA,

v.

BRIAN LAMONT TURNER,

*Defendant.*

CASE NO. 3:24-cr-00008

**MEMORANDUM OPINION**

JUDGE NORMAN K. MOON

 

The Defendant, Brian Lamont Turner, moves to dismiss Count One of the Third Superseding Indictment.[1] Dkt. 293. Count One charges the Defendant with conspiracy to commit sex trafficking by force, fraud, and coercion. He contends that the Government's delay in seeking an indictment on this count violated his due process rights. However, his arguments about the prejudice he suffered from the purported delay are largely speculative. Moreover, the timing of the indictment – which followed a complex investigation into an alleged multi-state sex trafficking operation – does not rise to the level of a due process violation. Accordingly, the Defendant's motion is denied. (And, discussed below, the Court also denies the Government's motion to supplement the testimony of a law enforcement agent regarding the timeline of its investigation.)

---

[1] The grand jury issued its Third Superseding Indictment after the Defendant filed his motion, which addressed Count One of the Second Superseding Indictment. Dkts. 293 (Motion to Dismiss), 297 (Third Superseding Indictment). Because Count One is substantively the same in both indictments, the Court construes the motion as if it had addressed Count One of the Third Superseding Indictment. This is consistent with the parties' briefing, which also referred to the Third Superseding Indictment. Dkts. 319, 330.

# I. BACKGROUND

The count at issue in the Defendant's motion was first included in a Superseding

Indictment issued by the grand jury on March 27, 2024. Dkt. 65. This count – which is also in

the second and third superseding indictments, Dkts. 180, 297 – alleges the following:

> Beginning at a time unknown but no later than April 2019 and
> continuing through on or about October 19, 2019, in the Western
> District of Virginia and elsewhere, the defendant, BRIAN
> LAMONT TURNER, did knowingly conspire with others known
> and unknown to the Grand Jury to knowingly recruit, entice,
> harbor, transport, provide, obtain, and maintain by any means, in
> and affecting interstate and foreign commerce, one or more adult
> female victims, including Adult Victim 4 ("AV4"), knowing and in
> reckless disregard of the fact that means of force, threats of force,
> fraud, coercion, and any combination of such means would be used
> to cause AV4 to engage in a commercial sex act, in violation of 18
> U.S.C. §§1591(a)(1) and (b)(1).
>
> All in violation of 18 U.S.C. § 1594(c).

Dkt. 65 at ¶¶ 6-7.

The Government's case for Count One appears to be based on an allegation that the

Defendant conspired with a woman nicknamed "Rain" between April and October of 2019 to

violate 18 U.S.C. § 1594(c). Dkt. 319 at 5. In other words, the Government alleges that the

Defendant entered an agreement with Rain to recruit and transport women knowing or with

reckless disregard that force, threats of force, fraud, or coercion (or some combination thereof)

would cause the victims to engage in commercial sex. Although the Government represents that

it expects the evidence for Count One to relate to at least two alleged victims – "AV4"[2] and

"AV5" – the events at issue in the Defendant's motion to dismiss involve AV4. Dkt. 319 at 4.

---

[2] The real names of "Rain" and "AV4" are known to the Court. Rain is a third party to this case whom the
Government has described as a "co-conspirator" in the Defendant's offenses. However, as far as the Court is aware,
she has not been criminally charged in connection to this case. The parties have referred to her as "Rain" in various
filings and the Court will continue to do so as well.  As for AV4, the parties are barred from using the alleged

Based on the indictment and the Government's briefing, the central allegations of Count One, as it relates to AV4, are as follows[3]: AV4 encountered the Defendant and Rain at a restaurant in Greenville County, South Carolina on October 19, 2019. AV4 gave the Defendant and Rain a ride to their hotel in exchange for gas money. Once they arrived, AV4 asked to use the restroom in the Defendant and Rain's hotel room. When AV4 left the restroom, the Defendant told her that she would be making money for him. The Defendant and Rain were armed with a firearm and knife, respectively. The Defendant forced AV4 to have sex with him and posted her on commercial sex websites to set up "dates." AV4 was also forced to have sex with a commercial sex customer. The Defendant told AV4 that he would take her to Virginia – where his sex trafficking operation was based – the next day. While trapped in the hotel room, AV4 texted her mother, who, in turn, contacted law enforcement. When officers arrived, they found AV4, the Defendant, and Rain in the room. First responders took AV4 to a nearby hospital, where she received a sexual assault examination, and officers on the scene arrested the Defendant. During his interactions with law enforcement that night, the Defendant lied about his identity and tried to jump off the hotel hallway balcony. Officers also located drugs, a firearm, and various electronic devices in the room. The Defendant was charged with (1) criminal sexual conduct – 1st degree, (2) kidnapping, (3) possession of a weapon during a violent crime, (4) possession of marijuana, (5) false information to police, and (6) being a fugitive from justice. State prosecutors, however, dropped the case in March 2020 when they were unable to locate AV4. Thus, the state charges were dismissed. Local law enforcement collected certain evidence, including the devices and AV4's Sexual Assault Nurse Examination ("SANE") kit. However, pursuant to local evidence

---

victims' full names pursuant to the Second Amended Protective Order. Dkt. 175. The Court will also refer to her using her assigned number.
[3] Unless otherwise noted, the specific alleged facts are taken from pages 5-6 and 8-11 of the Government's response brief. Dkt. 319.

management practices, they destroyed the devices in May 2021 and the SANE kit on November 20, 2023.

