CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
August 05, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:24-cr-00008 |
| v. | **MEMORANDUM OPINION** |
| BRIAN LAMONT TURNER, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

The Defendant, Brian Lamont Turner, moves to suppress evidence obtained pursuant to six search warrants issued in January 2024. He contends that these warrants were issued based on information obtained from a cell phone search that this Court later determined to be unlawful. Accordingly, he argues that the January 2024 warrants lacked probable cause without the tainted information. He also contends that the Government's affidavits submitted in support of the search warrants were misleading and that a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) is now required. His motions are denied. As the Court explains below, the affidavits provided probable cause for the warrants separate from the information derived from the suppressed cell phone search. Additionally, the Defendant has failed to make the substantial preliminary showings to merit a *Franks* hearing.

## I. BACKGROUND

### A. Goose Creek Phone Incident

On July 7, 2023, the Defendant was involved in an altercation in Goose Creek, South Carolina in which he allegedly forced another individual out of a vehicle at gunpoint, entered the entered the vehicle, and drove away.[1] Dkt. 121 at 1-2. During this incident, the Defendant dropped his cellphone and left the scene without it. *Id*. at 2. The phone was turned over to Goose Creek Police Department, which determined that the phone was "found property" and placed it in storage. *Id*. Under the police department's policies, the owner would have had 60 days to retrieve "found property." *Id*. But, before the 60-day window closed, the GCPD turned the phone over to the FBI. *Id*. at 3. Specifically, on August 3, 2023, the FBI asked the GCPD to hold the phone for the FBI and the department gave the phone to the FBI on August 8, 2023. *Id*. FBI Special Agent Mary Echols – the lead agent on the Government's investigation into the Defendant's alleged sex trafficking activities – subsequently searched the phone without a warrant. *Id*.

The following year – *after* the Defendant was arrested and indicted in the instant case – this Court granted a motion to suppress the search of his cell phone. *Id*. It found that the Defendant had *not* abandoned his phone and that the warrantless search of the Defendant's phone violated the Fourth Amendment. *Id*. at 5.

This ruling, however, did not come until well after the Government took a multitude of other investigative steps. Thus, federal agents included information derived from the illegally suppressed cell phone (which the Court will simply refer to as the "Goose Creek Phone") in affidavits submitted in support of a series of search warrants in January 2024.

## B. Overview of Investigation

---

[1] The vehicle was later determined to be owned by the Defendant and local authorities did not prosecute the case when the alleged victim was uncooperative. Dkt. 121 at 1-2.

2

The Court recounts the timeline of the Government's investigation before and after the extraction of the Goose Creek Phone, which occurred on November 2, 2023.

Before the extraction, the Government's investigation into the Defendant was well underway. At an evidentiary hearing, Echols testified that the FBI opened its investigation in February 2023 after it received a report from the Lynchburg Police Department "about an adult female who disclosed sex trafficking by [the Defendant.]" Dkt. 360 (Mar. 13, 2025 Hearing Trans.) at 55:12-20. Between February and November 2, 2023, federal investigators took the following significant steps:

- Monitored postings on SkipTheGames – a commercial sex website – and utilized a web-scraping database to identify an account that was posting advertisements for several adult women. *Id*. at 56:16 – 57:3; *see also* Dkt. 327-1 ("Echols Declaration") at ¶¶ 9-12 (explaining how the web-scraping tool works and how law enforcement used it).

- Obtained records from SkipTheGames showing the email account (itsthatdrip@gmail.com), IP addresses, and other information associated with posts on the website. Mar. 13, 2025 Hearing Trans. at 57:4-22; *see also* Dkt. 388 (Memorandum Opinion denying motion to suppress SkipTheGames records).

- Issued 26 grand jury subpoenas seeking records like phone numbers, hotel records, social media accounts, Cash App, financial institutions, and Google account records. Mar. 13, 2025 Hearing Trans. at 58:12-25; *see also* Dkt. 388 (Memorandum Opinion denying motion to suppress Priceline records); Echols Declaration at ¶¶ 5, 13, 16, 19-20, 22, 27, 29-30, 33-34, 37, 41, 44 (describing subpoenas issued to various entities before the Goose Creek Phone extraction).

- Identified 15 alleged victims and interviewed three of them. Mar. 13, 2025 Hearing Trans. at 59:23-60:6; *see also* Echols Declaration at ¶¶ 24, 39, 44 (referring to interviews with alleged victims); Dkt. 287-2 (report summarizing federal law enforcement's interview with Alleged Victim 1 ("AV1") on August 9, 2023).

- Interviewed eight witnesses and sources. Mar. 13, 2025 Hearing Trans. at 60:7-10; *see also* Echols Declaration at ¶¶ 18, 27, 38, 42-43 (describing interviews with witnesses, including one who "admitted he was a commercial sex customer and purchased sex from [the Defendant's] victims").

- Communicated with 10 local jurisdictions in Virginia, North Carolina, and South Carolina regarding incidents in which hotels or individuals at the hotels reported suspected prostitution and drug-related activity involving the Defendant and adult women. Mar. 13, 2025 Hearing Trans. at 60:21-61:6; *see also* Dkt. 386 at 21 (Memorandum Opinion denying motion to dismiss Count One and discussing Government's communications with Stafford County, Virginia law enforcement in September 2023 regarding *nolle prossed* state charges)

- Compared records and linked different accounts with the Defendant. Echols explained that "within many of the online accounts we received, in addition to the subscriber information, we received IP logs for his online activity. And we were able to then compare the IP logs and locations, and oftentimes device information is included within those IP logs. We were then able to compare those to link [the Defendant's] accounts." Mar. 13, 2025 Hearing Trans. at 59:1-16; *see also* Echols Declaration at ¶¶ 14 (explaining that the FBI compared Google login IP address and SkipTheGames post IP address logs to determine that the user of the SkipTheGames account and

4

itsthatdrip@gmail.com "used many of the same IP addresses on the same dates"), 44 (noting that analysis of subpoena returns and account data, including "records from SkipTheGames, Google, CashApp, financial institutions, and social media," established links between online accounts and the Defendant).

Echols stated that the overall picture painted by the investigative work before November 2, 2023 led law enforcement to believe that the Defendant "was trafficking adult females primarily using drug coercion, and that he was regularly traveling interstate for the purpose of commercial sex." Mar. 13, 2025 Hearing Trans. at 55:23-56:1; *see also id*. at 59:18-22 (stating that analytical work of subpoenaed records showed that the Defendant "was regularly traveling interstate" and "facilitating commercial sex by booking hotel reservations, paying for the hotel reservations, and then traveling out of state, transporting the victims out of state to engage in commercial sex.")

Echols testified that she first learned about the Goose Creek altercation and the existence of the phone on August 2, 2023, when the FBI received a report from the GCPD. *Id*. at 61:12-20. Based on that information, she asked an agent in the FBI's Charleston office to find out from GCPD if it still had the phone and if anyone had claimed it. *Id*. at 61:21-25. Because nobody had claimed the phone, the FBI agent retrieved it from GCPD on August 8, 2023. *Id*. at 62:4-7. Echols said that based on the information she had received, GCPD had not searched the phone (and would not have been able to do so because it was password-protected). *Id*. at 62:8-15. Once the phone was in the FBI's possession on August 8, 2023, it was "put into evidence" and Echols submitted an extraction request for the phone. *Id*. at 62:4-20. The extraction was not completed until about three months later, on November 2, 2023. *Id*. at 62:21-25; *see also* Echols Declaration at ¶ 35 (reporting that after the FBI retrieved the phone from GCPD it was sent to the

FBI's Richmond Division and Echols submitted a request on August 15, 2023 for the bureau's Computer Analysis and Response Team ("CART") to extract the phone's data. "CART did not remove the cellphone from the evidence until room until November 2, 2023, and therefore the cellphone was not searched until that date.").

The phone extraction contained about a month of data, covering June 4, 2023 to July 7, 2023. Mar. 13, 2025 Hearing Trans. at 63:5-9. Echols stated that the phone provided "limited new information," such as "contacts in the phone and a few additional email addresses that [the Government] had not previously identified." *Id*. at 63:20-22. The extraction also contained text messages "which corroborated much of what the victims and witnesses had told [the Government] already." *Id*. at 64:1-2; *see also* Dkt. 287-1 at ¶ 16 (Echols's T-Mobile search warrant affidavit describing texts on the phone between the Defendant and an alleged victim, as well as messages with commercial sex customers). Moreover, the phone further corroborated the Defendant's travel and usage of SkipTheGames. Mar. 13, 2025 Hearing Trans. at 64:3-4; *see also* Dkt. 287-1 at ¶¶ 19-22 (Echols's T-Mobile search warrant affidavit summarizing how texts on the phone about the Defendant's travels to certain locations overlapped with SkipTheGames commercial sex advertisements and hotel reservations for the same places). Nevertheless, Echols testified that the Goose Creek Phone did not contain information that led law enforcement to identify new alleged victims, nor did it identify new places to search for evidence. *Id*. at 64:5-6, 21-23.

