CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
10/30/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Case No. 3:24-cr-00008 |
| ) | |
| **BRIAN LAMONT TURNER** ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendant Brian Lamont Turner's Supplemental Motion to Suppress Fruits of the Search Warrant for the Basement, Dkt. 394. The motion is **DENIED**.

## FACTS

This matter involves Turner's second attempt to suppress evidence seized from the basement of 858 St. Charles Avenue pursuant to a search warrant issued on January 24, 2024. Turner previously moved to suppress this evidence in January 2025, arguing that the search warrant lacked probable cause without information derived from an unlawful cell phone search. Dkt. 294. On August 5, 2025, this Court denied that motion, finding that even after excising all information derived from that phone, the search warrant affidavit contained sufficient evidence to establish probable cause. *See* Dkt. 396 at 30.

Turner now raises a different ground for suppression of the same evidence, arguing that law enforcement unlawfully entered the house at 858 St. Charles Avenue to execute his arrest warrant without first obtaining a search warrant. Turner seeks to exclude (1) the black iPhone found on Turner after his arrest; (2) any evidence found during the basement search; and (3) Turner's phone seized from Adult Victim 3 ("AV3") who was with Turner during a prolonged standoff with law enforcement immediately before Turner's arrest. The Court incorporates the factual findings from its August 5, 2025 opinion which suppressed this evidence, and sets forth

additional facts relevant to the present motion.

On January 19, 2024, the FBI obtained an arrest warrant for Turner. On January 22, 2024, the FBI obtained a search warrant for (1) Turner's person and (2) cell phones found on Turner's person. During this time, the FBI located Turner at a hotel in Lynchburg, Virginia, which matched the location Turner used in various online advertisements. The FBI intended to arrest Turner in Lynchburg on January 23, 2024, but Turner left the hotel the night before, leaving behind two adult females whom the FBI believed to be working for him.

Eventually the FBI located Turner at 858 St. Charles Avenue, Charlottesville, Virginia. The FBI had no information about any connection that Turner had with the St. Charles address and had no knowledge that he lived there. At approximately 1:00 pm[1] on January 23, 2024, the FBI attempted to execute the arrest warrant at the house on St. Charles Avenue, but Turner refused to come out of the house or comply with requests that he voluntarily surrender. AV3 was in the house with Turner. An 18-hour standoff ensued with Turner in the house surrounded by law enforcement.

At approximately 1:45 pm, M.B., the owner of 858 St. Charles Avenue, arrived at the scene and gave FBI Special Agent Michael Mehnert verbal consent for agents to enter the house to arrest Turner. In doing so, M.B. asked that law enforcement refrain from breaking anything. M.B. gave agents a key to the side door on the main level of house and drew a map of the interior so agents would understand the rough layout of the main floor and basement. At approximately 2:39 pm, FBI agents entered the house and cleared the main level and the basement except the basement room where Turner and AV3 remained. FBI Special Agent Mary

---

[1] Unless otherwise noted, all times used in this Opinion refer to the Richmond Tactical Operations Center Incident Log submitted by the Government as part of the record. *See* Dkt. 417-1. Both parties relied on this log during the hearing before me.

Echols accompanied M.B. into the house to allow her to retrieve various personal items. M.B. did not revoke consent or object to the FBI's entry into the house at any point during the standoff. Likewise, neither the FBI nor any other law enforcement official sought a search warrant for Turner inside the house.

The following morning, at approximately 7:23 am, the FBI executed a partial breach of the basement entrance into the house and extracted AV3 from the basement. The FBI used flashbang grenades, Oleoresin Capsicum ("OC") spray, and other diversionary tactics to enter the basement and arrest Turner at 7:58 am. Law enforcement seized a black iPhone from Turner at the time of his arrest.

Around the time agents entered the basement to arrest Turner, FBI Special Agent Scott Medearis spoke with M.B. by phone who gave verbal consent to search the house and collect evidence. M.B. then arrived at 858 St. Charles Avenue and gave Agent Mehnert written consent to search the house. The timeline of events after M.B. gave written permission for law enforcement to search the house becomes important.