After receiving a report of sex trafficking from the Lynchburg Police Department, the FBI began investigating the Defendant in February 2023. Dkt. 360 ("Mar. 13, 2025 Hearing Trans.") at 55. Later that year, on November 30, 2023, the FBI contacted the Greenville County Sheriff's Office about the Defendant's 2019 arrest and received information from local authorities. Dkt. 379 ("May 5, 2025 Hearing Trans.") at 9-10. This was 10 days after the SANE kit's destruction. *Id*. at 9.

Law enforcement arrested the Defendant on a federal criminal complaint on January 24, 2024. Dkts. 3 (complaint); 4 (arrest warrant). A grand jury issued its first indictment on February 14, 2024. Dkt. 22. Count One – the conspiracy offense – was first alleged in a Superseding Indictment on March 27, 2024. Dkt. 65; *see also* Dkt. 180 (Second Superseding Indictment issued July 24, 2024); Dkt. 297 (Third Superseding Indictment issued January 15, 20250.

The Defendant moves to dismiss Count One because he contends that critical evidence for his case was lost between 2019 and the Government's November 2023 contact with Greenville County officials. He specifically focuses on three categories of evidence: (1) electronic devices; (2) the SANE kit; and (3) hotel-related information, such as the names of guests who stayed in nearby rooms. Due to the loss of this evidence, he contends that he has suffered substantial prejudice such that a trial on Count One will violate his Fifth Amendment due process rights.

## II. LEGAL STANDARDS

Courts in the Fourth Circuit conduct a two-part analysis for assessing a defendant's claim that a pre-indictment delay violated his Fifth Amendment right to due process. *United States v. Uribe-Rios*, 558 F.3d 347, 358 (4th Cir. 2009).

First, the Court must ask whether the defendant has shown "actual prejudice." *Id*. This is a "heavy burden" because the defendant must demonstrate "that any actual prejudice was substantial – that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected." *United States v. Shealey*, 641 F.3d 627, 634 (4th Cir. 2011) (quoting *Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir. 1996)). Mere "speculative prejudice" is not enough. *Id*.

Second, if a defendant meets his burden of showing actual prejudice, the Court must then "balanc[e] the prejudice to the defendant with the Government's justification for delay." *Uribe-Rios*, 558 F.3d at 358 (quoting *United States v. Automated Med. Labs., Inc.,* 770 F.2d 399, 404 (4th Cir. 1985). This requires an inquiry into "whether the Government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'" *Id*. (quoting *Automated Med. Labs., Inc.,* 770 F.2d at 404).

## III. DISCUSSION

## A. The Defendant has not established that he suffered actual prejudice from the loss of certain evidence

The Defendant has a different account of what occurred on October 19, 2019: that he never had sex with AV4 and that AV4 was willingly in the hotel room. Dkt. 293 at 9; 330 at 7. Thus, he contends that the loss of certain evidence impairs his defense. However, based on the

existing record, his arguments about the significance of the unavailable evidence are far too speculative to establish he has suffered actual prejudice.

### 1. Devices

Pursuant to a search warrant, the Greenville County Sheriff's Office collected five cell phones and two tablets from the hotel room. Dkt. 319-4 at 84, 92-93.[4] The devices remained in evidence storage until local law enforcement authorized their destruction on May 30, 2021. *Id*. at 93.

The Defendant contends that these devices would have contradicted various aspects of AV4's account, including that she had been filmed having sex and that she was held in the room against her will. Dkt. 293 at 11, 15; Dkt. 330 at 7; *see also* Dkt. 319-4 at 35 (supplemental report of Officer James Cannon stating that AV4 told her mother that she was forced to perform sex acts while being recorded); *id*. at 39 (AV4's victim statement on Oct. 19, 2019 alleging that the Defendant threatened to kill her if she tried to leave the hotel room).

He alleges that the devices would have shown that AV4 was willingly in the room because she and Rain "had communications in advance about meeting up." Dkt. 330 at 3. He contends that this is supported by body camera footage from Officer James Cannon, which showed "plain as day, that [the Defendant] found and showed the officers on scene the messages he sought between [Rain] and [AV4]." *Id*. at 4. He further contends that the material that Officer Cannon saw on AV4's cell phone corroborated the interactions between AV4 and Rain. *Id*. at 4-5.

The body camera footage is not so clear on these points.

---

[4] Officers seized several other items from the hotel room, including a 9 mm pistol, ammunition, a pocketknife, capped syringes, glass pipes, $155 in cash, a "green leafy substance," and a "white powder substance in clear bag." Dkt. 319-4 at 84, 86-87, 90-91. The Greenville County Department of Public Safety Crime Laboratory analyzed the two substances. It determined that the green substance was marijuana. *Id*. at 81. However, the lab's analysis of the white powder did not detect a controlled substance. *Id*. at 72.

First, the footage does not definitively show that the Defendant or Rain had messaged with AV4 prior to the evening of October 19, 2019. It is true that when Defendant and Rain were both in the hotel room, they told law enforcement that AV4 and Rain communicated prior to the events at the hotel. Dkt. 330 (Ex. A, Pt. 1.) at 25:08 to 25:22 (Defendant alleging that AV4 texted with Rain about a sex encounter); *id*. at 54:50-55:10 (Defendant stating that AV4 "hits [Rain] up" and "propositioned her to have sex with her for some money"); *id*. at 56:38 to 56:54 (Rain stating that she posted on a website called SkipTheGames and that AV4 "propositioned" her). The Defendant also allowed an investigator to look at a phone that he said belonged to him. *Id*. at 1:15:27-1:17:10. The Defendant directed an investigator to messages and a photo that AV4 allegedly sent before the events at the hotel.[5] *Id*. at 1:17:40-1:18:50. Although the Defendant emphasizes these aspects of the body camera footage, *see* Dkt. 330 at 4-5, the contents of the phone screen are not visible on the body camera footage. The recording captures the Defendant showing the phone to an investigator, attempting to narrate what is on the phone, and then conversing with other officers while the investigator reads the screen. *Id*. at 1:18:00-1:21:46. But the footage does not allow a viewer to see the screen.