As a result of the Goose Creek Phone extraction, the Government issued four grand jury subpoenas[2] and made a discrete inquiry to SkipTheGames regarding two email addresses

---

[2] These included subpoenas to Verizon and T-Mobile for subscriber information for contacts in the Goose Creek Phone and two subpoenas to Google which included requests for information related to two Google email (Gmail) addresses found on the phone. Dkt. 327-1 ("Echols Declaration") at ¶ 50.

discovered on the phone (although law enforcement learned no SkipTheGames accounts were associated with the addresses). *Id*. at 64:7-20. The Government reports that it has "self-suppressed" all material "related to steps attributable to the [Goose Creek] Phone." Dkt. 327 at 23. As far as the Court is aware, the only outstanding issues involving the Goose Creek Phone are those related to its impacts on the January 2024 search warrants raised in the instant motions to suppress.

The investigation took a new turn in late December 2023 when the web-scaping database that the Government used to monitor SkipTheGames identified a post as possibly depicting a minor. Mar. 13, 2025 Hearing Trans. at 66:8-12. Echols testified that this was a key development that led the Government to take its investigation more "overt," meaning it would execute search warrants and arrest the Defendant. *Id*. at 67:4-22; *see also* Echols Declaration at ¶¶ 60-61 (explaining that the FBI's common practice is to use "less invasive investigative techniques, such as subpoenas and interviews of third parties" earlier in an investigation and that once an investigation is more developed, law enforcement will shift to more overt techniques, like the execution of search warrants, to preserve evidence).

## C. January 2024 Search Warrants

The Government sought several search warrants in January 2024 as part of its efforts to locate the Defendant and preserve evidence of suspected violations of 18 U.S.C. §§ 1591 (sex trafficking by force, fraud, or coercion) and 2421 (transportation for purposes of prostitution).

On January 3, 2024, Echols submitted an affidavit in support of a search warrant application seeking T-Mobile records for two cell phone numbers. Dkt. 287-1. The warrant application specifically sought historical stored communications records for both numbers,

including location information. *Id*. at 18. Moreover, the warrant application sought prospective data for a 30-day period for one of the phone numbers. *Id*. at 18-19. The requested information also included location data. *Id*. at 19. United States Magistrate Judge Joel C. Hoppe issued the warrant the same day. *Id*. at 1.

Then, on January 19, 2024, Echols swore out affidavits for two warrant applications related to a third cell phone number. These applications sought warrants (1) to use a cell-site simulator for a 30-day period to locate the cellular device associated with the number, Dkt. 290-1, and (2) to obtain from Verizon (a) historical stored telecommunications records associated with the number and (b) 30 days of prospective data, including location information. Dkt. 290-2. United States Magistrate Judge C. Kailani Memmer issued both warrants the same day. Dkt. 290-1 at 1; Dkt. 291-2 at 1.

Also on January 19, 2024, Echols filed a criminal complaint against the Defendant for allegedly violating 18 U.S.C. § 2421(a) in June 2023. Dkt. 3. Judge Memmer issued the arrest warrant on the same day.

On January 22, 2024, law enforcement located the Defendant at a Quality Inn hotel in Lynchburg. Dkt. 291-1 at ¶ 30.

On the same day, Echols sought two search warrants: (1) a warrant authorizing a search of the hotel room and any other room that may be associated with the Defendant, *id*. at 1, and (2) a warrant authorizing a search of the Defendant's "person," two target cell phones, and any additional cell phones found on the Defendant. Dkt. 292-1. This second warrant application sought express authorization for a forensic examination of the cell phones to obtain various records, including location data and communications related to sex trafficking, commercial sex,

and interstate travel. *Id*. at 23-24. Judge Memmer issued both warrants later that day. Dkt. 291-1 at 2; Dkt. 292-1 at 2.

On January 23, 2024, law enforcement attempted to arrest the Defendant at a residence in Charlottesville. He was uncooperative and barricaded himself inside the residence for 18 hours. *See* Dkt. 20 at 3 (Pretrial Detention Order summarizing the circumstances of the Defendant's arrest). Thus, law enforcement did not take him into custody until the following day, January 24, 2024. The owner of the property granted permission for law enforcement to search the premises, but "upon learning from the residence owner that [the Defendant had] recently paid cash for the use of a basement-level room," the Government sought a warrant[3] to authorize a search of the property's basement. Dkt. 294-2 at 1-2. The warrant application specifically sought evidence related to violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2421, including travel records, narcotics, money, weapons, items related to commercial sex, and electronic devices. Dkt. 294-1 at 21. Judge Memmer approved the basement search warrant on January 24, 2024. Dkt. 294-1 at 30.

### D. Motions to Suppress

The Defendant now seeks to suppress the fruits of the search warrants described in the preceding section. Dkts. 287, 290-92, 294. The "Probable Cause" sections of the corresponding search warrant applications largely feature the same information. The instant motions raise two core arguments. First, without information from the suppressed Goose Creek Phone, the search

---

[3] FBI Special Agent Scott W. Medearis authored the affidavit in support of the basement search warrant application. Dkt. 294-2 at 1. Medearis, however, cited to and incorporated by reference Echols's affidavit that was submitted in conjunction with the application for a warrant authorizing a search of the Defendant's person and any cell phones found on his person. *Id*. In discussing the various search warrants, the Court will generally refer to Echols as the relevant affiant.

warrant applications do not achieve probable cause. Dkt 287 at 2; Dkt. 290 at 2; Dkt. 291 at 1;

Dkt. 292 at 1; Dkt. 294 at 1-2. Second, the affidavits submitted in support of the warrants are

misleading or provide incomplete information made knowingly and intentionally or with reckless

disregard for the truth, in violation of *Franks v. Delaware*, 438 U.S. 154, 158-60 (1978). Dkt.

287 at 2; Dkt. 290 at 2; Dkt. 291 at 1-2; Dkt. 292 at 2; Dkt. 294 at 2.


## II. IMPACT OF SUPPRESSED CELL PHONE ON PROBABLE CAUSE

### A. Legal Standards

A key principle in Fourth Amendment jurisprudence is that the exclusionary rule does not

only apply to "primary evidence obtained as a direct result of an illegal search or seizure."

*Segura v. United States*, 468 U.S. 796, 804 (1984). It also applies to "evidence later discovered

and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Id*.

When illegally obtained information is presented in a search warrant affidavit, it can

invalidate the resulting warrant if the information proved "critical to establishing probable cause

for the issuance of the warrant." *United States v. Karo*, 468 U.S. 705, 719 (1984). But, the

warrant may nevertheless be valid "if sufficient untainted evidence was presented in the warrant

affidavit to establish probable cause." *Id*. (citing *Franks v. Delaware*, 438 U.S. 154, 172 (1978)).

Thus, "[w]hen a warrant is supported in part by evidence obtained in an unlawful search, [courts]

routinely exclude that evidence and consider whether probable cause exists based on the

remaining facts." *United States v. Felder*, 457 Fed. Appx. 316, 322 (4th Cir. 2011) (unpublished);

*see also United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011) (applying *Karo*); *United States

v. Moses*, 540 F.3d 263, 271 (4th Cir. 2008) (same); *United States v. Gillenwaters*, 890 F.2d 679,

(4th Cir. 1989) (affirming district court that excised improperly-obtained information from a

search warrant affidavit and considered the "totality of the circumstances presented in the untainted portion of the affidavit" to find probable cause existed to issue the warrant).

In determining whether a search warrant is supported by probable cause, a judicial officer's "task … is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

**B. Redaction of Affidavits**

The Government attached redacted versions of the warrant affidavits to its response and removed information that it has identified as derived from the Goose Creek Phone. Dkt. 327. The Defendant contends, however, that the proposed redactions are underinclusive in certain places.

*1. Target Cellphone 1 (Number Ending in 2995)*

First, in the redacted search warrant affidavit for T-Mobile records (3:24-mj-00001) for two cell phones – identified as "Target Cellphone 1" (number ending in 2995) and "Target Cellphone 2" (number ending in 0033), Dkt. 327-3 – the Defendant contends that the first sentence of paragraph 13 should be redacted. Dkt. 335 at 3-4. The sentence reads as follows:

> T-Mobile subpoena records reveal the telephone number 434-234-2995 for Target Cellphone 1 was registered to TURNER from June 5, 2023 to August 1, 2023.