The FBI began photographing and searching the house at 8:53 am. Dkt. 410 at 4. At approximately 10:00 am, in an effort to lessen the burden of the search on M.B., Agent Medearis spoke with M.B. to determine which areas of the house Turner primarily occupied. *Id.* at 5; Dkt. 426 at 62–63. At that point, M.B. told Agent Medearis for the first time that she rented the basement to Turner. Upon learning this information, the FBI promptly stopped its search and sought a search warrant for the basement of the house.

Law enforcement submitted a warrant application to the magistrate judge to search the basement of the house. There was also a previously issued search warrant for a vehicle belonging to Turner that had not been executed. An officer with the vehicle warrant called the agents at the

3

house and stated that he was bringing the warrant to search the vehicle. Agents then mistakenly believed that the basement warrant had been issued and resumed searching. At 12:19 pm the agents continued the basement search for approximately 15 minutes until they realized that the magistrate judge had not issued the warrant for the basement. Dkt. 410 at 5. Finally, at 12:54 pm, the magistrate judge orally approved the basement warrant, and the FBI continued the search. The warrant was timestamped at 1:05 pm. *Id.* at 6, 13.

FBI agents brought AV3 to the U.S. Attorney's Office after she was removed from the house and after arresting Turner. Agents then took her to UVA Health Hospital for medical treatment before returning to the U.S. Attorney's Office. At 12:00 pm, Agent Echols learned that AV3 had a phone belonging to Turner in her possession. Agent Echols then executed a previously issued warrant to search AV3 and seized Turner's phone with the number ending in -8238.

## **DISCUSSION**

On a motion to suppress, the burden is on the party who seeks to suppress the evidence to establish that the search or seizure violated his Fourth Amendment rights. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). "Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." *United States v. Hale*, No. 7:19-CR-004, 2023 WL 6465141, at *3 (W.D. Va. Oct. 2, 2023) (quoting *United States v. Bello-Murillo*, 62 F. Supp. 3d 488, 492 (E.D. Va. 2014)), *aff'd*, No. 23-4769, 2025 WL 33132 (4th Cir. Jan. 6, 2025). "At a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *Id.* (quoting *Bello-Murillo*, 62

4

F. Supp. 3d at 492).

I.  **Consent**

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A well-recognized exception to the warrant requirement exists when officers obtain voluntary consent "from the individual whose property is searched . . . or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted).

Even if a third party does not have actual authority to consent, the search remains valid if officers reasonably believe that the third party has authority to consent. *Id.* at 188. An officer may reasonably rely on apparent authority to consent where "the facts available to the officer warrant a person of reasonable caution in the belief that the consenting party had authority." *United States v. Toyer*, 414 F. App'x 584, 588–89 (4th Cir. 2011) (citing *Rodriguez*, 497 U.S. at 188). In evaluating reasonableness, a court must view the facts "in light of the totality of the circumstances known to the officers at the time of the search." *United States v. Buckner*, 473 F.3d 551, 555 (4th Cir. 2007) (emphasis omitted).

Here, M.B. had actual authority to consent to the FBI's entry into the main level of the house and its subsequent search of that level and the search for Turner. M.B., as the owner of the house, provided a key to the side door on the main level, drew a map of the layout of the house, and had personal belongings in the house. There is no evidence that anyone other than M.B. owned the house.

Further, M.B. had apparent authority over the basement of the house. The FBI had no knowledge of Turner's recent rental arrangement with M.B. at the time of initial entry.[2] Thus, at

---

[2] At the hearing, Special Agent Josh Tidwell testified that the FBI did not know how Turner was

the time of the search, the information available to the FBI indicated that M.B. "owned the residence, could enter any room within it, and had common authority over the premises." *United States v. Johnson*, No. 94-5021, 52 F.3d 322, 1995 WL 227333, at *2 (4th Cir. May 10, 1995).

Turner argues that the circumstances were ambiguous as to whether M.B. had authority to consent such that the FBI should have inquired further. Specifically, Turner cites to the fact that the basement entrance was locked from the outside and that there was a locked bedroom within the basement where Turner was located. I am not persuaded by this argument.