Other aspects of the Defendant's encounter with law enforcement cast considerable doubt on whether the purported communications involved AV4. The investigator who viewed the phone noted that the phone number associated with the messages was not the same number AV4 provided them. *Id*. at 1:22:24-1:22:28. The Defendant told the officers that AV4 probably messaged from an "app number." *Id*. at 1:22:15-1:22:18. The investigator handed the phone to the Defendant to locate material that would support his account of events, but it appears that the

---

[5] The Defendant seems to have alleged that these communications were on an unnamed application on the Defendant's phone. *See* Dkt. 330 (Ex. A, Pt. 1.) at 1:15:20-1:15:45 (Defendant discussing providing law enforcement with access to a conversation on an "app").

Defendant never found it despite having at least two opportunities to do so. *See id*. at 1:22:37-1:23:23 (footage showing defendant holding phone until Officer Cannon exits the hotel room); 1:32:48-1:33:45 (footage showing Defendant holding phone when Officer Cannon returns to the room); 1:34:47-1:34:53 (Officer telling Defendant that "[t]he [phone] number you kept putting in, saying that she's showing up on the Backpage, it wasn't showing up."). At another point, the Defendant had a tense exchange with officers about whether he deleted content from the phone – which the Defendant denied doing. *Id*. at 1:33:50-1:34:05.

Given the limited information in the record related to the Defendant's phone and the multitude of issues on display in the body camera footage – particularly, officers' observation that the purported messages with AV4 did not match her known number, the Defendant's apparent inability to locate corroborating information on his own phone, and the concerns about whether he attempted to delete information – the Court cannot determine whether the Defendant actually possessed exculpatory digital evidence of himself or Rain messaging with AV4. It is just too speculative.

The body camera footage showing Officer Cannon's conversations with AV4 also fails to establish the nature of the evidence that could have been obtained from the destroyed phones. Officer Cannon briefly reviewed AV4's phone while she was standing with another officer in the hotel parking lot.  Dkt. 330 (Ex. A, Pt. 1) at 32:50. Officer Cannon asked AV4, "did you text them [the Defendant and Rain] at all today?" *Id*. at 32:52. She replied, "no, sir" and explained that her phone was "off" so she could only "get Wi-Fi."[6] *Id*. at 32:52-58. Officer Cannon then pointed to something on the screen (the contents of the screen are not visible during this portion

---

[6] The Court interprets this statement to mean that AV4's phone was not connected to a wireless mobile phone service but was otherwise operable when connected to Wi-Fi. It seems AV4 was implying that she was unable to send text messages without mobile phone service.

of the body camera footage) and asked AV4, "who is this?" *Id*. at 33:01-04. She responds, "that's the guy I met at Grandma's Kitchen" - the restaurant where she claimed to have encountered the Defendant and Rain. *Id*. at 32:58-33:06.[7] Officer Cannon then pulled up what appear to be photos of women (though it is difficult to make out the content of each picture).[8] *Id*. at 33:20-34:00. AV4 said that the Defendant "screenshotted" the pictures and "sent those to [her] phone." *Id*. 33:31-33:43.[9] AV4 claimed that the photos depicted "different girls that he had on websites." *Id*. 33:44-33:50. Officer Cannon asked AV4 whether she participated in "this kind of activity" (i.e., prostitution) and she replied that she "used to." *Id*. at 33:10-35:12. She said she "stopped" because she found out she was pregnant and insisted she was no longer engaged in sex work. *Id*. at 36:07-38:19. Even if AV4 was involved in prostitution at some point before October 2019, that does not change the fact that it is unclear from the body camera footage whether she communicated with Rain about meeting up or otherwise voluntarily exchanged messages or photos with either the Defendant or Rain before they arrived at the hotel. Nor is there anything else in the footage to establish that AV4 used a mobile phone application to message from a different number than the number known to law enforcement.

In sum, the Defendant's position that AV4's phone "corroborate[s]" his account of AV4 communicating with Rain overstates what is visible on the body camera footage. Dkt. 330 at 4. All that the body camera footage definitively establishes is that there were photos of women on AV4's phone. It is unclear where the pictures came from, when they were taken, who they depict,

---

[7] The Court understands "the guy" to be the Defendant.
[8] Officer Cannon later told other officers that the photos depicted AV4 "and some other girls" naked. Dkt. 330 (Ex. A, Pt. 1) at 43:45-43:48.
[9] AV4 acknowledged the photos and referred to "iDrop," Dkt. 330 (Ex. A, Pt. 1.) at 33:52-33:55, but Officer Cannon cut her off before she could elaborate. It appears she was referring to an iPhone feature called "AirDrop" – which allows for the sharing of files between phones – but the record does not establish whether this function was, in fact, how these photos appeared on her phone.

whether and when AV4 sent messages to the Defendant or Rain, the content of any such messages, and whether AV4 used a particular app to communicate. These are all open questions.

### 2. SANE kit

As noted earlier, AV4 was transported to a nearby hospital on October 19, 2019 for a sexual assault nurse examination (SANE). These examinations are used to collect DNA evidence that may be on a victim's body. Mar. 13, 2025 Hearing Trans. at 16 (testimony of Jean Anne Cheek, a forensic nurse examination coordinator at Virginia Commonwealth University). Medical records show that several "swabs" were used to collect possible DNA evidence from AV4. Def. Ex. 20 for May 5, 2025 Hearing ("Medical Records") at 75. The hospital then provided the kit to law enforcement. *Id*. at 76; Dkt. 319-4 at 2-5.