Dkt. 327-3 at ¶ 13; *see also id*. at ¶ 12 (explaining that the Defendant left Target Cellphone 1 at the scene of an altercation in South Carolina on July 7). The Defendant contends that Echols could have only known about the Defendant's association with Target Cellphone 1 and that Target Cellphone 1 was the same as the Goose Creek Phone if it had examined the Goose Creek

Phone for identifying information. Dkt. 335 at 4; *see also id*. at 5 ("Even if the FBI did not conduct a forensic extraction of the phone prior to November of 2023, any access of the phone to obtain identifying information would be an unlawful search.").

The Defendant has provided no evidence that shows the Government conducted a search of the device or otherwise retrieved its identifying information prior to the November 2023 extraction. While questioning Echols at the evidentiary hearing, defense counsel suggested that analyzing a phone's SIM card could have provided certain identifying information about the device. Mar. 13 Hearing Trans. at 93:3-25. However, Echols was unfamiliar with the technical details of SIM cards, *id*. at 93:9-25, and there is nothing in the record that shows the Government did, in fact, analyze a SIM card before November 2023. Echols also testified that she did *not* obtain the number from the Goose Creek Phone. *Id*. at 68:22-24.

Echols explained that she learned about the phone number through a law enforcement database and that subpoenaed records from T-Mobile confirmed that the number was associated with the Goose Creek Phone. More specifically, Echols recounted that after learning of the Goose Creek incident on August 2, 2023, she quickly took steps to identify the phone number that the Defendant was possibly using. *Id*. at 68:5-7. She described law enforcement's process for identifying a number associated with the Defendant, which ended in "2995:"

> Oftentimes if a phone is registered to somebody by name, it will appear in some of the databases that we have access to. That was the case with this phone. We were able to identify the phone.

*Id*. at 68:7-10; *id*. at 94:5-12 (explaining that the database she used could provide "[a]ddresses, phone numbers, names, aliases, date of birth, Social Security, neighbor list," and "some criminal history information."). Echols stated that she did not obtain the number from the Goose Creek

Phone itself. *Id*. at 68:22-24; *see also id*. at 97:4-5 (explaining that the reason she believed the Defendant had used the 2995 number was based on database queries).

Based on the database results, Echols requested a subpoena for subscriber information and served it on T-Mobile on August 4, 2023. *Id*. at 68:10-21, 69:2-9. The T-Mobile records showed that the Defendant was the registered subscriber of the number between June 5, 2023 and August 1, 2023.[4] *Id*. at 68:12-13. Significantly, "toll records" for the number showed that around the time of the Goose Creek incident on July 7 the Defendant deactivated a device from the 2995 number and activated a new one.[5] *Id*. at 69:3-7; 95:11-14. This led investigators to believe that the Goose Creek Phone had been connected to the 2995 number. *Id*. at 95:15-16, 96:10-12. This was a logical and reasonable inference. Thus, when the FBI later retrieved information from the Goose Creek Phone in November 2023, the extraction only corroborated what investigators already knew. *Id*. at 97:15-25.

Accordingly, the first sentence of paragraph 13 of the T-Mobile Search Warrant is not derivative of the suppressed Goose Creek Phone and does not need to be redacted. This conclusion also applies to similar arguments the Defendant makes regarding the inclusion of this information in subsequent search warrant affidavits. Dkt. 335 at 13, 17-18.

## 2. Goose Creek Phone Messages and Interstate Travel

---

[4] The 2995 number was listed in a January 3, 2024 search warrant seeking historical stored telecommunications for the period of June 5, 2023 through July 8, 2023. Dkt. 287-1.

[5] T-Mobile records also showed that the 2995 number was deactivated on August 1, 2023, and that the Defendant started using a new number ending in "0033." Mar. 13, 2025 Hearing Trans. at 68:25-69:9, 78:12-79:3. This number was later listed in the January 3, 2024 T-Mobile search warrant. Dkt. 287-1.

The second proposed redaction applies to a sentence that appears in the warrant affidavits related to the Quality Inn, a search of the Defendant and cell phones on his person, and the basement. Dkt. 335 at 15, 17-18. In those affidavits, Echols wrote the following:

> Based on my review of subpoenaed records *and messages*, it appears TURNER has a "circuit" wherein he travels across various states with his victims for purposes of engaging in sex trafficking activities.

Dkt. 327-6 at ¶ 23; Dkt. 327-7 at ¶ 19; Dkt. 327-8 at 19 ¶ 19[6] (emphasis added).

The Defendant contends that this sentence must be redacted because the "messages" were derived from the tainted Goose Creek Phone. The Court agrees that, in context, the "messages" are from the Goose Creek Phone. Nevertheless, other information that plainly support the "circuit" allegation plainly appear in the affidavits. Records related to Priceline (a hotel reservation website) and Cashapp (a money transfer service) support the assertion that the Defendant had a "circuit" of travel because the reservation records and IP addresses for Cashapp transactions coincide with the geographic area associated with IP addresses for SkipTheGames advertisements. *See* Dkt. 327-6 at ¶¶ 24-27 (describing how records related to Priceline reservations, SkipTheGames posts, and Cashapp transactions were associated with specific geographic locations in North Carolina, South Carolina, and Virginia between June 11, 2023 and June 19, 2023); Dkt. 327-7 at ¶¶ 20-23 (same); Dkt. 327-8 at 19 ¶¶ 20-23 (same). These details – which were not derived from the Goose Creek Phone - are sufficient to support Echols's statement about a "circuit." Accordingly, the Court excises the words "and messages," but otherwise leaves the rest of the sentence at issue intact.

---

[6] As noted earlier, the Basement Warrant Affidavit incorporated by reference the affidavit submitted in support of the warrant for a search of the Defendant's person and cell phones found on his person. Dkt. 327-8 at 1 ¶ 1. When citing to this affidavit the Court also cites to the ECF page numbers for clarity.

**C. Probable Cause**

"Whether probable cause for a search exists is a 'practical, common-sense' question, asking whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (quoting *Gates*, 462 U.S. at 238). When assessing probable cause, a judicial officer may draw "reasonable, commonsense inferences" based on "the totality of the circumstances." *United States v. Richardson*, 607 F.3d 357, 371 (4th Cir. 2010). Probable cause is "not a high bar" and law enforcement officers "need not 'rule out a suspect's innocent explanation for suspicious facts' to obtain a warrant." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586, 588 (2018)).

With these principles in mind, the Court turns to evaluating the remaining information in the affidavits to determine whether they support a finding of probable cause. The Court relies on the Government's redactions, along with the one additional redaction about Goose Creek Phone "messages" noted above, to review the warrant affidavits excised of information from the tainted phone search.

*1. T-Mobile Search Warrant for Target Cellphone 1 (434-234-2995) and Target Cellphone 2 (757-240-0033) – Issued January 3, 2024 (Dkt. 327-3; see also case no. 3:24-mj-00001)*

As noted earlier, Echols submitted an affidavit in support of a search warrant seeking T-Mobile's records for Target Cellphone 1 and Target Cellphone 2 as part of its search for evidence regarding suspect violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2421 and to determine Turner's then-current location in January 2024.

The Government specifically sought historical stored telecommunications records for these numbers, covering certain facts about communications from the number (date and time of communications, the method of communications, and the source and destination of the communications) and location-related information (including E-911 Phase II data, GPS data, cell tower and sector-related data, "timing advance data," and records related to distance-to-tower measurements). Dkt. 327-3 at 16. The historical records would cover June 5, 2023 to July 8, 2023 for Target Cellphone 1 and July 8 through the then-present for Target Cellphone 2. *Id.* The Government also sought 30 days of prospective data – including location information - for Target Cellphone 2. *Id.* at 16-17.

The affidavit begins with Echols describing her professional background and an overview of the investigation dating back to February 2023. *See id.* at ¶¶ 5-6, 9-16. She explains at the outset that the FBI had identified a particular account on a commercial sex website known as "SkipTheGames" that had posted hundreds of advertisements of adult women throughout 2023. *Id.* at ¶ 9. These ads were posted in various parts of Virginia, North Carolina, South Carolina, Maryland, and Pennsylvania, with the most recent posts (at the time of the warrant application) dated December 26, 2023. *Id.* The account was registered to one of the Defendant's email addresses, itsthatdrip@gmail.com. *Id.* Subpoenaed records from Google had shown that the "itsthatdrip" Gmail account was a "recovery email address" for a different account, bturner229011@gmail.com, that was registered to the Defendant. *Id.* at ¶ 14.