First, the existence of locks, without more, would not lead a reasonable officer to conclude that M.B. rented the basement separately to a third party (such as Turner) as opposed to simply separating a section of the homeowner's property. *See United States v. Gardner*, 554 F. App'x 165, 167 (4th Cir. 2014) (finding apparent authority to consent to search of a locked storage room where the room "did not appear to be a private area used exclusively by one resident nor did [the third party] indicate to officers that it was such a place"). Second, M.B. gave the FBI permission to search the house multiple times without any express limitation on the scope of that consent. In fact, she drew a map of the house, including the basement, to assist the FBI with its entry and search. At no point before the FBI entered the basement did M.B. indicate that any portion of the house was off-limits or separately controlled by another party. *See United States v. Kinney*, 953 F.2d 863, 867 (4th Cir. 1992) (finding that officers acted under a reasonable belief of valid consent where the third party produced keys to a locked closet and gave no indication that the area was exclusively controlled by the defendant). Third, M.B. knew

---

associated with 858 St. Charles Avenue and therefore treated the house as a third-party residence—meaning that the FBI could enter the premises to arrest Turner either on the authority of a search warrant or with the consent of the owner. Special Agent Echols similarly testified that the FBI did not have a primary residence for Turner during its investigation.

of the specific circumstances justifying the FBI's presence—to arrest Turner and to search the house for evidence related to him. She also knew Turner was staying in her basement. Under these circumstances, a reasonable officer would understand M.B.'s consent in light of the obvious purpose of the search and would reasonably conclude that her consent extended to the basement where both the FBI and M.B. knew Turner had barricaded himself to avoid arrest. Taken together, these factors support the conclusion that the FBI reasonably relied on M.B.'s apparent authority to consent to search of the basement and search for Turner in the basement.

Turner next contends that even if the FBI reasonably relied on M.B.'s apparent authority to consent to the search of the basement, including the basement bedroom, it exceeded the scope of consent by using flashbang grenades, breaking the door to the basement bedroom, and causing other damage to M.B.'s house. However, there is no indication that M.B.'s request that officers not break anything was a condition that would revoke consent if violated. *Cf. Reynolds v. Camp*, No. 7:21-CV-00220, 2022 WL 945330, at *4 (W.D. Va. Mar. 29, 2022) ("[V]oluntary consent is valid until withdrawn.") (citing *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012)). The FBI's use of necessary force to effectuate Turner's arrest after an 18-hour standoff did not exceed the reasonable scope of consent to enter and arrest a barricaded suspect.

Because M.B. had actual authority to consent to the FBI searching her house and apparent authority to consent to the search of the basement, and the FBI reasonably relied on that consent, the entry into the basement to seize Turner was lawful. Accordingly, Turner's arrest and the search of his person pursuant to the valid search warrant were lawful, as was the initial search of the premises.

## II.     Validity of Search Warrant

The FBI promptly stopped the basement search and sought a warrant when M.B. told

Agent Medearis that Turner rented a portion of the basement. The application and affidavit in support of the search warrant for the basement relied on independent evidence from the FBI's investigation of Turner and did not include any information obtained from the initial search of the basement.

No doubt, the FBI wrongly resumed its search of the basement when a miscommunication led agents to believe that the magistrate judge had issued the warrant for the basement (when in fact the warrant was for Turner's vehicle). The search continued for 15 minutes before the agents realized that the magistrate judge had yet to issue the basement warrant. This error, however, does not warrant suppression under the Fourth Amendment. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). The 15-minute search was not the result of intentional disregard for constitutional requirements, but rather a mistake regarding the specific warrant the magistrate judge had issued. The agents suspended the search promptly once they realized their mistake and did not resume their search until the magistrate judge gave verbal consent to search the basement. Suppression of any evidence recovered from the basement is not justified under these circumstances. *See id.* at 144–45 (finding that suppression of evidence found based on a subsequently recalled warrant was not required).