The undeveloped kit sat in evidence storage[10] until November 2023, when Greensville County law enforcement authorized the kit's destruction. Dkt. 319-4 at 8-10. The kit was destroyed on November 20, 2023 – just 10 days before federal investigators first communicated with the Greenville County Sheriff's Office about the Defendant's 2019 arrest. May 5, 2025 Hearing Trans. at 9, 23 (testimony of FBI Special Agent Mary Echols).

The Defendant contends that this missing evidence would have corroborated that he never had sex with AV4. This would, in turn, undercut the "coercion" element of Count One. Dkt. 330 at 6-7. The Government, for its part, argues that it is speculative whether the kit would have yielded exculpatory evidence. Dkt. 319 at 15. The Government contends that the Defendant admitted that he had sex with AV4. *Id*. at 14-15. It cites to a document prepared by Officer Drew

---

[10] The kit was likely never developed because the state charges against the Defendant were dismissed in March 2020 Dkt. 319-6 at 25-26, and over two years later, the sheriff's office reported that it had not received any request from the victim to investigate the case further. Dkt. 319-4 at 7 (supplemental report explaining that "[a]s of 11/16/2021, the sheriff's office has not been contacted by … the anonymous victim to investigate this case further.")

Epps, in which he reports that the Defendant "stated that he met the victim online and that it was purely consensual." Dkt. 319-4 at 17. Considering this purported admission, as well as AV4's statements and other evidence – like the weapons in the room and AV4 being undressed when officers entered the hotel room – the Government argues "it is far more plausible that the SANE kit would have inculpated [the Defendant]," and that the kit's loss "harmed the Government's case." Dkt. 319 at 15.

Based on the body camera footage and other records related to the October 2019 arrest, the Defendant's purported admission to having sex with AV4 in the police report is, at most, ambiguous. At various points, the Defendant adamantly denied to law enforcement that he had sex with AV4. Dkt. 330 (Ex. A, Pt. 1) at 1:10:22-1:10:34, 1:13:34. A different part of the local law enforcement reports also includes in a narrative description that the Defendant "denied any accusations" against him. Dkt. 319-4 at 25. The Defendant contends that the "consensual" comment refers to AV4's presence in the hotel room – which would be consistent with his allegation that AV4 was in the room voluntarily (presumably to "meet up" with Rain). Dkt. 330 at 3-4. Still, in the context of AV4's allegations, the "consensual" comment could also be consistent with her claim that he engaged in sexual acts with her. Accordingly, the Court does not place any weight on the use of the term "consensual" because it is unclear what exactly it refers to under the circumstances.

Nevertheless, the Defendant's arguments about the destroyed SANE kit are speculative. We simply do not know what the kit would have shown. AV4 reportedly used the bathroom and showered before the exam. Medical Records at 68. AV4's reported use of the restroom and showering before the exam suggests that the exam could have produced incomplete results about any sexual conduct involving AV4. Mar. 13, 2025 Hearing Trans. at 18. 21 (testimony of Jean

Anne Cheek). Moreover, the exam would not necessarily have addressed whether AV4 was *coerced* into sexual acts. *Id*. at 24. It is also just as possible that the results would have been inculpatory, given other facts like officers first encountering AV4 in a state of undress and the discovery of weapons in the room were consistent with AV4's account. *See* Dkt. 319-4 at 36 (report describing how AV4 was not wearing pants when law enforcement entered the hotel room); *id*. at 39 (victim statement referring to Defendant possessing a gun and threatening to kill her if she tried to leave); *id*. at 84 (inventory of property taken pursuant to search warrant referring to a firearm found under a pillow and a pocketknife found in a bag). True, the kit could have plausibly recovered DNA from individuals whom AV4 may have had sexual relations with inside the hotel room and, depending on the results, this could possibly be used to impeach AV4's credibility. But based on the current record, there is simply too much guesswork about what the kit would have shown and whether it substantially prejudices the Defendant.

### 3. Hotel records

The Defendant also argues that the passage of time resulted in the unavailability of valuable hotel-related evidence. This includes records identifying guests in neighboring hotel rooms at the Best Western (where he was arrested) and witnesses at a different hotel (an Econo Lodge), where he alleges AV4 initially tried to rent a room. Dkt. 293 at 11, 13. He reports that Best Western no longer possesses records of guests prior to June 2020 due to a system change, and that potential Econo Lodge witnesses "were never found and documented." *Id*. at 13.

"When the claimed prejudice is the unavailability of a witness, the defendant must 'demonstrate, with specificity, the expected content of that witness' testimony' and 'that the information the witness would have provided was not available from other sources.'" *United*

*States v. Kalbflesh*, 621 Fed. Appx. 157, 159 (4th Cir. 2015) (quoting *Jones v. Angelone,* 94 F.3d 900, 908 (4th Cir. 1996)). Thus, the defendant "'must relate the substance of the testimony which would be offered by the missing witnesses ... in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defense.'" *Id.* (quoting *United States v. Bartlett,* 794 F.2d 1285, 1290 (8th Cir. 1986)).

Here, the Defendant has not alleged with sufficient specificity the expected content of missing witnesses' testimony. While he contends that the witnesses "would have helped contradict [AV4's] version of events and show that she was not being held against her will," Dkt. 293 at 12, he has not made any representations about what he specifically anticipates these witnesses would say. The Defendant attributes the unavailability of this evidence to Best Western's recordkeeping policy and law enforcement's failure to track down the witnesses, but it is unclear why the Defendant could not have obtained this information during his state prosecution. As the Government points out, between the time of the Defendant's October 2019 arrest and the dismissal of the state charges in March 2020, he "had every incentive to contemporaneously investigate and obtain, for instance, information about hotel records." Dkt. 319 at 16. Like the SANE kit and the devices, the Defendant's argument about the hotel records is too speculative to meet the first prong for establishing a due process violation arising from preindictment delay.