The investigation overview also summarized information from an alleged victim – referred to as "AV1" – who claimed that the Defendant had transported her and other women from Virginia to other states for commercial sex. *Id.* at ¶ 10. The Defendant allegedly controlled various aspects of a commercial sex operation, including deciding which cities to advertise AV1,

posting ads of AV1, booking hotel reservations, paying for the hotel rooms, transporting AV1 in his vehicle, and staying in the parking lot or another room while AV1 saw commercial sex customers. *Id*. AV1 alleged that the Defendant received half of the proceeds and threatened to withhold narcotics from her if she failed to complete a commercial sex date. *Id*. at ¶¶ 10-11. Thus, she would participate in the dates to prevent sickness from drug withdrawals. *Id*. at ¶ 11.

Echols explained that T-Mobile subpoena records had shown that the phone number for Target Cellphone 1 was registered to the Defendant between June 5, 2023 and August 1, 2023, and that he activated a new number (Target Cellphone 2) on August 1, 2023. *Id*. at ¶ 13. The second number's association was Turner was further corroborated by Google records, which showed that the number was the "primary phone number" listed for two of his email accounts. *Id*. at ¶ 14.

Echols then described a pattern of interstate travel, in which the Defendant allegedly traveled with two women – identified as "AV1" and AV3" – for prostitution-related purposes in June 2023. Echols used reservation records and SkipTheGames posts, as well as IP address data for SkipTheGames, Priceline, and Cashapp to connect the Defendant to specific cities in North Carolina, South Carolina, and Virginia on particular dates that coincided with commercial sex ads for those locations. *Id*. at ¶¶ 17-22.

She also explained that during the FBI's investigation into the Defendant, she had contacted several local police departments in North Carolina that encountered the Defendant at hotels under suspicious circumstances. She specifically references a May 10, 2023 incident where a hotel in High Point, North Carolina contacted law enforcement about the Defendant and suspected prostitution. *Id*. at ¶ 24. Police saw condoms, lubricant, and evidence of drug use in the hotel room. *Id*. Additionally, on November 9, 2023, a hotel in Morrisville, North Carolina

contacted local law enforcement about an incident involving the Defendant and suspected prostitution. *Id*. Echols reports that SkipTheGames ads appeared in North Carolina on May 10, 2023 and November 9, 2023.

Echols stated that based on her training and experience, she "know[s] that traffickers routinely use cellular phones to engage in the target offense" and that "traffickers keep their cellphones with them while engaging in the Target Offenses." *Id*. at ¶ 23. Accordingly, she stated that she believed the target cellphones "have been, currently are, and will continue to be used in connection with and in furtherance of" transportation for purposes of prostitution and sex trafficking. *Id*. at ¶ 8, *see also id.* at ¶ 25.

Given this abundance of information unrelated to the Goose Creek Phone, the affidavit provides probable cause to believe that the T-Mobile records would provide evidence related to the target offenses, particularly interstate transportation for prostitution purposes. The affidavit describes a pattern of travel in which the Defendant's hotel reservations match the locations of commercial sex ads posted by a SkipTheGames account associated with the Defendant, as well as IP address data for Priceline, SkipTheGames posts, and Cashapp transactions. Moreover, the allegation of him traveling for such purposes is bolstered by local police departments in North Carolina responding to suspected prostitution activity at hotels on at least two occasions and AV1's account of the Defendant transporting her from Virginia to other states, including North Carolina, for commercial sex. The fact that a SkipTheGames post was made on December 26, 2023 - shortly before the warrant application - suggests that the activity was ongoing. The totality of these circumstances creates more than just bare suspicion of the Defendant's possible involvement with the target offenses and certainly meets the probable cause standard, which is "not a high bar". *Bosyk*, 933 F.3d at 325.

The Defendant, however, contends that the affidavit failed to set forth probable cause.

He argues that the affidavit lacks a sufficient temporal connection between AV1's statements about how the Defendant treated her, Dkt. 327-3 at ¶¶ 10-11, and other events described in the affidavit - like posting advertisements on SkipTheGames and traveling to certain hotels. Dkt. 335 at 8. To be sure, the only dates associated with AV1 are in the statements regarding the Defendant's alleged interstate travel with AV1 and AV3 in June 2023. Dkt. 327-3 at ¶¶ 17, 18, 20, 23. The Court also acknowledges that "time is a crucial element of probable cause" such that "a valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *United States v. McCall*, 740 F.2d 1331, 1335-36 (4th Cir. 1984). But the Defendant overlooks how the affidavit alleges a pattern of *ongoing* criminal activity. Indeed, the affidavit notes that the Defendant's SkipTheGames account posted commercial sex advertisements just days before the warrant application. Dkt. 327-3 at ¶ 10. And, local police had responded fairly recently, in November 2023, to suspected prostitution involving the Defendant at a hotel in Morrisville, North Carolina. *Id*. at ¶ 24.

While the affidavit could have more precisely defined the timeframe of AV1's allegations, her statements could be reasonably interpreted as generally describing the nature of her relationship with the Defendant in the context of prostitution activities and providing corroboration for the allegation that the Defendant and AV1 traveled from Virginia to South Carolina, where the Defendant posted advertisements of her on June 15 and 16, 2023 in Myrtle Beach. *Id*. at ¶¶ 17-18, 20.

The Defendant also contends that the interstate travel portion of the affidavit, *id*. at ¶¶ 17-25, fails to (1) describe the contents of the alleged sex advertisements, (2) establish that AV1 and

19

AV3 were present in certain locations or had traveled with the Defendant for commercial sex, and (3) establish that he had done anything other than possibly be present at hotels on certain dates. Dkt. 335 at 10-11. However, a judicial offer may draw "reasonable, commonsense inferences" based on "the totality of the circumstances." *Richardson*, 607 F.3d 371 (4th Cir. 2010). For example, the Court does not need detailed descriptions or images of the underlying commercial sex advertisements to infer what is most relevant here – that the advertisements offered sexual services of specific individuals in exchange for something of value, like money. It can also be reasonably inferred when an individual appears in a commercial sex advertisement, it is likely for a place where they are (or intend to be) present and available to provide such services. Thus, a commonsense read of the allegations in paragraphs 17, 18, and 20 of the affidavit is that AV1 and AV3 traveled with the Defendant from Central Virginia – where ads depicting them were posted on June 9 and 10, 2023 – to Myrtle Beach, South Carolina, where ads were likewise posted just a few days later, on June 15 and 16, 2023.

Law enforcement is also not required to "'rule out a suspect's innocent explanation for suspicious facts' to obtain a warrant." *Bosyk*, 933 F.3d at 325. It may very well be true that the Defendant was merely at hotels on dates named in the affidavits and was not involved in any criminal activity at these locations. Indeed, if allegations about him booking hotels on Priceline or otherwise renting hotel rooms were viewed in a vacuum, they would not, standing alone, establish probable cause. But the Court must consider the *totality* of information. The fact that activity on SkipTheGames and Cashapp coincide with his hotel reservations contributes to probable cause about his involvement with the target offenses. The same is true of the fact that law enforcement twice responded to suspected prostitution activity involving the Defendant at hotels in May and November of 2023.

Finally, the Defendant argues the affidavit fails to connect Target Cellphone 2 – which the affidavit alleges that he activated on August 1, 2023 – with any alleged criminal activity and that it fails to establish that he even actually used the phone (instead of, for example, getting a phone for a family member). Dkt. 335 at 8-9. However, based on her training and experience, Echols included an important insight in the affidavit that underscores the importance of phones to the offenses at issue. She writes that "traffickers routinely use cellular phones to engage in the target offenses" and thus tend to "keep their cellphones with them" while engaging in sex trafficking or transportation for prostitution-related purposes. Dkt. 327-3 at ¶ 23; *see also id*. at ¶ 17 ("It is common for a trafficker to be the primary person to communicate with the customers and schedule the dates.") Thus, it is reasonable to conclude that the requested phone data for Target Cellphone 2 (as well as Target Cellphone 1) would have yielded information about the Defendant's travel patterns – which is directly relevant to the target offenses. The Defendant's argument that the Government failed to show he was using Target Cellphone 2 also does not carry much weight. The affidavit explained that subpoenaed records showed that he activated the number on August 1, 2023 and that it was the "primary phone number" for two Google email accounts. *Id*. at ¶¶ 13-14. A commonsense inference is that when an individual links a phone number to his own email address – including one that features his name, like bturner229011@gmail.com – he will normally use his own phone number. The affidavit sufficiently connected the Defendant to the phones and there was probable cause to believe that evidence of the target offenses would be found in the T-Mobile records.

In sum, the T-Mobile Search Warrant is still supported by probable cause even without the Goose Creek Phone information.