Similarly, the discrepancy between when the search resumed at 12:54 pm upon the verbal consent of the magistrate judge and the warrant's timestamp of 1:05 pm also does not require suppression of any evidence seized from the basement. This ten-minute difference does not represent a constitutional violation of Turner's rights but is instead an administrative processing delay. *Cf. United States v. Cazares-Olivas*, 515 F.3d 726, 729–30 (7th Cir. 2008) (denying

…
…

suppression where oral approval of warrant was given). At best, from Turner's perspective, the magistrate had given verbal but not written permission to search the basement. But violations of Rule 41 of the Federal Rules of Criminal Procedure in the absence evidence that the search exceeded constitutional limitations do not justify exclusion. *Id.*

**III.     Inevitable Discovery**

The inevitable discovery doctrine permits admission of evidence that would have been discovered through lawful means. *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017) (citations omitted). The inevitable discovery doctrine permits evidence if "the prosecution [can] prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so." *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019) (emphasis in original) (citing *United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998)). In this case, even if I found that the basement search violated the Fourth Amendment, the inevitable discovery doctrine permits admission of the evidence.

Both prongs are satisfied here. The FBI legally could have obtained the evidence through the valid search warrant, which was based on independent evidence unrelated to any allegedly unlawful search. Indeed, the record reflects that the FBI secured such a warrant and that it intended to search only with proper authority, as demonstrated by the fact that it immediately stopped searching and sought a warrant upon learning that Turner rented a portion of the basement. *See United States v. Putt*, 990 F. Supp. 2d 571, 575–76 (E.D. Va. 2013) (applying the inevitable discovery doctrine where police sought and obtained a warrant once they were aware of contraband). The agents did not initially seek a warrant because they reasonably believed M.B. gave permission to search the entire basement. Once they realized the consent might not extend to the rented basement, they immediately sought proper authorization.

9

Turner's argument that the FBI had 19 hours to obtain a warrant but did not do so misses the point. The FBI reasonably relied on M.B.'s consent to search the house and only sought a warrant upon learning facts that called the scope of that consent into question. This demonstrates reasonable law enforcement conduct, not a deliberate effort to avoid warrant requirements.

**IV.    Attenuation**

Because the FBI's entry into the house was lawful based on M.B.'s consent, the subsequent seizure of Turner's phone from AV3 was also lawful. The FBI had obtained a search warrant for AV3's person and any phones in her possession prior to the standoff.

But even if entry into the basement to arrest Turner was unlawful, the phone seizure was sufficiently attenuated from any Fourth Amendment violation. Under the attenuation doctrine, courts consider "1) the amount of time between the illegal action and the acquisition of the evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002).

These factors weigh against suppression. Roughly four-and-a-half hours elapsed between when agents entered the basement and the seizure of the phone from AV3. While a few hours may be considered insubstantial, the second and third factors weigh in favor of admissibility. *See United States v. Torres*, No. 1:24-CR-2, 2024 WL 4038093, at *6 (N.D.W. Va. Sept. 4, 2024) (explaining that the timing factor is not determinative); *United States v. Belt*, 609 F. App'x 745, 749 (4th Cir. 2015). Multiple intervening circumstances occurred: AV3 left the basement on her own accord, received medical attention at the scene, and was transported to both the U.S. Attorney's Office and the hospital. While Turner argues that AV3 did not act voluntarily or independently, AV3 was never in custody, and there is no evidence that she was forced to interact with the agents. Lastly, there was no flagrant misconduct. *Cf. Brown v. Illinois,* 422 U.S.

10

590, 593, 605 (1975) (noting impropriety where officers broke into the defendant's apartment and held him at gunpoint). The FBI had a valid warrant for AV3 and her phones, and execution of the warrant was reasonable. *See Utah v. Strieff*, 579 U.S. 232, 240 (2016) (finding that existence of a valid arrest warrant attenuated the connection between unlawful conduct and discovery of the evidence).

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress the seizure of evidence from the basement of 858 St. Charles Avenue, Charlottesville, Virginia and the phones from Turner and AV3 in the Supplemental Motion to Suppress Fruits of the Search Warrant for the Basement (Dkt. 394) is **DENIED**.

It is so **ORDERED**.

Entered: October 30, 2025

*Robert S. Ballou*

Robert S. Ballou
United States District Judge