***

A defendant cannot just point to missing evidence, theorize that it is exculpatory, and assert that such circumstances must lead to a dismissal of a criminal charge. The defendant must establish with some degree of specificity what the evidence would have shown and how its absence prejudices his ability to defend himself. *See Shealey*, 641 F.3d at 627 (holding that the

13

defendant cannot rely on speculative prejudice to establish a due process violation from pre-indictment delay); *Jones*, 94 F.3d at 908 (discussing the requirements for establishing prejudice arising from the unavailability of witnesses). Here, the Defendant points to missing evidence that *he* contends is exculpatory. But, based on the body camera footage and other parts of the record discussed above, such arguments are too speculative. The Defendant essentially asks the Court to take him at his word about what the destroyed electronic devices and SANE kit would have shown or what witnesses at the hotel may have observed. The Court cannot do so. Absent speculation, the record does not establish that the missing evidence is exculpatory or otherwise provide sufficient support for his claim of actual prejudice.

The case law's use of the term "substantial" prejudice also suggests that the Court should consider other evidence available to a defendant to assess the degree of prejudice. The Defendant's own briefing highlights that certain evidence is available as to contested issues. For example, one of the factual disputes is whether the Defendant had sex with AV4. The Defendant notes that law enforcement "used an alternative light source to identify suspected semen stains with negative results," and that officers did not find any used condoms, opened condom wrappers, or boxes of unused condoms in the room. Dkt. 293 at 10. These findings would support his account that no sexual activity occurred. Additionally, the Defendant's central claim is that the missing evidence undercuts AV4's account by casting doubt on whether she was coerced into prostitution. But as the Defendant acknowledges, there are other ways he can challenge AV4's claims and her credibility. For example, the Defendant asserts that AV4's credibility is "severely compromised" in light of a prior conviction for making a false report to police and her inconsistent statements about her prior involvement in prostitution and the number of individuals she had sex with on October 19, 2019. Dkt. 330 at 9. Such information will likely

14

play a crucial part in any attempt to impeach AV4 at trial. In sum, the Defendant has several paths available for mounting a defense and challenging AV4's credibility. Accordingly, to the extent that the Defendant has suffered some degree of prejudice from missing evidence, the Court does not find it rises to a "substantial" level.

**B. The timing of the indictment does not violate fundamental concepts of justice or the community's sense of fair play and decency**

Even if the Defendant met his burden of showing actual prejudice from the loss of certain evidence, he still fails to show that the prejudice outweighs the Government's justification for the purported delay. Although he acknowledges that some of the unavailable evidence (i.e., the devices and witness evidence) was lost before the federal investigation began, he contends that the prejudice is so great that continued prosecution violates due process. Dkt. 293 at 15-16. He also argues that in 2023, the Government should have acted with "reasonable diligence" to obtain the SANE kit before its destruction on November 20, 2023. *Id*. at 15. As discussed below, there are legitimate reasons for how the Government conducted its investigation leading up to the March 2024 indictment on Count One. After "balancing the prejudice to the defendant with the Government's justification for delay," the Court finds that the indictment on Count One does not violate "fundamental conceptions of justice" or "the community's sense of fair play and decency." *Uribe-Rios*, 558 F.3d at 358.

*1. Overview of investigation*

At hearings on March 13, 2025 and May 5, 2025, FBI Special Agent Mary Grace Echols ("SA Echols") testified about how the Government approached its investigation into the

Defendant's alleged sex trafficking activities. SA Echols, who is the lead agent on this case, said that the FBI opened its investigation into the Defendant in February 2023 after receiving a report from the Lynchburg Police Department "about an adult female who disclosed sex trafficking by [the Defendant.]" Mar. 13 Hearing Trans. at 55.

On February 8, 2023, investigators ran a criminal history report on the Defendant. The 55-page document summarized his criminal history for cases across multiple states. Dkt. 319-6. The report included information about the Greenville County arrest — it listed the charges and noted that they were dismissed in March 2020. *Id*. at 24-26.  SA Echols stated that federal investigators learned about the October 2019 incident's possible connection to the sex trafficking investigation when they came across a news article sometime in October 2023. May 5 Hearing Trans. at 21-22. Relatedly, certain evidence relevant to Count One was lost or destroyed before February 2023. The Defendant reports that certain hotel records from before June 2020 are no longer available due to a "system change." Dkt. 293 at 13. Additionally, the devices seized from the hotel room were destroyed on or around May 30, 2021. Dkt. 319-4. at 93. There is nothing in the record to show that the FBI knew of this missing evidence at the outset of its investigation.

Of course, Count One is just one charge resulting from a larger investigation. SA Echols testified that between February and November 2023, law enforcement "focused on [the Defendant]'s then-current criminal activity and the victims that we believed he was actively trafficking." Mar. 13 Hearing Trans. at 58; *see also* May 5 Hearing Trans. at 22.  Her testimony conveyed that federal investigators took the following steps throughout much of 2023:

- Monitored a website called "SkipTheGames," where the Government believed the Defendant was posting commercial sex advertisements for his alleged victims. Mar. 13 Hearing Trans. at

56-57, 65; *see also id*. at 56 (describing use of "a database that
scrapes information from commercial sex websites"); *see also* May
5 Hearing Trans. at 37 (describing frequency and volume of
SkipTheGames posts).

- Issued 26 grand jury subpoenas seeking "[p]hone numbers, emails,
  hotel records, online accounts … such as social media accounts,
  Cash App, financial institutions, Google, Priceline, and some
  additional online accounts," and analyzed the responsive records.
  Mar. 13 Hearing Trans. at 58-59.