*2. Verizon Search Warrants for Target Cellphone 3 (434-439-8238) - Issued January 19, 2024*
*(Dkt. 327-5, see also case nos. 3:24-mj-00005, 3:24-mj-00006)*

On January 19, 2024, Echols submitted an affidavit in support of two search warrant applications seeking authorization (1) to use a cell-site simulator for a 30-day period to locate the cellular device associated with Target Cellphone 3 (434-439-8238), Dkt. 290-1, and (2) to obtain from Verizon (a) historical stored telecommunications records associated with the number and (b) 30 days of prospective data, including location information. Dkt. 290-2.

Both affidavits contain the same relevant information. The Court's conclusions about the redacted cell-site simulator affidavit, Dkt. 327-5, also apply to the warrant for cell-site data, E-911 Phase II data, and stored telecommunications records.

These affidavits are substantially similar to the earlier T-Mobile search warrant affidavit, but contain some updated information:

- Paragraph 3 explains that the Defendant was the subject of an arrest warrant issued January 19, 2024. Accordingly, Echols stated that the information related to Target Cellphone 3 would not only provide evidence of target offenses (18 U.S.C. § 2421(a) and 18 U.S.C. §1591) – it would also assist law enforcement in locating and arresting the Defendant.

- Paragraph 10 reports that the most recent SkipTheGames advertisement by the Defendant's account was made on January 17, 2024.

- Paragraph 25 explains that the T-Mobile search warrant returns showed that Target Cellphone 2 was likely no longer in use because activity for the phone "ceased around December 21, 2023." Based on the cell site information, the phone was "likely powered off" and "no longer communicating with the cell phone towers."

- However, paragraphs 26 and 27 explain why the Government believed the Defendant had started using a new number associated with Target Cellphone 3. Updated Priceline records showed that the number was added as a billing phone number for his account on December 15, 2023. Additionally, SkipTheGames records showed that starting on December 8, 2023, advertisements posted by the Defendant's account "were posted from a new device, an Apple iPhone, and from IP addresses hosted by Verizon Wireless." This carrier and device model were "consistent with Target Cellphone 3." The Defendant had also registered Target Cellphone 3 to an account used for messaging inmates at Middle River Regional Jail and had used the account to communicate with AV1 – who was held at the facility – on January 15, 2024.

- Paragraph 28 alleged that between December 2023 and the present, the Defendant continued to post SkipTheGames advertisements and "recently began posting a new victim which law enforcement is attempting to identify." His hotel bookings also allegedly overlapped with the cities identified in the sex ads.

The Defendant reiterates the arguments that the Court rejected above. Dkt. 335 at 13. He also argues that the new information fails to support probable cause.

He asserts that the references to hotel reservations and SkipTheGames posts in paragraph 26 "do not provide probable cause that the offenses of transportation nor trafficking are occurring or have occurred or that evidence of them is likely to be found in the phone records." Dkt. 335 at 13. But these paragraphs are not read in isolation. One of the affidavit's central allegations is that the Defendant posts commercial sex advertisements featuring female individuals to SkipTheGames, coordinates hotel reservations at these locations, and transports the individuals in the advertisements to the hotels for "dates" with commercial sex customers.

Dkt. 327-5 at ¶¶ 10-11, 18-24, 28. Records from Priceline and the SkipTheGames form part of the basis for this allegation and the fact that reservations continued to coincide with the cities listed in the ads, *id*. at ¶ 28, underscores this point. The connection between Target Cellphone 3 and these websites presents a fair probability that information about the phone's location (and other records related to the phone) would provide evidence of the target offenses.

The Defendant also contends that the information about him using Target Cellphone 3 to communicate with AV1 at a jail facility undermines probable cause because AV1 "is the only identified person in the affidavit who alleged that [the Defendant] was engaged in transportation or trafficking at some point with her." Dkt 335 at 14. Because she was incarcerated and not participating in commercial sex activity, there was less of a reason to obtain the phone records. *Id*. But AV1 is not the only relevant individual. The affidavit's analysis of interstate travel, for example, presents enough information about ads allegedly featuring AV1 *and AV3* being posted in multiple states and other corroborating information, including hotel reservation records, to raise a reasonable inference that the Defendant transported them for prostitution-related purposes in June 2019. Dkt. 327-5 at ¶¶ 18-24. The fact that AV1 was incarcerated in January 2024 also does not change that the affidavit alleges that the Defendant's SkipTheGames account was continuing to post commercial sex ads of at least one other individual. *Id*. at ¶¶ 10, 28. Moreover, reference to the Defendant using Target Cellphone 3 to communicate with AV1 corroborates that the phone number was, in fact, his.

Finally, the Defendant argues that paragraph 28 is "particularly troublesome" and largely conclusory because it asserts that the Defendant is "continuing to engage [in] the same pattern of criminal behavior" and fails to explain why law enforcement believes a new, unidentified individual in the SkipTheGames advertisements is a "victim." Dkt. 335 at 14. While the Court

need not place any weight on the Government's description of the Defendant's alleged conduct as a "pattern of criminal behavior," the fact that the Defendant was continuing to reserve hotels in the same cities as the sex ads supports probable cause because it is consistent with the allegation that he was facilitating transportation for commercial sex purposes. Paragraph 28 contains more than just mere suspicion in light of the ongoing overlap of the reservations and ads, as well as the prior specific instances of reservations, ads, and IP addresses coinciding. Dkt. 327-5 at ¶¶ 20-23. Echols's use of the term "victim" to describe an individual who recently appeared in the ads also does not undermine probable cause because, when read in the larger context of the affidavit, a reasonable inference is that the individual was a "victim" in the sense that they were being advertised in and transported to various localities to engage in prostitution. True, the Government could have included more details about this alleged victim. However, that was not essential for the probable cause determination.

When all of the information in the Verizon affidavits is considered, there was probable cause that the cell-site simulator and the historic and prospective cell-site data would yield evidence of the target offenses.

### 3. Quality Inn Search Warrant - Issued January 22, 2024 (Dkt. 327-6, see also case no. 3:24-mj-00009)

The affidavit submitted in support of a search warrant for any rooms associated with the Defendant at a Quality Inn in Lynchburg contains much of the same information as the T-Mobile search warrant affidavit. However, the following details are added:

- The most recent SkipTheGames ads were posted on January 21, 2024 for Lynchburg. Dkt. 327-6 at ¶¶ 14, 30.

25

- The Defendant "is routinely posting multiple women - including a new victim whom law enforcement is attempting to identify – on Skipthegames.com and booking hotel reservations in the corresponding cities in which he is posting the commercial sex advertisements." *Id.* at ¶ 29.

- Law enforcement surveillance located the Defendant at a Quality Inn in Lynchburg in the early morning hours of January 22, 2024. *Id.* at ¶ 30.

- Based on her training and experience, Echols states that "traffickers keep condoms, receipts from travel, multiple cell phones, and drug paraphernalia in the hotel rooms they rent." *Id.*

- At 3:40 p.m. on January 22, 2024, law enforcement observed the Defendant leave room 135 at the hotel before "a possible commercial sex customer" went into the same room. After the individual left, the Defendant pulled his vehicle up to the door and went inside the same room. *Id.* at ¶ 31.

- Echols alleges that during the investigation she has learned that the Defendant "typically rents two hotel rooms when he posts the female victims for commercial sex dates." *Id.* at ¶ 32. He stays in one room while the women see commercial sex customers in the other. *Id.*

The Government sought permission to seize evidence related to violations of the target offenses, including narcotics, travel records, money, weapons, condoms, lubricant, lingerie, and victims' clothing items, as well as electronic devices and their contents.

The Defendant raises several of the same arguments above about why the affidavit fails to state probable cause for the target offenses. Dkt. 335 at 15-16. For example, he contends that

the Government provided insufficient information about the new alleged "victim" and the alleged "pattern of criminal behavior." The Court's conclusions remain the same.

Additionally, he contends that the affidavit's allegations about how the Defendant was using the Quality Inn hotel room amounts to speculation and "wholly conclusory statements." *Id*. at 16. He contends that the fact that he was "seen at a hotel does not constitute probable cause to search." *Id*. But probable cause is not derived from his mere presence at a hotel. It is based on other critical information in the affidavit, including the overlap of bookings and the cities targeted by the commercial sex ads, Dkt. 327-6 at ¶ 29; *see also id*. at ¶¶ 24-26, the fact that the Defendant's SkipTheGames account posted ads for Lynchburg just one day before law enforcement located him at a hotel in Lynchburg, *id*. at ¶¶ 30-31, and the fact that law enforcement observed him leave room 135 before another individual entered the room and returned after the individual left. *Id*. at ¶ 31. All these facts, taken together, support the probable cause determination that there was a fair probability that evidence of the target offenses would be found in any rooms that the Defendant had rented.