- Identified 15 alleged victims and interviewed three of them. *Id*. at
  59-60.

- Interviewed eight other witnesses or sources. *Id*. at 60.

- Communicated with 10 local jurisdictions in Virginia, North
  Carolina, and South Carolina about suspected prostitution and
  drug-related activity involving the Defendant at hotels. *Id*. at 60-
  61.

On November 20, 2023, the SANE kit from October 2019 was destroyed. May 5 Hearing
Trans. at 9. There is nothing in the record to show that federal investigators knew of the SANE
kit at the time of its destruction.

On November 30, 2023, SA Echols spoke with a captain in the Greenville County
Sheriff's Office about the Defendant's October 2019 arrest. The captain stated that the office

maintained reports from the arrest, but that the charges were dismissed after AV4 could not be located. The captain emailed SA Echols police reports related to the arrest. Dkt. 319-5.

Toward the end of 2023, the federal law enforcement determined it was time to make their investigation more "overt" by seeking various search warrants as well as an arrest warrant for the Defendant. Mar. 13 Hearing Trans. at 66-67. SA Echols said that the event which triggered this activity was law enforcement's discovery in late December 2023 of an online sex advertisement featuring photos of a previously-unknown female who was flagged by a database as a potential juvenile. *Id*. at 66-67. Following an 18-hour standoff with law enforcement, the Defendant was arrested on a criminal complaint on January 24, 2024. Dkts. 3 (complaint); 4 (arrest warrant); 20 (pretrial detention order summarizing circumstances of Defendant's arrest).

In early 2024, the Government also took the following steps with regard to Count One:

- On January 3, 2024, federal officials interviewed AV4 via video teleconference. Dkt. 330-5. They also interviewed her at the United States Attorney's Office in Charlottesville on March 19, 2024. Dkt. 330-6.

- On March 20, 2024, AV4 testified in front of a federal grand jury. Dkt. 330-9.

- On March 27, 2024, the grand jury charged the Defendant with the conspiracy offense in Count One of the First Superseding Indictment. Dkt. 65.

The Defendant has not disputed that the Government took the investigative steps outlined above and the general timeline of the investigation. However, he argues that the scope and abundance of investigative activity suggests it would have been easy for the Government to issue

18

a preservation letter to Greensville County law enforcement sooner. Dkt. 330 at 14. This, in turn, would have possibly prevented the SANE kit's destruction. Dkt. 330 at 14. (And, he more broadly argues that the combination of missing evidence – despite much of it being lost before the federal investigation started – creates such significant prejudice such that his prosecution on Count One violates fundamental conceptions or justice and the community's sense of fair play or decency. Dkt. 293 at 16).

The Government likely disputes the above timeline to the extent that it relies on SA Echols's testimony that she received information about the 2019 arrest from a newspaper article in *October* 2023. After the May 5 hearing, the Government moved to supplement SA Echols's testimony with a declaration clarifying when she became aware of a news article related to the Defendant's October 2019 arrest. Dkt. 369. She states that after the hearing, she reviewed her emails and found that she actually received a link to the article the following month, on November 28, 2023. Dkt. 369-1 at ¶ 5; Dkt. 369-2 (copy of email).

The Government offers no other justification supporting its motion to supplement (other than, presumably, to correct a possible error in SA Echols's testimony). The Defendant opposes the Government's request on several grounds, including the significant amount of time the parties had to prepare for the hearing, the availability of the information to the Government prior to the hearing, and the inability of the Defendant to cross examine SA Echols about information introduced after the hearing. Dkt. 370 at 3. The Government did not reply to these arguments. Considering the fairness and cross-examination issues created by allowing the Government to introduce evidence on a key issue (i.e., when the Government knew about the relevance of the October 2019 arrest to its sex trafficking investigation) after the hearing, the Court declines to allow the requested supplementation and will deny the motion in an accompanying order.

(Nevertheless, as noted below, *infra* at 22-23, the October 2023 date makes no difference to the
outcome of the Court's analysis of the Defendant's motion to dismiss Count One.)

### 2. While the Government could have communicated with Greenville County officials sooner, continued prosecution of Count One does not create a due process violation

The Defendant's briefing, and defense counsel's questions of SA Echols and arguments at
the May 5 hearing, highlight what the Defendant contends were numerous opportunities before
November 20, 2024 where the Government could have identified the Greenville County episode
as relevant to the federal investigation and contacted local law enforcement.  But these moments
do not connect to the 2019 arrest in an obvious manner.

The most significant date that the Defendant points to is February 8, 2023, when the
Government obtained the Defendant's criminal history report. Dkt. 293 at 15; Dkt. 330 at 14. He
contends the report gave the Government notice about the October 2019 incident and it then
failed to be sufficiently proactive in seeking evidence from local officials. Dkt. 293 at 15. The
February 2023 criminal history report listed the state charges as *dismissed* on March 18, 2020.
Dkt. 319-6 at 24-26. SA Echols testified that it was not apparent at the time that these charges
had a connection to the federal sex trafficking investigation. May 5, 2025 Hearing Trans. at 35
("[T]hey were all state charges – local charges in Greenville, South Carolina. No federal nexus
based on the charges and out of our jurisdiction completely.") The Court agrees. True, the
criminal history report provided a summary of the prior Greenville County charges. But based on
the limited details the Government possessed about the 2019 charges at the time, it is unclear
why the Government would have had notice about the relevance of the underlying events to its
active investigation or why it would have been obligated to send preservation letters related to

dismissed charges. This is in contrast with the prior Stafford County, Virginia case, which had an

obvious connection to the federal investigation into the Defendant's suspected sex trafficking

activities. As summarized in the criminal history report, the Defendant was charged in Stafford

County for prostitution-related state pandering charges in April 2019. Dkt. 319-6 at 11. These

charges were later *nolle prossed* on July 1, 2020. *Id*.  SA Echols testified that federal law

enforcement reached out to Stafford County authorities in September 2023 and received police

reports related to the 2019 case. May 5 Hearing Trans. at 17. She explained the Government's

interest in the Stafford County case as follows:

> After we had a better understanding of his trafficking operation,
> his … then-current criminal conduct and the victims that he was
> trafficking at that time in 2023, that is when we started to look
> back because we realized that he had been doing this for a long
> time. We started with Stafford because that seemed like an obvious
> connection given the pandering and what we were investigating
> him for.