### 4. Warrant to Search the Defendant's Person and Cellular Phones Found On Him - Issued January 22, 2024 (Dkt. 327-7, see also case no. 3:24-mj-00010)

The affidavit in support of a warrant authorizing a search of the Defendant's person and Target Cellphones 2 and 3, as well as any cellular phones on his person. The application sought express authorization for forensic examination of the phones to identify records related to violations of the target offenses.

This affidavit contains much of the same information as the Verizon cell-site simulator warrant application, with some differences. Most relevant here is that the affidavit includes the following details:

- Reports that on January 17, 2024 the Defendant's SkipTheGames account posted an advertisement for Charlottesville. Dkt. 327-7 at ¶ 10.

- Echols states that based on her trial and experience and information learned through the investigation, she believed the Defendant "may have multiple cell phones on him, including Target Cellphone 2 and Target Cellphone 3." *Id*. at ¶ 30. She cites a specific instance in April 2019, where law enforcement in Stafford County, Virginia investigated the Defendant for suspected sex trafficking. *Id*. When officers conducted a sting operation and arrested the Defendant at a hotel, he "attempted to destroy three cellphones by throwing them on the concrete." *Id*. In an interview with law enforcement, he identified the cellphones as belonging to him and two adult women. *Id*.

The Defendant's reply brief, addressing the redacted version of this warrant affidavit, states that "[f]or the same reasons argued in the sections above, the remainder of the affidavit does not set forth probable cause for the searches requested." Dkt. 335 at 17. The Court likewise adopts the same conclusions provided above. This affidavit, even without the Goose Creek Phone information, contained ample information to provide probable cause for the issuance of the warrant. The information about the Stafford County arrest only added to probable cause for this search because there was a reasonable belief that the Defendant would have multiple cellphones in his possession and may try to destroy them. The fact that this happened in 2019 does not render the information irrelevant or stale because of the strikingly similar nature of the

instant target offenses and the Stafford County investigation and the documented history of attempted evidence destruction.

## 5. Warrant to Search Basement at 858 St. Charles Avenue, Charlottesville, Virginia - Issued January 24, 2024 (Dkt. 327-8, see also case no. 3:24-mj-00013)

On January 23, 2024, law enforcement attempted to arrest the Defendant at a residence on St. Charles Avenue in Charlottesville. He refused to exit the basement of the residence and was not arrested until the following day.

Although the owner of the residence provided permission to search the residence, the owner also said that the Defendant had paid several hundred dollars to use the room in the basement. Accordingly, the FBI determined out of "an abundance of caution" that it would seek a warrant to authorize a search of the target basement. Dkt. 327-8 at 1-2, 4 ¶¶ 3, 13.

The affidavit, sworn out by FBI agent Scott W. Medearis, provides information about the circumstances of the Defendant's arrest and why law enforcement believed a search of the basement was necessary. The affidavit notes that a woman was in the basement with him during the barricade, other witnesses informed law enforcement that the Defendant contacted them while in the basement, that at least one individual had reported that the Defendant typically possessed a firearm, and that the owner said that the Defendant stored belongings in the basement. *Id*. at 3-4 ¶¶ 11-13. The affidavit also incorporates by reference the affidavit Echols had submitted in support of the search of the Defendant's person and cell phones in his possession. *Id*. at 1 ¶ 1.

As he did regarding the redacted affidavit for the search of the Defendant's person and cell phones, the Defendant also incorporates and reiterates previously raised arguments about

probable cause. Dkt. 335 at 17-18. Here, the Court would similarly find that the totality of the information in the basement search affidavit provided probable cause that evidence related to the target offenses would be found in the basement. The Court does *not*, however, address the merits the Defendant raises in his supplemental motion to suppress the fruits of the basement search warrant. Dkt. 394.

***

The Court finds that the Defendant's motions to suppress are sufficiently resolved through the analysis outlined in *Karo* – that is, by excising the tainted information and considering whether the remaining statements establish probable cause. 468 U.S. at 719. Here, there was ample information remaining in the redacted search warrant affidavits to establish probable cause such that the Goose Creek Phone information would not have affected the magistrate's decision to issue the warrant.

### D. The Government Would Have Sought The Affidavits Without The Goose Creek Phone

The Government suggested at oral argument that the Court should also conduct a second line of inquiry into whether the earlier illegal search affected law enforcement's decision to seek the search warrants. Mar. 13, 2025 Hearing Trans. at 124:19-125:1 (citing *Murray v. United States*, 487 U.S. 533 (1988) and *United States v. Hill*, 776 F.3d 243 (4th Cir. 2015)). *Murray* and *Hill* relate to the "independent source doctrine," which applies "when a 'search pursuant to [a] warrant was in fact a genuinely independent source of the information and tangible evidence' that would otherwise be subject to exclusion because they were found during an earlier unlawful search." *Hill*, 776 F.3d at 251 (quoting *Murray*, 487 U.S. at 542). This doctrine does not neatly map onto the instant case because the evidence was only obtained pursuant to warrants that

contained the Goose Creek Phone information. In *Hill*, however, the Fourth Circuit suggested that a single-step *Karo* analysis (i.e., excising tainted information from a warrant affidavit to consider whether probable cause exists without the evidence obtained from an illegal search) is insufficient "where the facts call into question whether an illegal search affected an officer's decision to seek a warrant." *Hill*, 776 F.3d at 252. To the extent that this is even an issue raised by the sequence of events in this case and the motions to suppress, the Court concludes that the Goose Creek Phone did not influence the Government's decision to seek a warrant.

At the evidentiary hearing, Echols stated that she would have sworn out the search warrant affidavits regardless of the information obtained from her review of the Goose Creek Phone. Mar. 13, 2025 Hearing Trans. at 69:10-12, 70:19-24, 73:12-19, 73:24-74:4, 76:19-77:5, 77:14-17. The Court finds this testimony credible for a multitude of reasons. By the time of the Goose Creek Phone extraction in November 2023, an extensive investigation was well underway. *See supra* at 3-5. Moreover, the phone itself provided only a small subset of information – about a month of data from 2023 in an investigation that covered events going back to 2019. *Id*. at 63:5-15. Investigators did not identify any new victims from the phone and it only corroborated what law enforcement already believed based on victim and witness interviews. *Id*. at 64:1-6. Information from the phone directly led to the issuance of four grand jury subpoenas and a separate inquiry to SkipTheGames, *id*. at 64:7-20, but there is no evidence that information derived from these sources appears in the redacted search warrant affidavits or is otherwise being used by the prosecution.

Indeed, it appears that the Goose Creek Phone information was only included in the affidavits as a matter of convenience and not out of necessity. Echols explained that "[i]t was more concise to include all of that information using one source of information versus over a

31

dozen sources of information to get at the same evidence." *Id*. at 77:8-10.  This is consistent with the following exchange at the hearing:

> Government: Did the information in the Goose Creek phone impact the trajectory of your investigation in any significant way?
>
> Echols: No.
>
> Government: And why is that?
>
> Echols: Because at that point in the investigation, we had served dozens of subpoenas. We had been tracking [the Defendant's] criminal activity throughout 2023. We had served all the subpoenas we could at that time. And we had a good grasp on what accounts he was using, how he was facilitating the commercial sex. We had already identified the patterns of his travel, and I think we were ready to go [overt] at that time because of that.

*Id*. at 64:24-65:10.

It is also hard to imagine that the absence of the Goose Creek Phone would have stopped or delayed the Government's application for the T-Mobile search warrant (or any of the subsequent warrants) because in December 2023 investigators were alerted to the presence of a possible minor in the SkipTheGames posts. As the Court understands the sequence of events, law enforcement's concern about the possible minor was the result of a database flagging a post, not the Goose Creek Phone. *Id*. at 66:3-17. It is entirely understandable and foreseeable that the FBI would have made its investigation more "overt" in response to this significant development. *Id*. at 67:15-19 (Echols stating that "as soon as we learned of the potential juvenile, that's when we got the ball rolling and we decided we were going to go ahead and go overt and seek those search warrants and arrest warrant.").

For all of these reasons, the Court finds that the Government would have sought these warrants regardless of the Goose Creek Phone extraction.

## III. A *FRANKS* HEARING IS NOT WARRANTED

The Defendant also alleges that the Government included misleading or incomplete

information in the affidavits knowingly and intentionally or with reckless disregard for the truth

in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). The information (or lack thereof) relate

to Echols' assertion throughout the affidavits that the Defendant "posted" ads to SkipTheGames

and her omissions of certain information about AV1. As discussed below, the Defendant fails to

make out the substantial preliminary showings to merit a *Franks* hearing.