*Id*. at 34. The Defendant seems to suggest that because the Government sought information about

the 2019 Stafford charges in September 2023, it could have likewise inquired into the Greenville

County incident before November 2023. Dkt. 330 at 16. This argument ignores how the Stafford

County pandering charges were more directly relevant to the federal government's sex

trafficking investigation. The order in which the Government contacted local jurisdictions was

entirely sensible.

Defense counsel seemed to imply at oral argument that records documenting

SkipTheGames posts, received in March 2023, would have also provided a basis for outreach to

Greenville County officials. May 5 Hearing Trans. at 12-13, 39-40; Def. Ex. No. 10 for May 5,

2025 Hearing.[11] But the SkipTheGames sex advertisements also fail to provide a clear link to the

---

[11] This exhibit is a spreadsheet documenting certain posts on SkipTheGames from March 2023. It is not attached to
the Exhibit and Witness List for the May 5, 2025 hearing, Dkt. 368, but was filed with the Court via Box.com.

October 2019 incident. A spreadsheet introduced at the May 5 hearing documents hundreds of

posts made on the website between December 2022 and March 2023 associated with an email

address that the Government believed to belong to the Defendant. Def. Ex. 10 for May 5, 2025

Hearing. The URLs name specific geographic locations, including cities in Virginia

(Charlottesville, Lynchburg, and Richmond), North Carolina (Durham, Greensboro, and

Raleigh), and South Carolina (Greenville, Myrtle Beach, and Spartanburg). *Id*. It appears that 35

of the then-most recent posts in the spreadsheet were targeted to Greenville. *Id*. That said, other

than geography, it is unclear how the ads would have signaled to law enforcement to inquire into

the Defendant's dismissed charges from 2019. All that the spreadsheet establishes is that

significant numbers of ads were generated from a particular account in late 2022 and early 2023.

Many of these ads were apparently aimed at people in Greenville, but other cities are identified

in the post URLs. Indeed, Greenville is only referenced in 56 of the 675 posts in the spreadsheet.

*Id*.[12] To be sure, the Government later learned that the SkipTheGames website may have been

relevant to the October 2019 events, *see supra* at 7 (quoting Rain's allegation to police that she

had posted to SkipTheGames), yet this was not something investigators would have known from

the criminal history report or monitoring the site throughout much of 2023.

Finally, even if federal investigators realized a substantive connection between the 2019

arrest as early as October 2023 (when SA Echols testified that law enforcement found a news

article),[13] it is not apparent that the Government engaged in an undue delay in pursuing that lead.

Indeed, the timeline of events shows that SA Echols reached out the next month to obtain more

---

[12] That said, at the May 5 hearing, defense counsel also introduced an exhibit containing an intelligence report analyzing SkipTheGames posts based on IP address information. Dkt. 368-1 at 2. This report concluded that as of March 2023, the two "most frequented locations" for the posts, based on IP addresses, were Greenville, South Carolina and Lynchburg, Virginia. *Id*. While this suggests that someone in Greenville was posting to SkipTheGames, but it does not provide a clear connection to the Defendant's October 2019 arrest and dismissed state charges.
[13] Again, the Court acknowledges that this is a contested point based on the motion to supplement the May 5 hearing. Dkt. 369.

information. Amid an ongoing and complex investigation, this does not strike the Court as dilatory.

The central problem with the Defendant's argument about the timing of the Government's communication with Greenville County officials is that it asks the Court to second-guess the FBI's investigative priorities in what the record shows was a wide-ranging and complicated sex trafficking case. The critical question here is not whether the Government *could* have contacted Greenville County sooner; it is whether it was *constitutionally obligated* to act more quickly. The Defendant suggests that the Government should have reached out to Greenville "at some point in the 9-months before the SANE kit was destroyed," Dkt. 330 at 14, but it is otherwise unclear when, exactly, he contends the Government was required to do so. He emphasizes that law enforcement had information about the dismissed case as early as February 2023, when it ran the Defendant's criminal history. *Id*. But the Court is not aware of any authority holding that the Government has a due process obligation to send preservation letters out to local law enforcement agencies for evidence related to prior cases whenever it obtains a suspect's criminal history. Requiring courts to look back and essentially set *post facto* deadlines of when the Government should formally communicate with local law enforcement agencies about prior cases – including those involving *dismissed charges* – amid a complex investigation like this one would place the Court in the improper position of micromanaging criminal investigations. *See Lovasco*, 431 U.S. at 790-96 (discussing the latitude prosecutors have in conducting thorough investigations and determining whether, and when, to seek indictments). In *Lovasco*, the Supreme Court also observed that "if courts were required to decide in every case when the prosecution should have commenced, it would be necessary for them to trace the day-by-day progress of each investigation. Maintaining daily records would impose an administrative burden

on prosecutors, and reviewing them would place an even greater burden on the courts." *Id*. at 793 n.14. A similar logic surely applies to why courts should generally refrain from deciding when discrete investigative steps should occur.