### A. Legal Standards

A "*Franks* hearing" allows a defendant to attack a facially sufficient affidavit in a limited

range of circumstances. *Franks* protects against statements made knowingly, intentionally, or

with reckless disregard for the truth, as well as omissions designed to mislead or made with

reckless disregard of whether they would mislead. *United States v. Colkley*, 899 F.2d 297, 300-

301 (4th Cir. 1990).  At a *Franks* hearing, if a defendant establishes an affiant's material perjury

or recklessness by preponderance of the evidence, then the warrant "must be voided" and

evidence gathered pursuant to the warrant must be excluded. *Id*. at 300.

The standard for determining whether to hold a *Franks* hearing depends on whether a

defendant alleges that an affidavit contains affirmative false statements or omissions.

For affirmative false statements, the test is as follows:

> In order even to obtain an evidentiary hearing on the affidavit's
> integrity, a defendant must first make "a substantial preliminary
> showing that a false statement knowingly and intentionally, or with
> reckless disregard for the truth, was included by the affiant in the
> warrant affidavit."  This showing "must be more than conclusory"
> and must be accompanied by a detailed offer of proof. In addition,
> the false information must be essential to the probable cause
> determination: "if, when material that is the subject of the alleged

> falsity or reckless disregard is set to one side, there remains
> sufficient content in the warrant affidavit to support a finding of
> probable cause, no hearing is required."

*Id*. at 300 (citations omitted).

For omissions, the Fourth Circuit has articulated the following standards:

> To obtain a *Franks* hearing, a defendant must make a "substantial
> preliminary showing" to overcome the "presumption of validity
> with respect to the affidavit supporting the search warrant." When
> a defendant relies on an omission, this heavy burden is even harder
> to meet. In that situation, a defendant must provide a substantial
> preliminary showing that (1) law enforcement made an omission;
> (2) law enforcement made the omission "knowingly and
> intentionally, or with reckless disregard for the truth," and (3) the
> inclusion of the omitted evidence in the affidavit would have
> defeated its probable cause.

*United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021) (citations omitted). This showing also

requires a detailed "offer of proof." *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008).

## B. Discussion

### 1. Connection Between the Defendant and SkipTheGames Advertisements

Echols alleges throughout the affidavits that the Defendant "posted" commercial sex

advertisements for his victims to SkipTheGames. *See, e.g.*, Dkt. 327-3 at ¶¶ 18-23. He contends

that these are affirmatively false statements because they overstate what Echols could convey

with certainty. *See* Dkt. 335 at 21 (arguing that "Echols could not have known to the degree of

certainty in the affidavits that [the Defendant] made the specific postings that Echols used for

probable cause" because his ties to the SkipTheGames account and corresponding

itsthatdrip@gmail.com address were merely "circumstantial evidence" that he made the

postings.)

As an initial matter, the Court notes that the parties have different interpretations of whether the Defendant is arguing that the statements about his alleged posts are affirmative misrepresentations or misleading omissions. *See* Dkt. 327-12 at 38 n.14 (Government characterizing the arguments as alleging omissions); Dkt. 335 at 21 (Defendant describing Echols's statements as affirmative false statements). Under either rubric, his argument fails.

If the statement were construed as an affirmative false statement, he would need to make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Colkley*, 899 F.2d at 300. The Defendant has not made this showing.

First, although he asserts that "[t]he true facts do not establish that [he] posted, or even was aware of these posts, during the June 9, 2023 to June 2023 period [cited in the affidavits]," Dkt. 335 at 22, he has not alleged or presented sufficient concrete proof that would lead the Court to conclude that the references to him posting the ads are false. True, he has pointed to notes from an investigative interview in which AV1 said she had posted herself at some point in the past on SkipTheGames, Dkt. 287-2 at 2, and Echols acknowledged that a "verification selfie" used to create the itsthatdrip@gmail.com SkipTheGames account did not depict the Defendant, Mar. 13, 2025 Hearing Trans. at 92:8-13, but these facts are not incompatible with the Defendant posting the ads from the "itsthatdrip" account, as the Government alleges. It is unclear from the interview summary if AV1 specifically posted from the "itsthatdrip" account. Dkt. 287-2. It is important to note that AV1 also reported that both she *and the Defendant* posted ads on commercial sex websites. *Id*. at 3. It is also plausible that a "verification selfie" would not have featured the Defendant if the account was primarily posting women on a public-facing website. (Although, admittedly, the record related to the verification selfie is limited.) Based on the

limited information that the Defendant has produced on this matter, he has not made a "substantial preliminary showing" that a false statement appeared in the affidavit.

Second, the Court is not persuaded that the Defendant has made a substantial preliminary showing that Echols, at a minimum, included her statements with a reckless disregard for the truth. Indeed, her testimony suggests that she was only aware of the Defendant posting from the itsthatdrip@gmail.com SkipTheGames account:

> Defense Counsel: And you're aware that other people than Mr. Turner were posting on that itsthatdrip@gmail.com account, correct?
>
> Echols: No, I don't know that.

Mar. 13, 2025 Hearing Trans. at 92:14-16. The affidavit also included information explaining how Echols had linked the SkipTheGames account affiliated with the "itsthatdrip@gmail.com to the Defendant. That is, it stated that the SkipTheGames account was registered to the "itsthatdrip" Gmail address as the "recovery email address" the Defendant's other email account, bturner229011@gmail.com, Dkt. 327-3 at ¶ 14, and, the overlap between the advertisement locations and the Defendant's hotel reservation records provided further corroboration. *See, e.g., id*. at ¶ 19 ("The IP Addresses for the Priceline reservation and Skipthegames advertisements resolve to the area of Cary, North Carolina.").

The Defendant argues that the information connecting the Defendant with the "itsthatdrip" Gmail address and SkipTheGames account is nothing more than circumstantial evidence. Dkt. 335 at 21. This necessarily raises the question of what the Government knew about the Defendant's relationship to these accounts and suggests that the misleading "omissions" framework under *Franks* is a better fit for his contention that the Echols failed to provide sufficient information to support the assertion that the Defendant made the posts. Under

this approach, he would need to "provide a substantial preliminary showing that (1) law enforcement made an omission; (2) law enforcement made the omission 'knowingly and intentionally, or with reckless disregard for the truth,' and (3) the inclusion of the omitted evidence in the affidavit would have defeated its probable cause." *Haas*, 986 F.3d at 474.

Of course, law enforcement "cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Colkley*, 899 F.2d 300. Indeed, affidavits often just summarize relevant information known to investigators. But if the omitted information about the Defendant's connections to the SkipTheGames and "itsthatdrip" accounts were included in the affidavits, the following details would have been relevant:

- SkipTheGames informed the FBI that the account posting the ads was linked to the itsthatdrip@gmail.com address. Echols Declaration at ¶ 11.

- Multiple witnesses, including an alleged victim, corroborated that ads posted by the "itsthatdrip" account were posted by the Defendant. *Id*. at ¶ 12; *see also id*. at ¶ 18 (adult male witness identifying a SkipTheGames advertisement as posted by the Defendant).

- A subpoena to Google revealed that the "itsthatdrip" account was created in November 2022 and the subscriber name was "Yeah Yeah." *Id*. at ¶ 13. "Yeah Yeah" was the display name for social media accounts associated with one of the Defendant's phone numbers. *Id*. at ¶ 25. The Defendant's Facebook account also had a display name of "Yeah Yeah." *Id*. at ¶ 37.

- Google login IP address logs for the "itsthatdrip" Gmail account and SkipTheGame post IP address logs showed that the user of the "itsthatdrip" Gmail and the SkipTheGames account used the same IP addresses on certain dates. *Id*. at ¶ 14.

- Subpoenaed bank records showed a transaction for an Airbnb purchase and Airbnb subpoena records showed, in turn, that the account making the reservation was linked to itsthatdrip@gmail.com. *Id.* at ¶ 37.

- SkipTheGames alerted the FBI in March 2023 that the user of the "itsthatdrip" account made another SkipTheGames account using a different Gmail address, heatw453@gmail.com. This new account did post any advertisements but SkipTheGames indicated that the same device and phone number were used for both accounts. Subpoenaed Google records for the "heat2453" account showed two phone numbers linked to the account: 434-989-8408 and 434-282-3593. The Government later connected the Defendant to these phone numbers with subpoenaed records. *Id.* at ¶¶ 15-16.

If this abundance of information was inserted into the affidavits, it would only bolster the probable cause determination.

The Defendant argues that these pieces of information would underscore that Echols "was making assumptions" that he made the SkipTheGames posts in question. Dkt. 335 at 23. But a reasonable view of the totality of this information is that the Defendant was posting from the "itsthatdrip" account. To the extent that Echols made any sort of error or was imprecise in her language, it surely did not rise to the level of reckless disregard of whether her statements would be misleading. "An officer acts with reckless disregard when she fails to inform the magistrate of facts she subjectively knew would negate probable cause." 986 F.3d at 475. Here, none of the facts relevant to the Defendant's connections with the "itsthatdrip" Gmail account and SkipTheGames account would have negated probable cause.