While the Defendant's frustration over the missing SANE kit is understandable, the Court must also consider how federal law enforcement operated in a larger investigatory context in which it prioritized what it believed to be active, ongoing trafficking activity across multiple states. It is entirely reasonable that events related to dismissed state charges were not a focus of the investigation until later in 2023. As the Fourth Circuit has explained, "[t]he wheels of government bureaucracy may, at times, seem to turn at a frighteningly slow pace, but careful investigation and consideration prior to the bringing of criminal charges is generally a wise policy." *Automated Med. Labs., Inc*., 770 F.3d at 404. Indeed, in *United States v. Automated Medical Laboratories, Inc*., the Fourth Circuit observed that the Government "could possibly have acted with more dispatch in this case" – which involved a 45-month preindictment delay – but held that no due process violation occurred in the absence of "intentional delay" on the part of the Government or "reckless disregard of circumstances … suggesting that the delay would impair the [defendant's] ability to mount an effective defense." *Id*.[14] Similarly, while the Government *could* have sought information from Greenville County officials more quickly, it is not at all obvious that they *must* have done so. There are no allegations here of intentional delay by the Government for tactical advantage, nor does the record establish that the Government recklessly disregarded circumstances indicating that the Defendant would suffer prejudice to his defense on the conspiracy charge. The agents working on this case apparently did not even know

---

[14] The Fourth Circuit also held that the defendant in *Automated Medical Laboratories, Inc*. had only suffered "slight, possibly nonexistent, prejudice" because, among other reasons, the content of testimony from an unavailable witness was "highly speculative." 770 F.2d at 404.

about the underlying details and relevance of the October 2019 incident until, at the earliest, October 2023. And law enforcement did not know about the destruction of certain physical evidence until sometime after communicating with Greenville County officials on November 30, 2023. May 5 Hearing Trans. at 10. Once federal law enforcement contacted Greenville County, it took appropriate investigative steps, like interviewing AV4 in January, Dkt. 330-5, and obtaining the body camera footage and other evidence. *See* Dkt. 319 at 7 (Government brief reporting that "[o]n January 5, 2024, federal law enforcement took possession of crime scene photos of the October 19, 2019 incident and arrangements were made to later obtain the body worn cameras and vehicle cameras); Dkt. 330 at 2 n.1 (defense brief stating that the body camera footage "has been in the possession of the Government since January 30, 2024). The grand jury issued an indictment on Count One a week after AV4 testified before it on March 20, 2024. Dkt. 330-9; Dkt. 65. Taken together, these circumstances show that the Government engaged in a thorough and prompt investigation once the connection between its then-active case and the 2019 arrest was apparent.

Of course, the Defendant does not need to show an improper prosecutorial motive or intentional delay tactics to establish a due process violation. *See Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990). He needs to establish that continued prosecution violates "fundamental conceptions of justice" or "the community's sense of fair play and decency." *Uribe-Rios*, 558 F.3d at 358. In *Howell*, for example, the Fourth Circuit found that a preindictment delay for "mere convenience" fell short of this standard. 904 F.2d at 895. The Fourth Circuit also noted that prosecutors made "no assertion that the defendant's case was particularly complicated, or that the state was engaged in preindictment investigation," and thus, there was "no valid justification in this case for the preindictment delay that prejudiced the defendant." *Id*. Here, the

Government has done quite the opposite. It offers a number of reasons that this case is complicated: (1) the number of alleged victims, "many of whom had mental health and substance abuse issues who were often difficult to locate given their transient lifestyle;" (2) the interstate character of the suspected trafficking, which the Government alleges took place across five states; (3) the number of cellphones and social media sites at issue; and (4) the need to consult sex trafficking experts. Dkt. 319 at 20. The Government has also shown the multitude of steps it took as part of its preindictment investigation.

In reviewing the case law, the Fourth Circuit observes that "[i]f delay results from a protracted investigation that was nevertheless conducted in good faith, the Supreme Court has held that 'to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.'" *Uribe-Rios*, 558 F.3d at 358 (quoting *Lovasco,* 431 U.S. at 796). As noted earlier, *supra* at 6-14, the Defendant's alleged prejudice from the unavailable evidence is too speculative to show that he has suffered actual prejudice. But to the extent that he is "somewhat prejudiced," the delay at issue here does not violate due process because the Government's justifications outweigh the potential prejudice. Considering the lengthy prison sentence that a conviction on Count One could carry and the complicated nature of a multi-state sex trafficking investigation, the Government's preindictment investigation of Count One was consistent with conceptions of justice and community standards of fair play and decency. *See Lovasco*, 431 U.S. at 795 (noting that "[r]ather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition'

26

to that of 'mere speed.'" (citations omitted)). In sum, the Court finds that the Defendant's arguments – about the purported prejudice arising from the unavailability of certain evidence and the failure of the Government to communicate with Greenville County before November 30, 2023 – do not show that he was deprived of due process.

## **CONCLUSION**

The Defendant fails to show that the unavailability of certain evidence related to his 2019 arrest in Greenville County, South Carolina establishes actual prejudice to his defense on Count One of the Third Superseding Indictment. His arguments about the nature of the evidence and what it would have shown are simply too speculative. Even if he could establish actual prejudice, however, the Court still finds the Government's reason for the delay is justified. Continued prosecution will not violate fundamental conceptions of justice or the community's sense of fair play and decency. Accordingly, his motion to dismiss Count One, Dkt. 293, is **DENIED**. The Government's motion to supplement the May 5 hearing testimony of SA Echols, Dkt. 369, is also **DENIED**. The Court will enter an accompanying Order on this date.

Entered this  2nd  day of July, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

27