In sum, the Defendant has failed to make the required showings to merit a *Franks* hearing related to the affidavits statements about him posting to SkipTheGames.

**2. Omissions About AV1's Credibility**

The Defendant also contends that the affidavits made material omissions regarding AV1's

credibility that, in turn, made the affidavits misleading. The omissions include (1) purported

discrepancies between a summary of AV1's statements to law enforcement and her grand jury

testimony about how the Defendant controlled her drug use, (2) AV1's criminal history and the

fact that AV1 was facing state drug charges at the time of her August 2023 interview, and (3)

AV1 representing that she had, at some point, posted her own advertisements on SkipTheGames.

Dkt. 287 at 22; Dkt. 335 at 23-25.

The information about AV1 that is primarily at issue is found in paragraphs 10 and 11 of

the T-Mobile search warrant affidavit (and corresponding paragraphs of the other affidavits):

> 10. During an interview with Adult Victim 1 (hereinafter referred
> to as "AV1"), AV1 disclosed that TURNER transported her and
> other adult females from Virginia to various states to include North
> Carolina and South Carolina to engage in commercial sex.
> TURNER decided which locations AV1 was advertised in and
> posted commercial sex advertisements of AV1 on
> SkiptheGames.com. TURNER also made hotel reservations and
> paid for the hotels used to facilitate the commercial sex.
> Additionally, TURNER determined AV1's schedule and provided
> AV1 with drugs. TURNER transported AV1 in his vehicle, a blue
> Ford Mustang, and stayed in the parking lot or in another hotel
> room while AV1 saw the commercial sex customers. AV1 was
> required to give half of her money from the "dates" to TURNER.
>
> 11. Additionally, the investigation has revealed that TURNER uses
> narcotics to coerce his female victims to engage in commercial
> sex. Most of his victims are addicted to narcotics and TURNER
> controls their drug use in order to get them to follow his
> instructions. For instance, AV1 describes TURNER threatening to
> withhold drugs if she did not complete a commercial sex date. In
> order to prevent drug withdrawals, AV1 would complete the dates.

Dkt. 327-3 at ¶¶ 10-11.

In evaluating the purported omissions, the Court concludes that inclusion of the information would not have defeated probable cause.

First, the Defendant contends that AV1 has provided inconsistent statements about whether he was exploiting her drug addictions to force her to engage in commercial sex. He contends, in essence, that the summary of AV1's August 2023 interview with law enforcement paints the Defendant as helping her overcome drug-related issues, while the grand jury testimony suggested that the Defendant was encouraging her drug addiction. Dkt. 335 at 24-25.

In reviewing the record, the Court does not agree that such a stark discrepancy is present. In the interview with law enforcement, AV1 described how the Defendant gave her drugs, she did not have to pay for them, and at one point she used drugs every day. Dkt. 287-2 at 3. At the same time, the Defendant reportedly "limited her drug use because some would say that AV1 was irate on drugs" and "[c]lients wouldn't come back when she was acting that way." *Id*. AV1 reported that the Defendant helped her stop using heroin. *Id*. at 3. Later on, the summary notes that at some point while AV1 was working for the Defendant, she was using cocaine and would sleep every two days. *Id*. at 4. The Defendant "decided on AV1's schedule." *Id*. This does not paint such a clear picture of the Defendant as necessarily helping AV1 get off certain drugs for her own wellbeing. The account could also be consistent with limiting drug usage when she was going to be around customers to keep them happy, while also controlling her use of certain substances (cocaine) and keeping her away from others (heroin). In sum, the interview notes do not make the Defendant out to be someone who was selflessly helping AV1 live a drug-free life. Her allegation that the Defendant "decided" on a schedule where she would work for two full days while on cocaine suggests that he was exploiting her drug addiction.

40

When AV1 appeared before the grand jury after the law enforcement interview, she provided testimony, under oath, that when she was using drugs regularly she would get sick if she did not use drugs, Dkt. 287-4 at 11:23-12:6. She also testified that when she did not want to go on a date with a commercial sex customer, the Defendant would persuade her into doing it, by among other things, threatening to prevent her from having any more drugs. *Id*. at 24:3-14. She testified that she used "different drugs" that the Defendant gave her, including Percocets and meth. *Id*. at 24:18-25:9. AV1 said that the Defendant controlled her access to drugs through controlling her schedule, in that she would only get drugs if she slept after two days of being awake and taking commercial sex dates. *Id*. at 25:6-26:7. A reasonable inference from these statements is that drugs were used to incentivize sex work and AV1 risked becoming sick if she lacked access to the drugs.

This account is not in conflict with the law enforcement interview. Even if it is true that the Defendant helped AV1 stop using heroin and controlled her drug use to avoid upsetting customers, this is not inconsistent with her other allegations, namely that (a) that the Defendant facilitated her access to other substances, (b) he threatened to withhold drugs from her if she refused to take dates, and (c) drug usage played a significant role in her work schedule. To the extent that information regarding whether and how the Defendant controlled AV1's access to drugs was "omitted" from the affidavit and should have been included, it would have only strengthened probable cause by underscoring the role of narcotics in AV1's relationship with the Defendant and the coercive dynamics that can arise from controlling another person's access to drugs.

Next, the Defendant contends that AV1's criminal history and status as an incarcerated individual at the time of the August 2023 interview also undercut her credibility. As far as the

Court is aware, the state charges that AV1 faced at the time of her interview in August 2023 were unrelated to the instant case. Government counsel explained at oral argument that no promises were made to AV1 and her incarceration did not affect her interview or grand jury appearance. Mar. 13, 2025 Hearing Trans. at 158:15-21. The Defendant has not presented any evidence that calls these representations into question. The Defendant also asserts that the affidavit improperly omitted AV1's 2017 convictions for breaking and entering and larceny after breaking and entering and that AV1 had lied to law enforcement about her identity on at least one occasion. Dkt. 335 at 25. But the connection between these prior cases and AV1's credibility in the instant case is not obvious. Indeed, if information about the identity fraud were included in the affidavit, it would have contributed to probable cause because those facts show that AV1 lied about her real name to law enforcement when officers showed up to a hotel in North Carolina on November 9, 2023 to investigate suspected prostitution involving her, the Defendant, and another individual. *See* Dkt. 327-15.

Overall, the Court finds that if information about AV1's incarcerated status and other aspects of her criminal history had been included in the affidavits, such details would not defeat probable cause. This is not a case where much of the information in an affidavit comes from one informant. *See, e.g., United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016). And, other information presented in the affidavit, such as the analysis of interstate travel based on hotel, SkipTheGames, and Cashapp records, corroborated aspects of AV1's allegations related to traveling for commercial sex purposes and being posted on SkipTheGames. The criminal history would not have cast serious doubt on her reliability or the veracity of her statements given the totality of information in the affidavit. Because this information was of limited significance, (and, in the case of the false identification, could have bolstered probable cause for the warrants),

the Defendant has failed to make a preliminary showing that Echols withheld facts that "she subjectively knew would negate probable cause." *Haas*, 986 F.3d at 475.

Finally, the Court finds that the omissions of AV1's statements that she posted commercial sex advertisements for herself is not material to probable cause. The August 2023 interview summary notes that AV1 had, at some point in the past, posted herself on SkipTheGames, Dkt. 287-2 at 2, and both she and the Defendant "posted ads" to SkipTheGames and another website. *Id*. at 3; *see also* Dkt. 287-4 at 22: 8-9 (AV1 testifying to grand jury that both she and the Defendant had posted her on commercial sex advertisements). The Defendant seems to suggest that this information would have cast doubt on whether he made the various SkipTheGames posts attributed to him. However, there is no indication in these statements that AV1 specifically posted from the SkipTheGames account at issue – the one associated with the "itsthatdrip" Gmail address.  And, as discussed earlier, *supra* at 35-38, Echols was justified in drawing a connection between the Defendant and the posts when she drafted the affidavits. If a reference to AV1 posting herself on commercial sex ads was added to the affidavits, it would not have undermined probable cause. It would only further underscore AV1's prior involvement in commercial sex work, which is already apparent from the affidavit. Given that this information would not have affected the probable cause calculus, the Defendant also fails to make a substantial preliminary showing that Echols "omitted the information to mislead the magistrate judge or in reckless disregard of whether it would be misleading." *Haas*, 986 F.3d at 475.

## CONCLUSION

For the reasons provided above, the Defendant's motions to suppress and requests for a *Franks* hearing are **DENIED**. The Court will enter an accompanying order on this date.

43

Entered this <u>5th</u> day of August, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE